No. 18-3325

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

SHEILAR SMITH, et al.,

*Plaintiffs-Appellants*,

v.

OSF HEALTHCARE SYSTEM, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois,
No. 3:16-cv-00467-SMY-RJD
The Honorable **Staci M. Yandle**, Presiding

## PLAINTIFFS-APPELLANTS' OPENING BRIEF AND SHORT APPENDIX

**KELLER ROHRBACK L.L.P.**
Matthew Gerend (*Lead Attorney*)
Lynn L. Sarko
Laura R. Gerber
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

Ron Kilgard
3101 N. Central Ave., Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Karen L. Handorf
Michelle C. Yau
Mary Bortscheller
Scott M. Lempert
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel.: (202) 408-4600

*Counsel for Plaintiffs-Appellants*

(Additional counsel listed on inside cover)

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA  19087
Tel.: (610) 667-7706

**IZARD, KINDALL & RAABE, LLP**
Mark P. Kindall
29 South Main Street, Suite 305
West Hartford, CT  06107
Tel.: (860) 493-6292

*Counsel for Plaintiffs-Appellants*

# DISCLOSURE STATEMENTS

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

　　　[　] 　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

　　Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

　　and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　Mathew Gerend, Keller Rohrback L.L.P.

　　(see atched for additional counsel)

(3)　If the party or amicus is a corporation:

　　i)　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　list any publicly held company that owns 10% or more of the party's or amicus' stock:

　　　　N/A

Attorney's Signature: s/ Matthew Gerend　　　　　　　Date: 11/02/2018

Attorney's Printed Name: Matthew Gerend

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ✕　　**No** _____

Address: Keller Rohrback L.L.P.

　　　　1201 Third Avenue, Suite 3200, Seattle, Washington 98101

Phone Number: 206-623-1900　　　　　Fax Number: 206.623.3384

E-Mail Address: mgerend@kellerrohrback.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

   and All Others Similarly Situated, and on Behalf of the OSF Plans



(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   See Attached





(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A


Attorney's Signature: s/  Lynn L. Sarko                          Date: 12.07.2018

Attorney's Printed Name:  Lynn L. Sarko

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:  Keller Rohrback L.L.P.

          1201 Third Avenue, Suite 3200, Seattle, Washington 98101

Phone Number: 206-623-1900                     Fax Number: 206-623-3384

E-Mail Address: lsarko@kellerrohrback.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

   and All Others Similarly Situated, and on Behalf of the OSF Plans


(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   See Attached



(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A


Attorney's Signature: s/  Laura R. Gerber                    Date: 12.06.2018

Attorney's Printed Name: Laura R. Gerber

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: Keller Rohrback L.L.P.

   1201 Third Avenue, Suite 3200, Seattle, Washington 98101

Phone Number: 206-623-1900                    Fax Number: 206-623-3384

E-Mail Address: lgerber@kellerrohrback.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See Attached

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

    N/A

Attorney's Signature:  s/  Ron Kilgard                    Date:  12.06.2018

Attorney's Printed Name:  Ron Kilgard

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ⨉

Address:  Keller Rohrback L.L.P.

            3101 North Central Avenue, Suite 1400, Phoenix, Arizona 85012

Phone Number:  602-248-0088              Fax Number:  602-248-2822

E-Mail Address:  rkilgard@kellerrohrback.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

   and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   See Attached

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  s/  Karen L. Handorf                          Date:  December 6, 2018

Attorney's Printed Name:  Karen L. Handorf

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____   **No** ✕

Address:   Cohen Milstein Sellers &  Toll PLLC - 1100 New York Aveune, N.W., East Tower, STE. 500

      Washington, DC 20005

Phone Number: 202-408-4600                          Fax Number:  202-408-4699

E-Mail Address:  khandorf@cohenmilstein.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See Attached

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Michelle C. Yau                     Date: December 6, 2018

Attorney's Printed Name: Michelle C. Yau

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____    **No** ✕

Address: Cohen Milstein Sellers & Toll PLLC - 1100 New York Avenue, N.W., East Tower, STE. 500

Washington, DC 20005

Phone Number: 202-408-4600                     Fax Number: 202-408-4699

E-Mail Address: myau@cohenmilstein.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[    ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See Attached

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/ Mary Bortscheller          Date: December 6, 2018

Attorney's Printed Name: Mary Bortscheller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____     **No** ✕

Address:  Cohen Milstein Sellers & Toll PLLC - 1100 New York Avenue, NW., East Tower, STE. 500

Washington, DC  20005

Phone Number: 202-408-4600          Fax Number: 202-408-4699

E-Mail Address: mbortscheller@cohenmilstein.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See Attached

(3)   If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/  Scott M. Lempert                Date: December 6, 2018

Attorney's Printed Name: Scott M. Lempert

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** _____    **No** ✕

Address: Cohen Milstein Sellers & Toll PLLC - 1100 New York Avenue, NW., East Tower, STE. 500

Washington, DC  20005

Phone Number: 202-408-4600                Fax Number: 202-408-4699

E-Mail Address: slempert@cohenmilstein.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[    ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See Attached

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/ Mark K. Gyandoh                    Date: December 6, 2018

Attorney's Printed Name: Mark K. Gyandoh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ___X___

Address:  280 King of Prussia Road

Radnor, PA 19087

Phone Number:  (610) 667-7706                    Fax Number:  (610) 667-7056

E-Mail Address:  mgyandoh@ktmc.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3325

Short Caption: Smith v. OSF Healthcare System, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie Bailey, and Peggy Wise, on Behalf of Themselves

and All Others Similarly Situated, and on Behalf of the OSF Plans

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See Attached

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   N/A

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   N/A

Attorney's Signature: s/ Mark P. Kindall          Date: December 6, 2018

Attorney's Printed Name: Mark P. Kindall

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No ✕

Address: 29 South Main Street, Suite 305

West Hartford, Connecticut 06107

Phone Number: 860-493-6292          Fax Number: 860-493-6290

E-Mail Address: mkindall@ikrlaw.com

rev. 01/15 GA

*Attorneys for Plaintiffs-Appellants*

**KELLER ROHRBACK L.L.P.**
Matthew Gerend (*Lead Counsel*)
mgerend@kellerrohrback.com
Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Laura R. Gerber
lgerber@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900

**KELLER ROHRBACK L.L.P.**
Ron Kilgard
rkilgard@kellerrohrback.com
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088

**COHEN MILSTEIN SELLERS & TOLL, PLLC**
Karen L. Handorf
khandorf@cohenmilstein.com
Michelle Yau
myau@cohenmilstein.com
Mary J. Bortscheller, ARDC #6304457
mbortscheller@cohenmilstein.com
Scott Lempert slempert@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600

**ARMSTRONG LAW FIRM LLC**
Matthew H. Armstrong, ARDC #6226591
matt@mattarmstronglaw.com
8816 Manchester Road, No. 109
St. Louis, MO 63144
Tel: (314) 258-0212

**KESSLER TOPAZ MELTZER & CHECK, LLP**

Mark K. Gyandoh
mgyandoh@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706

**IZARD, KINDALL & RAABE, LLP**

Mark P. Kindall
mkindall@ikrlaw.com
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292

# TABLE OF CONTENTS

STATEMENT CONCERNING ORAL ARGUMENT ............................ xii

JURISDICTIONAL STATEMENT ........................................... 1

    I.    District Court's Jurisdiction ................................. 1

    II.   Appellate Court Jurisdiction ............................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 2

STATEMENT OF THE CASE ................................................ 3

    I.    Statutory Background ....................................... 3

        A.   ERISA's Pension Safeguards ....................... 3

        B.   The Church Plan Exemption ....................... 6

        C.   Informal Internal Revenue Service Opinions ........... 10

        D.   The Supreme Court's *Advocate* Decision .................. 12

    II.   Factual Background .......................................... 13

    III.  Procedural History ........................................... 17

SUMMARY OF ARGUMENT ............................................... 21

STANDARD OF REVIEW ................................................... 25

ARGUMENT ................................................................. 26

    I.    The Plans Are Not Church Plans Because They Are Not Maintained by a Permissible Entity. .................. 26

        A.   Only Two Types of Entities May Maintain a Church Plan. .............................................. 26

        B.   OSF Maintains the Plans. ........................... 29

i

C.     OSF Is Neither a Church nor a Principal-Purpose Organization. ................................. 33

D.     The Committees Do Not Maintain the Plans. .......................................................... 35

      1.     The District Court Applied an Erroneous, Acontextual Definition of "Maintained." ...................................... 36

      2.     The District Court Failed to Evaluate Which Entity Had the "Primary" Responsibility. .................................. 44

      3.     The District Court Ignored Genuine Factual Disputes Regarding Who Administers the Plans. ....................... 46

E.     Even If the Committees "Maintained" the Plans, They Are Not Principal-Purpose "Organization[s]." ....................................... 48

F.     The Informal Position of the IRS and Department of Labor Is Neither Controlling nor Persuasive. ......................................... 52

II.     The District Court Abused Its Discretion by Denying Plaintiffs' Rule 56(d) Request. ............................. 55

III.     Application of the Church Plan Exemption Is Unconstitutional. .............................................. 57

    A.     Religious "Accommodations" Must Eliminate Government Entanglement in Religion or Relieve a Substantial Religious Burden. ....................................... 59

    B.     Application of the Church Plan Exemption Does Not Eliminate Government

Entanglement in Religion or Alleviate a
Substantial Religious Burden. .................................... 64

    1.    ERISA Does Not Burden or Cause
            Entanglement in Religion. ................................ 64

    2.    Application of the Exemption Does
            Not Comport with Congress's Stated
            Purpose. ............................................................. 66

    3.    The District Court Mistakenly Relied
            on *Amos* and Other Valid Religious
            Accommodations. ............................................... 69

C.    A Religious Accommodation Must Be
      Measured to Avoid Burdening
      Nonbeneficiaries. ....................................................... 71

CONCLUSION .......................................................................... 73

# TABLE OF AUTHORITIES

## CASES

*Advocate Health Care Network v. Stapleton*,
137 S. Ct. 1652 (2017)..............................................................*passim*

*Anderson v. UNUM Provident Corp.*,
369 F.3d 1257 (11th Cir. 2004)......................................... 30, 31, 39

*Bankers Life & Cas. Co. v. United States*,
142 F.3d 973 (7th Cir. 1998)............................................................53

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................50

*Bowen v. Kendrick*,
487 U.S. 589 (1988)........................................................................67

*Burwell v. Hobby Lobby Stores, Inc.*,
134 S. Ct. 2751 (2014)..............................................................66, 72

*Butler v. Holy Cross Hosp.*,
No. 16-5907 (N.D. Ill.) ..................................................................12

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003)..........................................................62

*Christensen v. Harris Cty.*,
529 U.S. 576 (2000)..................................................................52, 53

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*,
413 U.S. 756 (1973)..................................................................64, 69

*In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wis. Steel*,
681 F. Supp. 512 (N.D. Ill. 1988)....................................................40

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*,
483 U.S. 327 (1987)................................................. 60, 61, 62, 69

*Estate of Cowart v. Nicklos Drilling Co.*,
    505 U.S. 469 (1992)........................................................40

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005)..................................................*passim*

*Diak v. Dwyer, Costello & Knox, P.C.*,
    33 F.3d 809 (7th Cir. 1994)............................................29

*Digrugilliers v. Consol. City of Indianapolis*,
    506 F.3d 612 (7th Cir. 2007)......................................61, 63

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*,
    687 F.3d 840 (7th Cir. 2012)..............................59, 60, 68

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006)........................................................37

*Easley v. Kirmsee*,
    382 F.3d 693 (7th Cir. 2004)..........................................57

*In re Estate of Muppavarapu*,
    836 N.E.2d 74 (Ill. App. Ct. 2005)................................66

*Evans v. City of Chicago*,
    689 F.2d 1286 (7th Cir. 1982)........................................58

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101 (1989)........................................................43

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987)................................................29, 31, 39

*Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*,
    885 F.3d 1038 (7th Cir. 2018)........................................59

*Golden Gate Rest. Ass'n v. City & Cty. of S.F.*,
    546 F.3d 639 (9th Cir. 2008)....................................31, 39

*Bd. of Educ. v. Grumet*,
    512 U.S. 687 (1994)........................................................60

*Hanshaw v. Life Ins. Co. of N. Am.*,
  2014 WL 5439253 (W.D. Ky. Oct. 24, 2014) ..................................................34

*Hibbs v. Winn*,
  542 U.S. 88 (2004)..................................................................................37, 50

*Hightower v. Tex. Hosp. Ass'n*,
  65 F.3d 443 (5th Cir. 1995)....................................................................32, 39

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999)......................................................................................39

*Jimmy Swaggart Ministries v. Bd. of Equalization*,
  493 U.S. 378 (1990)................................................................................64, 65

*John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*,
  510 U.S. 86 (1993)........................................................................................51

*United States v. Lee*,
  455 U.S. 252 (1982)......................................................................................72

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971)......................................................................................59

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996).............................................................................4, 5, 39

*Loughrin v. United States*,
  134 S. Ct. 2384 (2014)...........................................................................27, 50

*Lynch v. Donnelly*,
  465 U.S. 668 (1984)......................................................................................59

*McCreary Cty. v. ACLU of Ky.*,
  545 U.S. 844 (2005)................................................................................60, 67

*United States v. Mead Corp.*,
  533 U.S. 218 (2001)......................................................................................52

*Medina v. Catholic Health Initiatives*,
  877 F.3d 1213 (10th Cir. 2017)..............................................................*passim*

*Mercier v. Fraternal Order of Eagles*,
   395 F.3d 693 (7th Cir. 2005) ............................................................. 70

*Milwaukee Deputy Sheriffs' Ass'n v. Clarke*,
   588 F.3d 523 (7th Cir. 2009) ............................................................. 68

*Oconomowoc Residential Programs v. City of Milwaukee*,
   300 F.3d 775 (7th Cir. 2002) ............................................................. 25

*Owens v. St. Anthony Med. Ctr.*,
   No. 14-4068 (N.D. Ill.) ................................................................... 12

*United States v. Patel*,
   778 F.3d 607 (7th Cir. 2015) ............................................................. 25

*Rollins v. Dignity Health*,
   --- F. Supp. 3d. ----, 2018 WL 4262334 (N.D. Cal. Sept. 6, 2018) ........... *passim*

*Rose v. Long Island R.R. Pension Plan*,
   828 F.2d 910 (2d Cir. 1987) ......................................................... 5, 41

*Santa Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000) ....................................................................... 68

*Sanzone v. Mercy Health*,
   326 F. Supp. 3d 795 (E.D. Mo. 2018) ............................... 36, 37, 44, 50

*Sipma v. Mass. Cas. Ins. Co.*,
   256 F.3d 1006 (10th Cir. 2001) ......................................................... 35

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ....................................................................... 53

*Stalp v. Excellus Health Plan, Inc.*,
   2012 WL 3637257 (D. Neb. Aug. 22, 2012) ....................................... 40

*Stapleton v. Advocate Health Care Network & Subsidiaries*,
   No. 14-1873 (N.D. Ill.) ................................................................... 13

*Stapleton v. Advocate Health Care Network*,
   817 F.3d 517 (7th Cir. 2016) ..................................................... *passim*

*Sterk v. Redbox Automated Retail, LLC*,
   770 F.3d 618 (7th Cir. 2014)...........................................................25

*Texas Monthly, Inc. v. Bullock*,
   489 U.S. 1 (1989)................................................... 62, 63, 69, 71

*Thorkelson v. Publishing House of Evangelical Lutheran Church in
   America*,
   764 F. Supp. 2d 1119 (D. Minn. 2011).....................................51, 52

*Estate of Thornton v. Caldor, Inc.*,
   472 U.S. 703 (1985)...............................................................71, 73

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985)......................................................................64

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996)................................................................39, 43

*Wallace v. Jaffree*,
   472 U.S. 38 (1985)........................................................................62

*Walz v. Tax Commission*,
   397 U.S. 664 (1970).....................................................................69

*White v. Regester*,
   422 U.S. 935 (1975).....................................................................58

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001).....................................................................51

**STATUTES**

26 U.S.C. § 6110(k)(3) ........................................................................53

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1331....................................................................................1

29 U.S.C. § 1001(a) ..............................................................................4

29 U.S.C. § 1002(1) .............................................................................38

29 U.S.C. § 1002(2) .............................................................................38

29 U.S.C. § 1002(16) ................................................................ 29, 37, 38

29 U.S.C. § 1002(21) ...................................................................... 38

29 U.S.C. § 1002(33) ................................................................. *passim*

29 U.S.C. § 1003 ............................................................................. 5

29 U.S.C. § 1021 ............................................................................. 4

29 U.S.C. § 1022 ............................................................................. 4

29 U.S.C. § 1023 ............................................................................. 4

29 U.S.C. § 1024 ............................................................................. 4

29 U.S.C. § 1025 ............................................................................. 4

29 U.S.C. § 1026 ............................................................................. 4

29 U.S.C. § 1053 ............................................................................. 4

29 U.S.C. § 1083 .......................................................................... 4, 5

29 U.S.C. § 1104 ............................................................................. 4

29 U.S.C. § 1105 ............................................................................. 4

29 U.S.C. § 1106 ............................................................................. 4

29 U.S.C. § 1109 ............................................................................. 4

29 U.S.C. § 1132(a)(3) ................................................................... 46

29 U.S.C. § 1132(e)(1) ..................................................................... 1

29 U.S.C. § 1307 ............................................................................. 4

29 U.S.C. § 1321(b)(3) ..................................................................... 5

29 U.S.C. § 1322 ............................................................................. 4

29 U.S.C. § 1362 ............................................................................. 5

42 U.S.C. § 12113(d) ..................................................................... 70

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. I ....................................................*passim*

## RULES

Fed. R. Civ. P. 56(a) ...................................................25

Fed. R. Civ. P. 56(d) ...................................................*passim*

## LEGISLATIVE HISTORY

124 Cong. Rec. 10,464 (1978) ....................................9

124 Cong. Rec. 11,103 (1978) ....................................9

124 Cong. Rec. 12,106-07 (1978) .............................8, 67

125 Cong. Rec. 1,356 (1979) ......................................9

125 Cong. Rec. 10,052 (1979) ......................... 7, 8, 28, 67

126 Cong. Rec. 23,049 (1980) ....................................9

*Hearings Before the Subcomm. on Private Pension Plans & Emp. Fringe Benefits of the Comm. on Fin.*, 96th....................................28

S. Rep. No. 93-127, *reprinted in* 1974 U.S.C.C.A.N. 4838 (1973)...................4, 51

S. Rep. No. 93-383, *reprinted in* 1974 U.S.C.C.A.N. 4889 (1973)...............4, 6, 66

*Stenographic Transcript of Hearings Before the Comm. on Fin., U.S. S., Exec. Sess.*, 96th........................................10

## OTHER AUTHORITIES

29 C.F.R. § 2509.2015-01 (2015) ...........................65

41 Fed. Reg. 36,281 (Aug. 27, 1976) ......................53

Claire Hughes, *Retirees of Former Schenectady Hospital Face Pension Loss*, Times Union (Jan. 29, 2017) ....................12

DOL Field Assistance Bulletin No. 2018-01 (Apr. 23, 2018)................65

DOL Op. Ltr. 86-19A, 1986 WL 38856, at *1 (Aug. 22, 1986) ...........................54

Ellen E. Schultz, *IRS Nears Action on Church Pensions,* Wall St. J.
(June 5, 2010) ..............................................................................................11

IRS Gen. Couns. Mem. 39,007, 1983 WL 197946 (Nov. 2, 1982) ............ 10, 11, 53

IRS Priv. Ltr. Rul. 83-15-054, 1983 WL 198031 (Jan. 13, 1983) ...................11, 53

IRS Priv. Ltr. Rul. 86-12-068, 1985 WL 297663 (Dec. 26, 1985) ........................53

IRS Priv. Ltr. Rul. 2014-21-031, 2014 WL 2136100 (May 23, 2014) ..................53

John H. Langbein et al*., Pension and Employee Benefit Law* (5th ed.
2010) .............................................................................................................4

*Letting Pensions Go Broke*, NJ.com (Nov. 28, 2016)...........................................12

Rev. Proc. 2011-44, 2011 WL 4389043 (Sept. 22, 2011) .....................................11

Rev. Proc. 2018-1, 2018 WL 253644 (Jan. 2, 2018).............................................54

# STATEMENT CONCERNING ORAL ARGUMENT

Plaintiffs-Appellants ("Plaintiffs") respectfully submit that this case is appropriate for oral argument. This is one of several cases currently pending in federal courts involving an important issue of federal pension law: the scope of the statutory definition of a "church plan."[1] Church plans are exempt from the otherwise comprehensive federal regulation of pension plans, as set out in the Employee Retirement Income Security Act of 1974 ("ERISA").

This Court previously considered a threshold question regarding the church plan definition: whether every church plan must be "established" by a church. *See Stapleton v. Advocate Health Care Network*, 817 F.3d 517 (7th Cir. 2016). The Supreme Court subsequently granted *certiorari* and concluded that church plans need not be "established" by a church so long as they are "maintained" by a permissible entity. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017).

---

[1] *See, e.g.*, *Kaplan v. Saint Peter's Healthcare Sys.*, No. 13-2941 (D.N.J.); *Rollins v. Dignity Health*, No. 13-1450 (N.D. Cal.); *Cappello v. Franciscan All., Inc.*, No. 16-290 (N.D. Ind.); *Sanzone v. Mercy Health*, No. 16-923 (E.D. Mo.), *appeal docketed*, No. 18-3574 (8th Cir. 2018).

This appeal concerns two issues left unresolved by *Advocate*: which entities may maintain church plans and whether application of the church plan exemption to religious hospital systems, but not secular hospital systems, violates the Establishment Clause.

These questions are of critical importance to the current and former employees of OSF HealthCare System ("OSF") and other hospitals claiming to sponsor church plans, as these employees have been deprived of critical ERISA protections for their pensions. Plaintiffs believe that oral argument could assist the Court in resolving these issues.

# JURISDICTIONAL STATEMENT

## I. District Court Jurisdiction

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case is a civil action arising under the laws of the United States, including under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Establishment Clause of the First Amendment of the United States Constitution. The district court further had jurisdiction pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

## II. Appellate Court Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. This appeal is taken from the final decision and judgment of the district court entered on September 28, 2018, by the Honorable Staci M. Yandle, which granted summary judgment in favor of Defendants-Appellees ("Defendants") and disposed of all parties' claims. Short Appendix ("SA") at 1-18. Plaintiffs-Appellants ("Plaintiffs") timely filed their Notice of Appeal on October 26, 2018. Plaintiffs' Appendix ("A") at 968-71.

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    In concluding that the pension plans sponsored by Defendant OSF HealthCare System ("OSF") qualified for the statutory "church plan" exemption from ERISA coverage, did the district court misconstrue the meaning of the statutory term "maintained"?

2.    Did the district court err in concluding there were no genuine disputes of material fact regarding whether the pension plans sponsored by OSF were "maintained," not by OSF, but instead by OSF's internal benefit committees?

3.    Did the district court err in concluding that OSF's internal benefit committees qualify as "organizations" that may maintain a church plan?

4.    Did the district court abuse its discretion in denying Plaintiffs' Rule 56(d) request to defer Defendants' premature motion for summary judgment?

5.    Did the district court err in concluding that application of the church plan exemption is permissible under the Establishment Clause?

# STATEMENT OF THE CASE

This appeal concerns whether OSF, a multi-billion-dollar hospital system, can claim a narrow exemption from ERISA that Congress provided for "church plans." Plaintiffs Sheilar Smith, Kasandra Anton, Bonnie Bailey, Peggy Wise, and June Schwierjohn filed a class action against OSF and the fiduciaries of two pension plans that cover the employees of OSF and its affiliates: The Sisters of the Third Order of St. Francis Employees Pension Plan (the "OSF Plan") and the Retirement Plan for Employees of Saint Anthony's Health Center (the "SAHC Plan") (collectively, the "Plans"). Plaintiffs, who are participants in the Plans, seek a declaration that the Plans are not exempt from ERISA and seek injunctive and other relief requiring Defendants to fund, insure, and otherwise operate the Plans in accordance with ERISA. A129-44.

## I. Statutory Background

### A. ERISA's Pension Safeguards

Congress enacted ERISA following several highly publicized failures of private pension plans, recognizing that existing state and common law protections were insufficient to protect employee

retirement security.[2]  Prior to ERISA's passage, many employers made illusory pension promises.  Although they promised employees would receive defined benefit pensions upon retirement, many employers made inadequate or delayed contributions to their pension plans and then denied responsibility to pay promised benefits from corporate assets when plans fell on hard times.  *See supra* note 2.

Congress sought "to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  This was accomplished through several key ERISA safeguards, including minimum funding and vesting requirements, insurance of plan benefits through the Pension Benefit Guaranty Corporation ("PBGC"), and rules concerning reporting, disclosures, and fiduciary responsibilities.  *E.g.*, 29 U.S.C. §§ 1083, 1053, 1021-1026, 1104-1106, 1109, 1307, 1322.

---

[2] *See, e.g.*, 29 U.S.C. § 1001(a) (noting "the lack of employee information and adequate safeguards," the "inadequacy of current minimum standards," and the "depriv[ation] of anticipated benefits" due to "the termination of plans before requisite funds have been accumulated."); S. Rep. No. 93-127, *reprinted in* 1974 U.S.C.C.A.N. 4838, 4844-47 (1973); S. Rep. No. 93-383, *reprinted in* 1974 U.S.C.C.A.N. 4889, 4891-903 (1973); *see also* John H. Langbein et al., *Pension and Employee Benefit Law* 78-83 (5th ed. 2010).

Critically, with respect to defined benefit pension plans, Congress required employers to make ongoing contributions into trusts in amounts sufficient to fund current and *future* benefit obligations. *See id.* § 1083. Congress also prohibited employers from limiting their liability for unfunded benefits. *See id.* § 1362. These requirements sought to "[t]o increase the chances that employers will be able to honor their benefits commitments[.]" *Lockheed Corp.*, 517 U.S. at 887.

The scope of ERISA's reach is broad; it covers both for-profit and non-profit employers. *E.g.*, 29 U.S.C. § 1003. Congress exempted only two general categories of plans. One exemption is for governmental plans: i.e., plans sponsored by federal, state, and local governmental entities. *Id.* § 1003(b)(1).[3] The other exemption—the sole general exemption for plans sponsored by private employers—is for "church plan[s]." *Id.* § 1003(b)(2) (exemption from Title I of ERISA); *id.* § 1321(b)(3) (exemption from Title IV of ERISA).

---

[3] Congress exempted governmental plans based, in part, on federalism concerns and its recognition that "'the ability of the governmental entities to fulfill their obligations to employees through their taxing powers' was an adequate substitute for both minimum funding standards and plan termination insurance." *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 914 (2d Cir. 1987) (citations omitted).

## B.    The Church Plan Exemption

Congress exempted church plans to avoid "examinations of books and records" that "might be regarded as an unjustified invasion of the confidential relationship … with regard to churches and their religious activities."  S. Rep. No. 93-383, 1974 U.S.C.C.A.N. at 4965.  When ERISA was enacted in 1974, the statute defined a church plan as "a plan established and maintained for its employees by a church or by a convention or association of churches."  29 U.S.C. § 1002(33)(A)(i) (1974) (Plaintiffs' Addendum ("ADD") at 1) (As used herein, "church" includes "a convention or association of churches.").

At the time of ERISA's enactment, some plans established and maintained by churches covered both church employees and employees of church-associated agencies.  To ensure that these pre-existing plans were exempted from ERISA, the original statute provided that "a plan in existence on January 1, 1974, shall be treated as a 'church plan' if it is established and maintained by a church … for its employees *and employees of one or more agencies of such church*."  *Id.* § 1002(33)(C) (ADD1) (emphasis added).  But Congress included a sunset clause; that

provision "shall not apply … for any plan year beginning after December 31, 1982." *Id.*

Church groups had two primary concerns about this 1974 definition: (1) that the sunset provision would preclude church plans from covering employees of church agencies after 1982; and (2) that the requirement that all church plans be "established and maintained" by a church would exclude certain non-hierarchical, congregational denominations that used distinct financial services organizations (often called "pension boards") to maintain their pension plans. To address these concerns, Senator Talmadge and Representative Conable co-sponsored amendments to the church plan definition, which were enacted as part of the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364 (1980). This language adopted in 1980 remains current law. ADD2-3 (current version of statutory text).

With respect to the first concern (regarding employees of church agencies), Talmadge recognized that "Church agencies are essential to the churches' mission" and that church plans "have historically covered both ministers and lay employees of churches and church agencies." 125 Cong. Rec. 10,052 (1979) (ADD13). Talmadge noted that under the

1974 definition, "the churches must divide their plans into two so that one will cover church employees and the other, agency employees." *Id.* Because these agencies were small and financially dependent upon churches, Talmadge expressed doubt that "the agency plans would survive subjection to ERISA." *Id.* (unlike "a business," which would "pass[]" increased plan costs "on to the consumer," "[t]he incomes of most church agencies … are dependent solely upon tithes and other offerings."). Talmadge also recognized that "[m]inisters and lay employees have a unique need to be covered by one plan." *Id.* Conable shared these concerns. *See, e.g.*, 124 Cong. Rec. 12,107 (1978) (ADD7).

Accordingly, Talmadge and Conable proposed, and Congress enacted, a provision stating that an "employee of a church … includes … an employee of an organization … which is controlled by or associated with a church." 29 U.S.C. § 1002(33)(C)(ii)(II) (ADD2). Congress also provided that "[a] church … shall be deemed the employer of any individual included as an employee under clause (ii)." *Id.* § 1002(33)(C)(iii). The result was that a "church plan"—which is still defined as "a plan established and maintained … for *its employees*

… by a church," *id.* § 1002(33)(A) (emphasis added)—could continue to include employees of church-associated organizations indefinitely.[4]

With respect to the second concern of church groups (regarding congregational denominations that used separate pension boards to "maintain" their church plans), Talmadge and Conable proposed—and Congress enacted—language that amended the meaning of "[a] plan established and maintained … by a church" to include:

> a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits … for the employees of a church …, if such organization is controlled by or associated with a church[.]

29 U.S.C. § 1002(33)(C)(i) (ADD2).

Accordingly, a church plan may be "maintained" by either a church or a church-associated principal-purpose organization, such as a pension board. *See, e.g.*, 126 Cong. Rec. 23,049 (1980) (definition "clarified to include plans maintained by a pension board maintained by

---

[4] *See, e.g.*, 124 Cong. Rec. 10,464 (1978) (ADD4) (a church plan could "continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church."); 124 Cong. Rec. 11,103, 16,518-19 (1978); 125 Cong. Rec. 1,356, 10,042 (1979) (ADD5, ADD9-12).

a church") (ADD20); *Stenographic Transcript of Hearings Before the Comm. on Fin., U.S. S., Exec. Sess.*, 96th Cong. 40 (June 12, 1980) (statement of Talmadge) (definition would now "include church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church") (ADD29).

## C.    Informal Internal Revenue Service Opinions

In 1982, the General Counsel of the Internal Revenue Service ("IRS") issued a memorandum in response to two orders of religious sisters, which had submitted an *ex parte* request that benefit plans for their hospital employees be recognized as church plans for tax purposes. IRS Gen. Couns. Mem. 39,007, 1983 WL 197946 (Nov. 2, 1982).  Those plans were not maintained by any church and the IRS recognized that the plans would not qualify as church plans if they were maintained by the orders themselves.  *Id.* at *5.  However, citing the new language in subparagraph 33(C)(i) regarding plans "maintained" by principal-purpose organizations, the memorandum took the position that the plans could qualify as church plans for tax purposes if they were merely *administered* by a three-person administrative committee.  *Id.*  There was no public notice or opportunity for affected employees to comment,

and the memorandum itself instructed: "This document is not to be relied upon or otherwise cited as precedent by taxpayers." *Id.* at *6.

Beginning in the late 1980s, benefits consultants realized the possibilities of this IRS position for larger religiously affiliated hospital systems and encouraged them to set up internal committees to administer their plans. As these hospital systems sought their own "private letter rulings," the IRS never re-examined its view; it merely applied the same conclusions adopted by its general counsel in 1982. *See, e.g.*, IRS Priv. Ltr. Rul. 83-15-054, 1983 WL 198031 (Jan. 13, 1983). Before 2011—when the IRS first required advance notice to employees, *see* Rev. Proc. 2011-44, 2011 WL 4389043 (Sept. 22, 2011)—these hospital systems typically informed employees of the loss of ERISA protections years after the fact, if at all.[5]

The explosion of unregulated and uninsured "church plans" predictably led to plan failures of the sort ERISA was designed to prevent. In two 2012 cases that resulted in litigation, complaints

---

[5] *See, e.g.*, Ellen E. Schultz, *IRS Nears Action on Church Pensions,* Wall St. J. (June 5, 2010), https://goo.gl/6Obu5e.

alleged that employees suffered pension losses of 40-50%.[6]  Participants
of other underfunded plans operated as church plans have faced
significant reductions to accrued benefits.[7]

### D.    The Supreme Court's *Advocate* Decision

The Supreme Court recently addressed a threshold question
regarding the church plan definition.  Employees of three non-profit
hospital systems argued that although the 1980 amendments altered
which employees could be covered by a church plan and which entities
could maintain a church plan, Congress did not eliminate the basic
requirement that a church plan be "established" by a church.  This
Court agreed.  *See Stapleton v. Advocate Health Care Network*, 817 F.3d
517 (7th Cir. 2016).

The Supreme Court granted certiorari and reversed, concluding
that "[u]nder the best reading of the statute, a plan maintained by a
principal-purpose organization … qualifies as a 'church plan,' regardless

---

[6] *See Owens v. St. Anthony Med. Ctr.*, No. 14-4068 (N.D. Ill.); *Butler v.
Holy Cross Hosp.*, No. 16-5907 (N.D. Ill.).

[7] *See* Karin Price Mueller, *Bamboozled: How Catholic Hospitals Get
Away with Letting Pensions Go Broke*, NJ.com (Nov. 28, 2016),
https://goo.gl/7TGIkA; Claire Hughes, *Retirees of Former Schenectady
Hospital Face Pension Loss*, Times Union (Jan. 29, 2017),
https://goo.gl/QwjVMf.

of who established it." *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1663 (2017). The Supreme Court emphasized that the key to the church plan exemption is not the "one-time, historical event" of who "establish[ed]" a plan but instead whether a plan is "maintain[ed]" by a permissible entity, as "it is the entity *maintaining* the plan that has the primary ongoing responsibility (and potential liability) to plan participants." *Id.* at 1661.

*Advocate* did not consider the alternative reasons why plaintiffs' plans did not qualify as church plans, including that plans sponsored by hospital systems are not "maintained" by principal-purpose organizations. *See id.* at 1657-58 nn.2-3.[8]

## II. Factual Background

OSF is an Illinois non-profit corporation that operates eleven acute care hospitals as well as other health care facilities in Illinois and Michigan. A105, A122 ¶¶ 32, 124; A174, A189 ¶¶ 32, 124; A780, A783. One facility owned and operated by OSF is St. Anthony's Health Center, which is an Illinois nonprofit corporation that merged with OSF

---

[8] *Advocate* settled after remand, and neither this Court nor the district court in that case resolved the alternative arguments. *See Stapleton v. Advocate Health Care Network & Subsidiaries*, No. 14-1873 (N.D. Ill.).

in 2014 and has since been operated by OSF under the name OSF Saint Anthony's Health Center ("SAHC"). A105 ¶ 36; A175 ¶ 36. OSF also owns a for-profit corporation comprised of healthcare related businesses. A105 ¶ 32; A174 ¶ 32. As of 2016, OSF had net patient service revenues of $2.41 billion and assets of $3.49 billion. A100, A105 ¶¶ 17, 33; A174 ¶ 33. Like other large non-profit hospital systems, OSF relies upon revenue bonds to raise money. A106 ¶ 39; A176 ¶ 39; A914-16.

Although OSF claims an affiliation with the Roman Catholic Church, OSF is not itself a church and does not claim to be a church in its Form 990 tax filings with the IRS. A929 (claiming it is "[a] hospital or a cooperative health service organization"); *see also* A107 ¶ 45; A177 ¶ 45. OSF's Bylaws explain that the purpose for which OSF was organized was "to establish, acquire, support, erect, maintain, own, and equip health care providers and institutions" and to perform certain ancillary activities. A931. *Accord* A957 (OSF was founded "for the purpose of operating hospitals").

OSF's 18,000 employees have earned retirement benefits through the Plans, which are defined benefit pension plans. A100, A105, A108

¶¶ 17, 34, 56-59; A171-72, A175, A178-79 ¶¶ 17, 34, 56-59.  Plaintiffs

Anton, Bailey, and Wise were employees of OSF and are vested

participants in the OSF Plan.  A99-100 ¶¶ 15, 15.1-2; A170-71 ¶¶ 15,

15.1-2.  Plaintiffs Smith and Schwierjohn were employed by SAHC and

are vested participants in the SAHC Plan.  A98-99, A100 ¶¶ 14, 15.3;

A170, A171 ¶¶ 14, 15.3.  OSF admits it is the employer and plan

sponsor with respect to both Plans.  A110 ¶¶ 72-74; A180-81 ¶¶ 72-74.

OSF admits that it has the power to continue, amend, or terminate both

Plans.  A109 ¶¶ 63, 65-71; A179-80 ¶¶ 63, 65-71.

OSF currently operates the Plans as if they are ERISA-exempt

church plans.  A120 ¶ 115; A188 ¶ 115; *see also* A196-201.  But the OSF

Plan was previously operated as an ERISA-covered plan.  *See* A580-87.[9]

*See also* A588-91 (1985 statement reflecting OSF payment of PBGC

premiums).  In 1989—after receiving an informal, IRS private letter

ruling ("PLR") opining that the OSF plan was a church plan for tax

purposes, A395-401—OSF sought and received a refund of premiums it

had paid to the PBGC, A415-16; A597-602.  In 1992 OSF retroactively

_____

[9] OSF previously went by the name Sisters of the Third Order of St.
 Francis before it changed its name in 1989.  *See* A222-23.

amended the Plan to be a "church plan." A594-96. Similarly, although the SAHC Plan was operated as an ERISA plan beginning in 1976, A334, SAHC sought and received a PLR and PBGC refund in 1991, and thereafter ran the plan as a church plan, A402-14; A417-20; A715. Despite these changes, OSF continues to sponsor multiple *ERISA-governed* plans, including another pension plan. A734; A745-69; A772-74.

OSF admits it is responsible for funding both Plans. A111 ¶¶ 78-80; A181-82 ¶¶ 78-80. *See also* A66, A72; A258, A303-04; A340, A369-70, A379-80; A913. Yet OSF has left the Plans severely underfunded. As of 2016, the OSF Plan trust held assets sufficient to fund only 55.9% of the over $1 billion in accrued benefits. A514. Likewise, as of 2015, the SAHC Plan trust held assets sufficient to fund only 54% of the over $70 million in accrued benefits. A528.

The OSF Plan is purportedly administered by the Sisters of the Third Order of St. Francis Employees Pension Plan Administrative Committee ("OSF Plan Committee"). A 172 ¶ 18; A304 § 9.02. Yet meeting minutes reveal this committee met infrequently, for a combined total of 70 minutes between 2010 and 2017. A612-13; A636-

37; A640; A650; A670; A682-83; A702-03; A707-08.  Similarly, although the SAHC Plan is purportedly administered by the SAHC Retirement Committee ("SAHC Committee"), A 172 ¶ 19; A380-84 § 11.2-9, meeting minutes show that this committee met only twice since 2010, A728; A730.  (The OSF Plan Committee and SAHC Committee are referred to collectively as the "Committees.")

## III.  Procedural History

Plaintiffs alleged two alternative bases why the Plans are subject to ERISA.  First, they alleged that the Plans do not satisfy the statutory definition of a church plan because they are not "maintained" by a permissible entity.  A120-22, A129-31.  Specifically, because the Plans are maintained by OSF, a healthcare system, they cannot meet the statutory requirement that church plans be "maintained" by either a church or an organization whose "principal purpose or function" is "the administration or funding" of benefit plans for church employees. *See* 29 U.S.C. § 1002(33)(A), (C)(i).[10]  Second, Plaintiffs alternatively alleged that even if the Plans qualified as "church plans," application of the

_____

[10] Plaintiffs additionally alleged that the Plans failed to satisfy other aspects of the church plan definition.  This appeal addresses only the "maintained" requirement.

exemption to the Plans would violate the Establishment Clause. A125-26, A144-48. If Plaintiffs prevail on either theory, they are entitled to declaratory and other relief requiring the Plans to comply with ERISA.

After Plaintiffs filed suit in April of 2016, *see* Dist. Ct. Dkt. 1, a series of disputes ensued regarding venue and the consolidation of related cases, *see* A467-71; Dist. Ct. Dkt. 30-37, 40-42, 43-45, 51-55, 62-66, 69-71, 73-77, 93. Meanwhile, an additional dispute arose regarding whether this action should be stayed pending a decision in *Advocate*. *See* A473-77; Dist. Ct. Dkt. 86, 87, 89, 96-97, 106, 111. In March of 2017, the district court ruled that written discovery could continue, but ordered that depositions, as well as all other case deadlines, be held in abeyance pending an opinion in *Advocate*. A26; A43-45.

The Supreme Court issued its opinion in *Advocate* on June 5, 2017, and the district court subsequently granted Plaintiffs leave to file an amended complaint and ordered the parties to submit a revised scheduling order. Dist. Ct. Dkt. 116. On August 10, 2017, Magistrate Judge Daly approved the proposed case schedule submitted by the parties, which provided that discovery was to be completed by

September 6, 2018, and dispositive motions would be due by September 21, 2018.  A52-59.

Notwithstanding this agreed-upon schedule, Defendants filed a motion for summary judgment on December 29, 2017.  Dist. Ct. Dkt 147, 148.  At the time, depositions had been noticed but not taken, and the parties were negotiating a number of discovery disputes, including Defendants' production of documents and electronically stored information.  *See, e.g.*, A424-29; A482-88.

On January 5, 2018, pursuant to Rule 56(d), Plaintiffs filed a motion and supporting declaration requesting the district court defer briefing and consideration of Defendants' motion for summary judgment to allow for completion of relevant discovery.  Dist. Ct. Dkt. 162.  The district court did not rule on Plaintiffs' motion to defer prior to the deadline for Plaintiffs to respond to Defendants' summary judgment motion.  It also did not rule on the parties' stipulated request to extend the summary judgment briefing schedule pending resolution of Plaintiffs' motion to defer.  *See* Dist. Ct. Dkt. 164.  Accordingly,

Plaintiffs opposed Defendants' summary judgment motion on February 1, 2018.[11]

The district court granted summary judgment in favor of Defendants on September 28, 2018. SA1-16. In that order, the district court denied all other pending motions, including Plaintiffs' motion to defer. SA6-7, SA16. The district court held that the Plans were ERISA-exempt church plans, concluding that there were no genuine disputes of material fact that the Plans were "maintained" by the Committees and that the Committees qualified as principal-purpose organizations within the meaning of 29 U.S.C. § 1002(33)(C)(i). SA10-13. The district court further held that the church plan exemption did not violate the Establishment Clause based on the general premise that the government may accommodate religion. SA15-16.

This appeal followed.

---

[11] Because Plaintiffs' memorandum contained materials designated "confidential" pursuant to the applicable protective order, Plaintiffs filed a motion to seal, *see* Dist. Ct. Dkt. 173, and filed and served their sealed memorandum via email on February 1, 2018, pursuant to local practice standards. *See* Dist. Ct. Dkt. 68 ¶ 10; S.D. Ill. CM/ECF User's Manual § 2.10. On September 7, 2018, the district court denied the motion to seal, Dist. Ct. Dkt. 190, and Plaintiffs' unredacted opposition memorandum was filed at Dist. Ct. Dkt. 191.

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment to Defendants. The Plans do not qualify as ERISA-exempt church plans because they are not "maintained" by either of the two types of entities that may maintain a church plan: (i) a church, 29 U.S.C. § 1002(33)(A); or (ii) an organization controlled by or associated with a church whose "principal purpose or function" is "the administration or funding" of benefit plans for church employees, *id.* § 1002(33)(C)(i) (ADD2). The undisputed facts demonstrate that the Plans are "maintained" by OSF, a healthcare system with a principal purpose of providing healthcare. OSF is the employer and "plan sponsor"; it made the commitment to offer benefits to its employees; it has the authority to amend the Plans; it determines the nature of, and eligibility for, benefits; and it is responsible for funding benefits. In other words, OSF is the entity that "has the primary ongoing responsibility (and potential liability) to plan participants." *Advocate*, 137 S. Ct. at 1661.

The district court's conclusion that the Plans were instead "maintained" by the Committees was flawed for multiple reasons. It ignored the meaning of the term "maintained" as used in the context of

ERISA and erroneously conflated maintenance with administration, a distinct function under ERISA.  It failed to evaluate which entity had the *primary* ongoing responsibility to Plan participants.  And it ignored genuine factual disputes regarding whether the Committees even administered the Plans.  Yet even if the Committees do maintain the Plans, the district court also erred because the Committees are mere subsets or agents of OSF, and thus cannot qualify as autonomous principal-purpose "organizations" within the meaning of 29 U.S.C. § 1002(33)(C)(i).

The district court relied on the Tenth Circuit's recent opinion in *Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017), which concluded that a plan covering employees of a church-associated hospital system was "maintained" by an internal administrative committee.  But the district court ignored—and indeed repeated— multiple legal errors in *Medina*: among other things, *Medina* assumed its conclusion, failed to apply *Advocate*'s discussion of the meaning of "maintained," and otherwise refused to consider the meaning of terms within the context of ERISA.  Respectfully, *Medina* is unpersuasive.

It is noteworthy that although *Advocate* did not consider who maintained the relevant plans or whether internal hospital committees qualified as principal-purpose organizations, *see supra* p. 13, Justice Sotomayor explained in her concurrence that "the provisions governing which organizations qualify as principal purpose organizations … need also be construed in line with their text and with a view toward effecting ERISA's broad remedial purposes." 137 S. Ct. at 1663-64 (citation omitted). In a case consolidated with *Advocate*, the district court on remand recently held that plaintiffs plausibly alleged that the pension plan sponsored by Dignity Health was not "properly maintained as a church plan" because, despite the plan being *administered* by an internal committee, plaintiffs plausibly alleged that the plan was *maintained* by Dignity, which "is neither a church … nor an organization whose principal purpose or function is the administration or funding of the Plan as required by section 1002(33)(C)(i)." *Rollins v. Dignity Health*, --- F. Supp. 3d. ----, 2018 WL 4262334, at *5 (N.D. Cal. Sept. 6, 2018). *See also Stapleton*, 817 F.3d at 523 n.5. *Rollins* further recognized that plaintiffs had "the better

argument" that an internal committee of a hospital system could not qualify as a principal-purpose "organization." 2018 WL 4262334, at *7.

Reversal is also warranted because the district court abused its discretion in denying Plaintiffs' Rule 56(d) motion to defer. When Defendants filed their motion, Plaintiffs—consistent with the mutually agreed-upon case schedule—were in the process of seeking documents, electronic discovery, and deposition testimony regarding, *inter alia*, what role the Committees actually played with respect to the administration or maintenance of the Plans. By unnecessarily denying Plaintiffs access to discovery that would have permitted them to better demonstrate the existence of genuine factual disputes, the district court abused its discretion.

Finally, if the Court reverses with respect to the "church plan" status of the Plans, principles of constitutional avoidance would warrant remanding on that question and vacating the district court's dismissal of Plaintiffs' as-applied Establishment Clause claim. However, if the Court affirms that the Plans satisfy the statutory church plan definition, then the Court should reverse on the constitutional question. The district court relied on the general premise

that the government may accommodate religion.  But it ignored that *unnecessary* religious accommodations violate the Establishment Clause.  Where, as here, the government exempts religious entities, but not secular entities, from a generally applicable statute in the *absence* of any government entanglement in religion or substantial burden on religious exercise, the government lacks a secular purpose and has the improper effect of endorsing and otherwise advancing religion.

## STANDARD OF REVIEW

This Court "review[s] issues of statutory construction de novo." *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015).  Similarly, it "review[s] the district court's ruling on summary judgment *de novo*, construing the record in the light most favorable to the non-movant." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 777 (7th Cir. 2002).  Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"The district court's denial of plaintiffs' Rule 56(d) motion for additional discovery is reviewed for an abuse of discretion."  *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 622-23 (7th Cir. 2014).

# ARGUMENT

## I. The Plans Are Not Church Plans Because They Are Not Maintained by a Permissible Entity.

### A. Only Two Types of Entities May Maintain a Church Plan.

The term "church plan" is defined in 29 U.S.C. § 1002(33). As originally enacted in 1974, subparagraph 33(A) provided that "[t]he term 'church plan' means a plan established and maintained for its employees by a church ..." (ADD1). Thus, as originally enacted, a church plan had to be "maintained" by a church.

In 1980 Congress amended the statute to accommodate congregational denominations that often set up separate "pension board[s]" to maintain their benefit plans. *See supra* pp. 7, 9-10 (citing ADD20, ADD29). Congress retained the original language in subparagraph 33(A), but added the following new subparagraph 33(C)(i):

> A plan established and maintained for its employees ... by a church ... includes a plan *maintained* by an *organization*, whether a civil law corporation or otherwise, the *principal purpose or function of which is the administration or funding of a plan* or program for the provision of retirement benefits ... for the employees of a church ..., if such organization is controlled by or associated with a church[.]

29 U.S.C. § 1002(33)(C)(i) (emphasis added) (ADD2).

These provisions remain the same today, and no other provision addresses who may "maintain" a church plan. Accordingly, only two types of entities may "maintain" a church plan: (1) churches, pursuant to subparagraph 33(A); or (2) entities described in subparagraph 33(C)(i), i.e., principal-purpose organizations.

Critically, Congress did not permit *all* organizations associated with churches to maintain their own church plans: only pension boards and similar "organizations" with a "principal purpose or function" of administering or funding benefit plans for church employees could do so. Thus, a church-associated hospital or school cannot maintain its own church plan.

This point is underscored by a different statutory amendment, also enacted in 1980, that does not contain the principal-purpose limitation. *See generally Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) ("[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." (citation omitted)). Specifically, in 1980 Congress allowed

church plans to provide benefits to employees of *any* "organization …

controlled by or associated with a church." *Id.* § 1002(33)(C)(ii)(II), (iii)

(ADD2). *See supra* pp. 8-9 (explaining the mechanics of these

subsections). This broader language—not confined by the principal-

purpose limitation—reflected Congress's intent to permanently extend a

provision, set to expire in 1982, that had permitted a church to include

employees of *any* associated agency, including hospitals or schools, in its

church plan. *See supra* pp. 7-9.

When all of the provisions of subparagraph 33(C) are read

together, the following framework is clear: although employees of a

church-associated hospital or school may be covered by a church plan,

that hospital or school cannot itself *maintain* its own church plan.[12]

---

[12] That Congress did not envision stand-alone church plans maintained
by hospitals is further evidenced by its emphasis on the need for a
*single* plan to cover church and agency employees. *See, e.g.*, *Hearings
Before the Subcomm. on Private Pension Plans & Emp. Fringe Benefits
of the Comm. on Fin.*, 96th Cong. 365 (Dec. 4-5, 1979) ("one plan for
both church and agency employees is critical") (ADD24); 125 Cong.
Rec. 10,052 ("Ministers and lay employees have a unique need to be
covered by one plan.") (ADD13).

## B.    OSF Maintains the Plans.

The Supreme Court explained in *Advocate* that an entity maintains a plan if it "has the primary ongoing responsibility (and potential liability) to plan participants." 137 S. Ct. at 1661. *See also Rollins*, 2018 WL 4262334, at *6.  In other words, "maintain" means to commit to, and have the ultimate responsibility for, providing benefits. *See also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987) (employer did not "maintain" a plan because it did not "assume[] … responsibility to pay benefits on a regular basis"); *cf. Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 811 (7th Cir. 1994) (plan "established or maintained" by employer if there was "'an expressed intention by the employer to provide benefits on a regular and long-term basis'") (citation omitted).

Here, there is no genuine dispute that OSF made the ongoing commitment to pay benefits through the Plans and has the *primary* ongoing responsibility to Plan participants.  Defendants admit that OSF "offers participation in" the Plans "to eligible employees," A114 ¶ 97; A185¶ 97, and that OSF is the employer and "plan sponsor" with respect to both Plans.  A110 ¶¶ 72-74; A180-81¶¶ 72-74.  *See also* 29

U.S.C. § 1002(16)(B) (defining "plan sponsor" as the entity that "established or *maintained*" the plan) (emphasis added). OSF executed the operative OSF Plan restatement, which lists OSF as the "Employer" and "sponsor," details the benefits to which OSF's employees are entitled, and states that OSF "will operate the Plan." A249-50, A258, A268-69, A304, A307, A327. *See also Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1267 (11th Cir. 2004) (renewal of obligations to pay benefits is evidence that employer "maintained" plan).

Likewise, OSF executed an SAHC Plan amendment in 2014 stating that, "[n]otwithstanding any provision in the Plan to the contrary, the sponsor of the Plan shall be OSF … , which assumes and herein acknowledges its obligations, responsibilities, and rights as sponsor of the Plan." A913; *Accord* A385 § 12.1 (SAHC Plan restatement § 12.1). Through this amendment, OSF assumed the benefit commitments previously enacted by SAHC as the "Sponsoring Employer," as detailed in the SAHC Plan restatement. *See* A334-35, A340, A353-56, A369-70, A385, A394.

A key element of maintaining a plan is possessing the "power to modify" or amend its terms, i.e., to determine the nature of the benefit

commitment on an ongoing basis. *Anderson*, 369 F.3d at 1265-67. *See also Golden Gate Rest. Ass'n v. City & Cty. of S.F. (GGRA)*, 546 F.3d 639, 653-54 (9th Cir. 2008) (holding that city "establishes *and maintains*" plan because it made the benefit promise and had control over whether the plan would continue, the conditions of benefit eligibility, and the "kind and level" of benefits) (emphasis added). Here, Defendants admit that OSF has the authority to amend both Plans. A109 ¶¶ 63, 65-71; A179-80 ¶¶ 63, 65-71. The OSF Plan restatement states that OSF "shall have the sole responsibility for amending and terminating this Plan." A303-04 § 9.01(d). *See also* A311-12 § 10.01. The SAHC Plan restatement similarly provides that OSF "shall have the sole authority … to amend or terminate, in whole or in part this Plan." A379-80 § 11.1. *See also* A371 § 9.1. OSF has in fact amended both Plans. *See, e.g.*, A913; A915-16; A918-26.

Another key aspect of maintaining a plan is financing or arranging to finance benefits. *See Anderson*, 369 F.3d at 1267 (relying on employer's "maintenance of a fund to pay benefits"); *Fort Halifax*, 482 U.S. at 9 ("commitment" to pay benefits entails obligation to "monitor[] the availability of funds for benefit payments"). Defendants

admit that OSF is responsible for funding both Plans. A111 ¶¶ 78-80; A181-82 ¶¶ 78-80. The OSF Plan restatement provides that OSF "shall establish a 'funding policy and method' … consistent with the objectives of this Plan," A303-04, and the Summary Plan Description states that OSF "is required to contribute" to the OSF Plan, A66, A72. The SAHC Plan restatement provides that OSF "shall have the sole responsibility for making contributions necessary to provide benefits under the Plan." A379-80.

Logically, maintaining a plan must also entail the authority to *stop* offering benefits, i.e., to terminate the plan. *See Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 449 (5th Cir. 1995) (foundation's decision to terminate rather than continue plan meant that foundation "maintained" plan). Defendants admit that OSF has the authority to terminate both Plans. A109 ¶¶ 63, 65-71; A179-80 ¶¶ 63, 65-71. *See also* A313-14 § 10.05, A371-72 § 9.2. Any surplus in OSF Plan assets will revert to OSF upon termination. A312-14 §§ 10.03, 10.05.

That OSF maintains the Plans is further supported by: (i) the OSF Plan document itself, which reflects that OSF, the "Employer," "maintain[s]" the OSF Plan, A258 § 2.21; and (ii) OSF's request to the

IRS for a PLR, in which OSF described the OSF Plan as "maintained" by OSF.  A554.  Indeed, although OSF has since pleaded in the alternative, *see* A179-80, it previously admitted, without equivocation, that OSF "maintains" both Plans, A20 ¶¶ 65-66, 70; A29-34¶¶ 65-66, 70, 88, 170.

### C.    OSF Is Neither a Church nor a Principal-Purpose Organization.

Because the Plans are "maintained" by OSF, they would qualify as ERISA-exempt church plans only if OSF is a church, *see* 29 U.S.C. § 1002(33)(A), or a principal-purpose organization, *id.* § 1002(33)(C)(i) (ADD2).  But there is no genuine dispute that OSF is a healthcare corporation, not a church.  OSF annually reports to the IRS in its Form 990 that it qualifies as a public charity because it is a "hospital" or "health service organization"; it does not claim to be a "church," another option on that form.  A929; *see also* A107 ¶ 45; A177 ¶ 45.  OSF's 1988 letter to the IRS requesting a PLR conceded it "is not in and of itself a church," and instead claimed it was merely "associated with" the Roman Catholic Church.  A552.  *See also* A400 (IRS letter ruling stating that OSF "is not itself a church"); A566-67.  Indeed, OSF did not claim to be a church in moving for summary judgment, Dist. Ct. Dkt. 148, and

the arguments Defendants did make—that the *Committees* maintain the Plans, *id.* at 11-14, and that OSF is *controlled by or associated* with a church, *id.* at 14-20—would be wholly unnecessary if OSF were a church.

There also is no genuine dispute that OSF does not have a "principal purpose or function" of administering or funding benefit plans for church employees. OSF's principal purpose is the provision of healthcare. Its Bylaws list its "purpose" as the operation of "health care providers and institutions." A931. *See also* A957 (OSF founded "for the purpose of operating hospitals"). In conjunction with its bond offerings, OSF describes itself as "an integrated health care delivery system that operates 11 acute care hospitals in Illinois and Michigan." A783.

Because OSF maintains the Plans and is neither a church nor a principal-purpose organization, the Plans are not church plans. 29 U.S.C. § 1002(33)(A), (C)(i). *See also Rollins*, 2018 WL 4262334, at *5; *Hanshaw v. Life Ins. Co. of N. Am.*, 2014 WL 5439253, at *8 (W.D. Ky. Oct. 24, 2014) (hospital that maintained plan did not satisfy subparagraph 33(C)(i) because its "principal purpose is the provision of healthcare, not the administration of a benefits plan").

### D.    The Committees Do Not Maintain the Plans.

The district court entered summary judgment based on its conclusion that the Plans were "maintained," not by OSF, but by two internal OSF Committees that are named as the *administrators* of the Plans.  SA11-13.  But there is no genuine dispute that the Committees do *not*: sponsor the Plans; make the commitment to provide benefits to OSF's employees; execute the Plan restatements; control Plan amendments[13]; fund the promised Plan benefits; or possess authority to terminate the Plans.  *See supra* pp. 29-33.

The district court's conclusion that the Committees nonetheless "maintained" the Plans was based on its (1) misinterpretation of the meaning of the term "maintained" in the context of ERISA; (2) failure to

---

[13] The SAHC Plan restatement states that the SAHC Plan Committee "shall have no power to add to, subtract from or modify any of the terms of the Plan."  A381-82 § 11.5.  Although the OSF Committee "may act on behalf of [OSF] in adopting any amendment" to the OSF Plan, A311 § 10.01(a), this provision makes clear that the OSF Committee is acting as an agent of OSF, and the restatement elsewhere states that OSF has "sole responsibility" for amendments, A304 § 9.01(d).  This limited delegation of amendment authority does not mean the administrator "maintains" the OSF Plan.  *See Sipma v. Mass. Cas. Ins. Co.*, 256 F.3d 1006, 1013 (10th Cir. 2001) ("that an employer delegates part of the operational responsibility for the plan to the insurer does not mean that it did not 'establish or maintain' a plan") (citation omitted).

evaluate which entity had *"primary"* responsibility; and (3) disregard for genuine factual disputes regarding whether the Committees actually exercised their limited authority.

### 1. The District Court Applied an Erroneous, Acontextual Definition of "Maintained."

The district court, following the lead of *Medina*, relied on dictionary definitions unconnected to ERISA to support its determination that the "ordinary meaning" of the term "maintain" was to "care for the plan for purposes of operational productivity." SA12 (quoting *Medina*, 877 F.3d at 1225). *Accord Sanzone v. Mercy Health*, 326 F. Supp. 3d 795, 803 (E.D. Mo. 2018). Like *Medina* and *Sanzone*, the district court then concluded that the Committees satisfied this definition of "maintained" because they were named as the *administrators* of the Plans. SA12-13. In other words, the district court, *Medina*, and *Sanzone* defined "maintained" as synonymous with "administered." This was erroneous.

Those opinions relied on the general premise that, in construing a statute, a court may look to a term's ordinary meaning if that term was left undefined by Congress. *See Medina*, 877 F.3d at 1225 (citations

omitted); *Sanzone*, 326 F. Supp. 3d at 803 (citations omitted).  But as the Supreme Court has explained,

> [t]he definition of words in isolation … is not necessarily controlling in statutory construction. … Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).  *Accord Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (refusing to define a statutory term "in isolation" based on an acontextual reliance on a dictionary definition).

ERISA uses the terms "maintain" and "administer" to refer to two distinct functions.  This is clear from how these terms are contrasted within a single paragraph of ERISA's definitional provision: paragraph 16 distinguishes between the "plan sponsor," which is the entity that "established *or maintained*" a plan, 29 U.S.C. § 1002(16)(B) (emphasis added), and the plan "administrator," which is the entity so designated by the plan instrument, *id*. § 1002(16)(A)(i).  Although paragraph 16 provides that a sponsor must fill the role of administrator if its plan fails to designate an administrator, *id*. § 1002(16)(A)(ii), the sponsor may designate a *different* "administrator" without losing its status as

the "plan sponsor" that "established or maintained" the plan, *id.* § 1002(16)(A)(i).

Other provisions confirm that "maintained" refers to the sponsor's commitment to provide benefits rather than to plan administration. ERISA defines both "welfare plan" and "pension plan" by reference to the entity or entities that "established or maintained" the plans for the purpose of providing specified benefits. 29 U.S.C. § 1002(1), (2). *See also Rollins*, 2018 WL 4262334, at *6 (noting that ERISA's repeated pairing of the term "maintained" with the term "established," including by referring to the role of the plan sponsor, suggests "a degree of responsibility not found in the word 'administer'") (citations omitted).

Both the statutory text and Supreme Court precedent further make clear that "administration" refers to the exercise of fiduciary discretion in applying the terms of a plan, whereas "maintained" refers to the non-fiduciary decisions of a plan sponsor in making the benefit commitment and designing the terms of a plan. ERISA expressly lists plan "administration" as a fiduciary function, 29 U.S.C. § 1002(21)(A)(iii). Maintenance is not listed within ERISA's three-part definition of a fiduciary. *See id.* § 1002(21)(A).

Consistent with these provisions, the Supreme Court has repeatedly recognized that "plan sponsors" (i.e., the entities that "established or maintained" plans) are "generally free … to adopt, modify, or terminate" benefit plans, and when they "undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust." *Lockheed Corp.*, 517 U.S. at 890 (citations omitted). In doing so, the Supreme Court expressly separated these so-called "settlor" functions of a plan sponsor from fiduciary actions, including plan "administration." *See, e.g.*, *id.*; *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-44 (1999); *Varity Corp. v. Howe*, 516 U.S. 489, 529 (1996) ("[T]he decision to modify or terminate welfare benefits … are not governed by ERISA's fiduciary obligations because they do not involve discretionary administration of the plan.").

As noted above, courts interpret "maintained" consistent with the role of the plan sponsor in designing and offering benefits. *See supra* pp. 29-33 (citing *Advocate*, 137 S. Ct. at 1661; *Fort Halifax*, 482 U.S. at 12; *Anderson*, 369 F.3d at 1267; *GGRA*, 546 F.3d at 653-54; *Hightower*, 65 F.3d at 449). And courts treat administration and maintenance as distinct concepts. *See, e.g., Hightower*, 65 F.3d at 446, 449 (foundation

"maintained" plan even though distinct entity was plan administrator); *Rollins*, 2018 WL 4262334, at *6; *Stalp v. Excellus Health Plan, Inc.*, 2012 WL 3637257, at *1-2 (D. Neb. Aug. 22, 2012) (plan administered by insurance company was "maintained" by employer that paid premiums); *In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wis. Steel*, 681 F. Supp. 512, 518 (N.D. Ill. 1988) ("maintaining a plan is not defined[,]" but "choice of words suggests someone with more responsibility" than to "simply administer[]").

Accordingly, by treating administration and maintenance synonymously, the district court gave the term "maintained" a different meaning under the church plan definition than it has elsewhere in ERISA. *Contra Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) ("[I]dentical terms within an Act bear the same meaning."). Nothing in the specific language of subparagraph 33(C)(i) suggests that Congress intended that result. Indeed, the language confirms that "maintained" and "administration" are distinct terms.

Subparagraph 33(C)(i) can be divided into two distinct parts. The first part ("A plan established and maintained … by a church … includes a plan maintained by an organization") describes a condition

for a *plan* to qualify as a church plan: i.e., if it is "maintained" by an "organization." The second part ("the principal purpose or function of which is the administration or funding of a plan") restricts the scope of *organizations* that, pursuant to the first part, can maintain a church plan. As the Supreme Court explained, "everything after the word 'organization' in [subparagraph 33(C)(i)] is just a (long-winded) description of a particular kind of church-associated entity—which this opinion will call a 'principal-purpose organization.'" *Advocate*, 137 S. Ct. at 1656. Accordingly, although an *organization* can qualify as a "principal-purpose organization" if its principal purpose is plan "administration," a *plan* will not qualify as a church plan unless it is "maintained" by a principal-purpose organization.

As *Rollins* recently recognized, "[i]f Congress had not intended to attach any significance to the word 'maintained,' it could have simply required that a plan be 'administered or funded' by a principal-purpose organization, and not also 'maintained' by one." 2018 WL 4262334, at *6 (citing *Advocate*, 137 S. Ct. at 1659 ("when legislators did not adopt obvious alternative language, the natural implication is that they did not intend the alternative")). Construing subparagraph 33(C)(i) as

merely requiring a principal-purpose organization to "administer or fund" the plan "simply reads the word 'maintained' out entirely," in violation of "another well-settled principled of statutory construction: 'that legislative enactments should not be construed to render their provisions 'mere surplusage.'" *Id.* (citation omitted)).

Because both the general ERISA context and the specific text of the church plan definition compel the conclusion that "maintained" means something more than administration, the district court's reliance on dictionary definitions—and its resulting conflation of maintenance and administration—was in error. *See also Rollins*, 2018 WL 4262334, at *7 (criticizing *Medina* for not addressing "the word 'maintain' in the context of the remainder of" ERISA's definitional provisions).[14]

Finally, the district court's passing suggestion that it did not equate "maintain" and "administer," SA12 n.3, is unpersuasive. The

---

[14] The Tenth Circuit also assumed its conclusion. *Medina* initially formulated the "maintained" question as follows: "is *the entity's retirement plan* maintained by a principal-purpose organization?" 877 F.3d at 1222 (emphasis added). *See also* SA8. Implicit in this formulation ("the *entity's* retirement plan") is the erroneous assumption that the "entity" that sponsors or provides a benefit plan may be distinct from the entity that "maintain[s]" the plan. *But see supra* pp. 37-40.

sole reason the district court concluded that the Committees "care[] for the [Plans] for purposes of operational productivity" is because of their authority as plan administrators: i.e., their authority to interpret the Plan language, make eligibility and benefit determinations, and make certain rules concerning plan administration. SA12-13. These are well recognized functions of *plan administrators*. *See, e.g.*, *Varity Corp.*, 516 U.S. at 530 ("the discretionary interpretation of a plan term, or the discretionary determination that the plan does not authorize a certain type of procedure, would likely qualify as plan administration by a fiduciary"); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (according deference to plan administrators who have been granted "discretionary authority" "to determine eligibility for benefits or to construe the terms of the plan").[15]

---

[15] Although the OSF Plan restatement states that the plan "shall be administered and maintained by" the OSF Committee, SA4 (citing A304 § 9.02), the authority designated to the committee relates only to plan administration, A304-06 § 9.02, 9.04, the committee acts "on behalf" of OSF, A264 § 2.40, and the restatement elsewhere states that OSF "maintains" the plan, *see supra* pp. 32-33.

### 2. The District Court Failed to Evaluate Which Entity Had the "Primary" Responsibility.

Even if plan administration duties were examples of plan maintenance, the district court further erred by failing to evaluate which entity, as between the Committees and OSF, had the "*primary* ongoing responsibility." *Advocate*, 137 S. Ct. at 1661 (emphasis added). Remarkably, *Medina* and *Sanzone* entirely ignored this standard. *See Medina*, 877 F.3d at 1224-27; *Sanzone*, 326 F. Supp. 3d at 802-05. The district court recited it, SA13, but did not meaningfully evaluate which entity had *primary* responsibility. Instead, it summarily concluded that the Committees qualified because the Plans "entrust" them with plan administration responsibilities (including benefit determinations and plan interpretation). The district court did not evaluate those responsibilities in comparison to the authority and liability retained by OSF, including that OSF made the commitment to provide benefits and is responsible for funding those benefits.

The district court also failed to address the fact that the Committees acted as agents of OSF. The OSF Committee is "designated" plan administrator by OSF and acts "on behalf of" OSF. A264 § 2.40. *See also* A304 § 9.01(c) (OSF "shall periodically review the

performance of" the OSF Committee).  Likewise, the members and chairperson of the SAHC Committee are appointed by, and "shall serve at the pleasure of" OSF's Board.  A380 § 11.2.  The district court did not consider how Committees acting "on behalf of" or "at the pleasure of" OSF could be considered to have *primary* responsibility.

The district court relatedly failed to address how the Committees could have primary responsibility if they were merely interpreting and carrying out Plan terms designed, executed, and/or adopted by OSF. The OSF Plan restatement states that the OSF Committee's administration authority is "subject to the specific terms of the Plan"; it must "administer the Plan in accordance with its terms" and interpret the Plan "in light of … evidence of the *intent of the Employer* [i.e. OSF] in establishing and modifying the Plan …." A304-06 § 9.04, 9.06 (emphasis added).  Similarly, the SAHC Plan restatement provides that the SAHC Committee "shall administer the Plan in accordance with its terms" and makes clear that it "shall have no power to add to, subtract from or modify" any Plan term, "to change or add to any benefits," or "to waive or fail to apply any requirements of eligibility for benefits … without the express consent of" the OSF Board.  A380-82 § 11.2, 11.5.

Ultimately, the discretion to interpret and determine eligibility under Plan terms adopted by OSF does not surpass OSF's primary responsibility as the entity that makes the benefits commitment, determines the nature of benefits, sets the criteria for benefit eligibility, and funds those benefits.  Although the district court additionally noted that a participant may file suit against a plan administrator for a "wrongful denial of benefits," SA13, a participant may also file suit against OSF for violations of its commitments, including for failure to fund Plan benefits.  *See* A148-59; 29 U.S.C. § 1132(a)(3).  At the very least, there exist genuine disputes of material fact regarding which entity has "primary ongoing responsibility (and potential liability) to plan participants." *Advocate*, 137 S. Ct. at 1661.

### 3. The District Court Ignored Genuine Factual Disputes Regarding Who Administers the Plans.

Even if administration alone could constitute plan maintenance, the district court failed to evaluate whether the Committees actually administered the Plans.  The district court relied exclusively on the delegation of *authority* to administer the Plans.  *See* SA12-13.  But genuine disputes exist regarding whether the Committees performed the administrative tasks on which the district court relied.  The

meetings minutes of these Committees reveal that they almost never convened for meetings. The OSF Committee met for a total of only seventy (70) minutes over the *eight-year* period between 2010 and 2017; it met twice in 2010, 2014, and 2015, and once in 2013 and 2016. A612-13; A636-37; A640; A650; A670; A682-83; A702-03; A707-08. The SAHC Committee met only *twice* since 2010, for a total of two hours, A728; A730. *See also* A426 (addressing RFP No. 2); A462 (admitting that no other minutes existed).

The district court disposed of this argument in a footnote, asserting that "the question is not whether the Plan Committees are doing their jobs well or excessively delegating their authority, but rather whether the structure satisfies the requirement of the church plan definition." SA13 n.4. But the "requirement of the church plan definition" is not merely that a principal-purpose organization possess the authority to maintain a plan; the plan must actually be "maintained" by the principal-purpose organization. 29 U.S.C. § 1002(33)(C)(i). Indeed, even the district court's own definition of "maintained" requires more than the possession of authority: it looks to which entity actually "cares for the plan for purposes of operational

47

productivity." SA12.  There are obvious, genuine factual disputes as to whether Committees that met so infrequently (in some years, not at all) were "car[ing] for" the "operational productivity" of the Plans.

## E.   Even If the Committees "Maintained" the Plans, They Are Not Principal-Purpose "Organization[s]."

Subparagraph 33(C)(i) requires that the principal-purpose entity that maintains a plan be an "organization."  29 U.S.C. § 1002(33)(C)(i) (ADD2).  The Committees are not.  Defendants conceded that the Committees are "internal OSF benefit committees" whose members are appointed by OSF's Board.  Dist. Ct. Dkt. 148 at p. 11.  The OSF Plan Committee is "designated" plan administrator by OSF and acts "on behalf of" OSF.  A264 § 2.40; *see also* A304 § 9.02.  The members and chairperson of the SAHC Plan Committee are appointed by, and "shall serve at the pleasure of," the OSF Board.  A380 § 11.2.  If a vote of the OSF Plan Committee is tied, "the decision of [OSF] shall control."  A304 § 9.02.  Members of both Committees are indemnified by OSF.  A306 § 9.07; A389 § 13.11.

The membership of the two Committees is identical, A226 ¶ 27, and these same individuals also sit on other "committees" performing other OSF business during omnibus meetings.  *See generally* A606;

A610; A644; A965-66.  Defendants also admit that the Committees do not have charters.  A462.

Because the Committees are merely non-juridical subsets of OSF conducting business on OSF's behalf, there is at least a genuine dispute as to whether the Committees are "organizations" distinct from OSF— whose principal purpose is not plan administration or funding. Notably, the Supreme Court expressly declined to consider whether "hospitals' internal benefits committees" qualify as principal-purpose organizations.  *Advocate*, 137 S. Ct. at 1658 n.3.

The district court relied on statutory language stating that a principal-purpose "organization" may be a "civil law corporation *or otherwise*," 29 U.S.C. § 1002(33)(C)(i) (emphasis added), and concluded that this "suggests that principal purpose organizations need not be a [sic] separate, legally independent entity."  SA11.  But that language means only that a principal-purpose organization need not be incorporated—a partnership, LLC, or unincorporated association may qualify if it meets the other statutory criteria.  That language does not eliminate the basic requirement that the entity be an "organization."

*See Rollins*, 2018 WL 4262334, at *7 ("'Or otherwise' cannot simply encompass any possible entity[.]").

The district court noted that the statute does not define "organization," SA11, and, following the lead of *Medina* and *Sanzone*, relied on dictionary definitions to conclude that an internal committee of another entity could qualify. *Id.* But that again ignored statutory context. *Contra Hibbs*, 542 U.S. at 101. Congress distinguished between church-associated, principal-purpose organizations (which may maintain church plans) and other church-associated organizations (which may not maintain church plans but whose employees may participate in a church plan). *See supra* pp. 26-28.

To permit *any* church-associated entity to maintain its own ERISA-exempt church plan by creating an internal committee to serve as a principal-purpose "organization" would eviscerate the distinction Congress made between subparagraph 33(C)(i) and subparagraphs 33(C)(ii)(II) and (iii). *Contra Loughrin*, 134 S. Ct. at 2390. It would also render superfluous the principal-purpose clause of subparagraph 33(C)(i). *Contra Bennett v. Spear*, 520 U.S. 154, 173 (1997). And it would be an odd way to express a simple idea: that church plans can be

maintained by any organization controlled by or associated with a church.  *Contra Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes.").[16]

*Medina* noted that under plaintiffs' view, "virtually no plan administered by a benefits committee or similar organization could qualify for the church-plan exemption."  877 F.3d at 1226.  But this assumes the conclusion.  Nothing in the statutory text or legislative history indicates that Congress intended internal benefits committees of otherwise disqualified hospitals to maintain church plans.  And in any event, *Medina's* premise is flawed: if a *church* used an internal committee to *administer* its own plan, the plan would still be "maintained" by the church pursuant to subparagraph 33(A).  As the legislative history makes clear, subparagraph 33(C)(i) was intended to address the situation in which churches and religious denominations used *separate* organizations, such as denominational pension boards, to

---

[16] *See also* S. Rep. No. 93-127, *reprinted in* 1974 U.S.C.C.A.N. at 4854 (ERISA coverage should be construed "liberally" to provide "maximum" protections for workers, and "exemptions should be confined to their narrow purpose."); *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 97 (1993) (the court is "inclined, generally, to tight reading of exemptions from comprehensive schemes of this kind").

maintain their church plans. *See supra* pp. 7, 9-10. That practice is fully consistent with Plaintiffs' interpretation.

Finally, although the district court cited *Thorkelson v. Publishing House of Evangelical Lutheran Church in America*, 764 F. Supp. 2d 1119, 1127 (D. Minn. 2011), that opinion merely paraphrased subparagraph 33(C)(i) before concluding, without analysis, that it was "clear" that the plan was a church plan because it was "administered" by a committee. *Id.*

## F. The Informal Position of the IRS and Department of Labor Is Neither Controlling nor Persuasive.

Defendants also relied on informal IRS and Department of Labor ("DOL") opinion letters that had adopted Defendants' interpretation of subparagraph 33(C)(i). *See* Dist. Ct. Dkt. 148 at p. 13. But as this Court previously recognized, *see Stapleton*, 817 F.3d at 530, the statutory interpretation reflected in these opinion letters is not entitled to deference because it was not arrived at through "a formal adjudication or notice-and-comment rulemaking," *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000), and was not intended to be binding on third parties, *United States v. Mead Corp.*, 533 U.S. 218, 233 (2001). Indeed, the law is clear that "[n]either the courts nor the IRS may rely

on letter rulings as precedent." *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998); *see also* 26 U.S.C. § 6110(k)(3) ("a written determination may not be used or cited as precedent"); ERISA Proc. 76-1, § 10, 41 Fed. Reg. 36,281 (Aug. 27, 1976) ("Only the parties described in the request for opinion may rely on the opinion[.]").

The IRS and DOL opinions are also not entitled to any "respect" because they lack any "power to persuade." *See Christensen*, 529 U.S. at 587 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Among the factors that give an interpretation the "power to persuade" are the "thoroughness evident in its consideration" and the "validity of its reasoning." *Skidmore*, 323 U.S. at 140. The IRS's initial 1982 General Counsel Memorandum, as well as the subsequent PLRs on which Defendants rely, are entirely devoid of reasoning: they assume, without explanation, that "maintained" means "administered" and that an internal committee can qualify as an "organization."[17] The DOL opinion letter Defendants cited merely paraphrased the statute before

---

[17] *See* IRS Gen. Couns. Mem. 39,007, 1983 WL 197946 (Nov. 2, 1982); IRS Priv. Ltr. Rul. 83-15-054, 1983 WL 198031 (Jan. 13, 1983); IRS Priv. Ltr. Rul. 86-12-068, 1985 WL 297663 (Dec. 26, 1985); IRS Priv. Ltr. Rul. 2014-21-031, 2014 WL 2136100 (May 23, 2014). *See also* A395-401; A402-14.

concluding that a plan "maintained and operated under the authority of a [p]lan [c]ommittee" qualified. DOL Op. Ltr. 86-19A, 1986 WL 38856, at *1 (Aug. 22, 1986).

It is noteworthy that although *Advocate* recognized that the IRS "believe[s]" that an "internal benefits committee of a church-affiliated non-profit" qualifies as a principal-purpose organization, 137 S. Ct. at 1657, it did not adopt this interpretation, *id.* at n.2, 1658 n.3, and with respect to the "established" issue, it engaged in its own *de novo* interpretation without reliance on the IRS or DOL. *Id.* at 1658-63.

Defendants also cannot rely on decades-old PLRs that specifically addressed the Plans. *See* A395-402; A402-14. A taxpayer may rely on a PLR only *vis-à-vis the IRS* and only with respect to the *tax status* of a plan. *See* Rev. Proc. 2018-1, § 2.01, 2018 WL 253644 (Jan. 2, 2018) (a "letter ruling" is a response to a taxpayer's inquiry "about its status for tax purposes or the tax effects of its acts or transactions"); *see also id.* § 11.03. No authority provides that an IRS PLR regarding a plan's tax status may be used as a defense to claims by plan participants to enforce ERISA.

*     *     *

Because the district court erred as a matter of law and because there exist genuine disputes of material fact regarding whether the Plans are maintained by a principal-purpose organization, the Court should reverse the district court's grant of summary judgment.

## II. The District Court Abused Its Discretion by Denying Plaintiffs' Rule 56(d) Request.

As Plaintiffs' counsel explained in a Rule 56(d) declaration, additional discovery was essential to certain arguments Plaintiffs would have made in opposition to Defendants' motion, including those related to which entity maintains the Plans. A422 A426; A433-35. *See also* A483-84. For example, Plaintiffs had sought additional discovery to confirm what the meeting minutes seem to suggest: that the Committees did not actually administer—much less maintain—the Plans and did not operate autonomously from OSF. *See supra* pp. 44-52. Specifically, Plaintiffs sought, but had not yet received, materials prepared for and presented to the Committees. *See* A435 (addressing RFP No. 2). They sought, but had not yet received, electronic discovery on a variety of topics, including the maintenance and administration of the Plans. *See, e.g.*, A425-27, A430; A435-38; A479, A480, A482-84; A486-88. Plaintiffs sought, but were denied, the opportunity to conduct

depositions of the members of the Committees and OSF human resources personnel. *See* A430; A439-54 (notices of depositions); A488 ¶¶ 105-06.

The district court did not dispute that additional discovery was "pertinent" to the issues addressed in its order. *See* SA6-7. Instead, it observed that Rule 56(d) "does not require" a court to allow time for discovery, and concluded that although Defendants filed their motion "well before the extended discovery deadline, Plaintiffs had ample time and opportunity to conduct discovery." *Id.*

But the district court ignored that discovery was slow to commence because of disputes over venue and consolidation, as well as because of the Supreme Court's pending decision on the then-threshold "established" issue. *See supra* pp. 18-19. Depositions were held in abeyance pending a decision in *Advocate*. A43-45. Because affirmance by the Supreme Court would have obviated the need to engage in discovery regarding the alternative reasons why ERISA applies, the parties agreed—pending a decision in *Advocate*—to refrain from conducting electronic discovery, issuing additional requests, and producing documents responsive to certain existing requests. A48 n.1.

On August 10, 2017, following the *Advocate* decision and an additional three-week stay of discovery, Dist. Ct. Dkt. 116, the district court approved the proposed case schedule agreed to by all parties, which provided that discovery was to be completed by September 6, 2018, and dispositive motions would be due by September 21, 2018.  A52-59.

The district court improperly rewarded Defendants for agreeing to this one-year discovery schedule and then unilaterally truncating it by moving for summary judgment on December 29, 2017—before they had produced relevant materials solely within their possession and provided testimony that would have allowed Plaintiffs to offer a more complete opposition to their motion.  *See, e.g.*, *Easley v. Kirmsee*, 382 F.3d 693, 699 (7th Cir. 2004) (citing cases in which district courts improperly granted summary judgment while "litigants were awaiting responses to outstanding discovery requests from reluctant defendants who were withholding facts necessary for the litigants to oppose summary judgment").

## III. Application of the Church Plan Exemption Is Unconstitutional.

Plaintiffs alleged, in the alternative, that even if the Plans satisfy the "church plan" definition, they still are not exempt from ERISA

because applying the church plan exemption to religiously affiliated hospital systems like OSF would violate the Establishment Clause. A125-26; A144-48. The district court granted summary judgement to Defendants on this claim. SA14-16.

If this Court reverses the district court's holding that the church plan exemption applies, there would be no need to evaluate whether application of the exemption violates the Constitution. In that case, principles of constitutional avoidance would compel vacatur of the district court's ruling on Plaintiffs' Establishment Clause claim. *See, e.g., White v. Regester*, 422 U.S. 935, 935-36 (1975) ("Rather than render an unnecessary judgment on the validity of the constitutional views expressed by the District Court[,] … we vacate the judgment of the District Court and remand" for consideration of other, non-constitutional issues); *cf. Evans v. City of Chicago*, 689 F.2d 1286, 1299 (7th Cir. 1982) (vacating portion of order that unnecessarily resolved constitutional question).

However, if the Court affirms that the Plans qualify as church plans, it should reverse the district court's Establishment Clause holding. "[A] governmental practice violates the Establishment Clause

if it (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion." *Doe ex rel. Doe v. Elmbrook Sch. Dist.* (*Elmbrook*), 687 F.3d 840, 849 (7th Cir. 2012) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). In applying *Lemon's* "primary effect" prong, this Court considers *inter alia* whether the government practice has the "effect of communicating a message of government endorsement … of religion." *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring)).[18] Application of the church plan exemption to religiously affiliated hospital systems like OSF serves no secular purpose and has the primary effect of endorsing and otherwise advancing religion.

## A. Religious "Accommodations" Must Eliminate Government Entanglement in Religion or Relieve a Substantial Religious Burden.

Congress may not favor "religious adherents collectively over nonadherents." *Bd. of Educ. v. Grumet*, 512 U.S. 687, 696 (1994).

---

[18] *See also Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1045-46 & n.1 (7th Cir. 2018) (continuing to apply endorsement test notwithstanding "debate among the Justices" about its "continuing validity.").

*Accord Elmbrook*, 687 F.3d at 850 ("[T]he touchstone for Establishment Clause challenges remains 'the principle that the First Amendment mandates government neutrality … between religion and nonreligion.'") (quoting *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005). Exempting religious hospital systems, but not secular hospital systems, from PBGC insurance, minimum funding requirements, and other ERISA requirements violates this principle of neutrality, as it favors religious entities collectively over secular entities.

The district court—and the Tenth Circuit in *Medina*—relied on a limited exception to this neutrality principle: the government may "'accommodate religious practices.'" *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (citation omitted). *See* SA15 (citing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335 (1987)); *Medina*, 877 F.3d at 1231-33. But the government may "accommodate" religious entities by exempting them from a generally applicable law only if that law (i) creates excessive government entanglement in religion, *Amos*, 483 U.S. at 335; or (ii) imposes substantial burdens on religious exercise, *see Cutter*, 544 U.S. at 720.

For example, *Amos* addressed the exemption of religious entities from Title VII's prohibition of religious discrimination in employment. By preserving the ability of religious entities to hire and fire employees who share or violate their religious beliefs, the exemption "alleviate[d] *significant governmental interference* with the ability of religious organizations to define and carry out their religious missions." 483 U.S. at 335 (emphasis added). *See also Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 617 (7th Cir. 2007) (discussing *Amos*). Similarly, in *Cutter*, the Supreme Court held that the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which provides an exemption from governmental actions that impose "substantial burdens" on the religious exercise of institutionalized persons, did not violate the Establishment Clause "because it alleviates exceptional government-created burdens on private religious exercise." *Cutter*, 544 U.S. at 720.[19]

---

[19] *See also Charles v. Verhagen*, 348 F.3d 601, 611 (7th Cir. 2003) ("RLUIPA seeks to remove only the most substantial burdens States impose upon prisoners' religious rights"). Courts have reached the same conclusion with respect to the "nearly identical" provisions of the Religious Freedom Restoration Act ("RFRA"). *Id.* at 610-11.

Critically, *Amos* and *Cutter* do not permit *unnecessary* religious accommodations. Indeed, both cases made clear that "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Cutter*, 544 U.S. at 714 (quoting *Amos*, 483 U.S. at 334-35).

Thus, an exemption exclusive to religious entities from a generally applicable law that imposes *no* substantial religious burden and causes *no* religious entanglement would serve no purpose and would have no effect other than to improperly favor religious adherents over nonadherents. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989); *cf. Wallace v. Jaffree*, 472 U.S. 38, 59 & n.48 (1985) (explaining that "no purpose is not a secular purpose," and concluding that a law favoring religious exercise in the absence of any need to accommodate religious exercise violated the Establishment Clause because it could support "only two conclusions": "(1) the statute was enacted to convey a message of state endorsement and promotion of [religion]; or (2) the statute was enacted for no purpose").

*Texas Monthly* held that an exemption from a generally applicable sales tax violated the Establishment Clause because it was available exclusively to religious, but not secular, publications. 489 U.S. at 15.

In that case, the state "adduced no evidence that the payment of a sales tax by subscribers to religious periodicals or purchasers of religious books would offend their religious beliefs or inhibit religious activity." *Id.* at 18. Thus, because the "government direct[ed] a subsidy exclusively to religious organizations that … cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion … , it 'provide[d] unjustifiable awards of assistance to religious organizations' and cannot but 'conve[y] a message of endorsement' to slighted members of the community." *Id.* at 15.[20] *See also Digrugilliers*, 506 F.3d at 616-17 (Establishment Clause may be violated by "protective" zoning laws that "give churches privileges that similarly situated secular users … do not enjoy," since it could not be argued that, absent protective zones, "the church's effective operation as a religious institution" would be "gravely" impaired).

---

[20] *See also Tex. Monthly*, 489 U.S. at 28 (Blackmun, J., concurring) (tax exemption available "exclusively to the sale of religious publications" constituted "preferential support" of religion).

**B. Application of the Church Plan Exemption Does Not Eliminate Government Entanglement in Religion or Alleviate a Substantial Religious Burden.**

**1. ERISA Does Not Burden or Cause Entanglement in Religion.**

ERISA is indistinguishable from an array of neutral laws that do not burden religious exercise when applied to commercial activities. *See, e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 391-94 (1990) (distinguishing between *religious* burdens and general "administrative and recordkeeping burdens," noting that even "substantial administrative burdens … do not rise to a constitutionally significant level," and applying generally applicable tax to sale of religious materials). Although ERISA imposes disclosure and recordkeeping requirements, *see Medina*, 877 F.3d at 1233, record keeping and inspection provisions that "apply only to commercial activities undertaken with a 'business purpose,' … have no impact on … evangelical activities." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305 (1985) (applying Fair Labor Standards Act to religiously affiliated commercial activities). And the Supreme Court has rejected arguments that religious exercise is burdened simply

because a neutral, generally applicable law decreases funds available for religious purposes. *Jimmy Swaggart*, 493 U.S. at 390-91.

Although *Medina* asserted that ERISA limits the use of socially responsible investment policies, 877 F.3d at 1233; *accord* Dist. Ct. Dkt. 148 at p. 23 n.19, the DOL has made clear that ERISA does not prohibit screening morally objectionable investments as long as alternative investments are reasonably expected to perform on par with screened investments. 29 C.F.R. § 2509.2015-01 (2015); *see also* DOL Field Assistance Bulletin No. 2018-01 (Apr. 23, 2018).[21] It is implausible that OSF would be unable to locate investment alternatives that perform at least as well as the stock of individual companies that manufacture abortifacients, alcohol, tobacco, or defense weapons. *See* A237 (OSF Socially Responsible Guidelines). OSF offered no evidence suggesting otherwise. Moreover, because the DOL standard is compelled by the duty to act solely in the interest of the plan's participants, 29 C.F.R. § 2509.2015-01—a standard also required by Illinois law and the Plan documents, *see, e.g.*, *In re Estate of Muppavarapu*, 836 N.E.2d 74, 77

---

[21] *Available at* https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2018-01.

(Ill. App. Ct. 2005); A304-06 § 9.04; A379-80 § 11.1—ERISA imposes no *additional* burden on OSF.

OSF has effectively conceded that ERISA compliance does not impose substantial burdens on its religious exercise, as OSF chooses to comply with ERISA with respect to its other benefit plans, A772-74, including several retirement plans. *Id. See also* A734; A745-69. Thus, as Judge Kanne explained in his concurring opinion in *Stapleton*, "this is not one of those cases," like the contraceptive mandate challenged in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), in which a statute "compel[s] entities to provide services that violate their religious beliefs." 817 F.3d at 532 (Kanne, J., concurring).

## 2. Application of the Exemption Does Not Comport with Congress's Stated Purpose.

The district court cited *Medina*'s discussion of Congress's stated purpose in enacting the church plan exemption. *See* SA15 (citing *Medina*, 877 F.3d at 1231). Congress enacted the exemption to avoid "examinations of *books and records*" that "might be regarded as an unjustified invasion of the confidential relationship … with regard to *churches and their religious activities*," S. Rep. No. 93-383, 1974

U.S.C.C.A.N. at 4965 (emphasis added).[22]  But the relevant question in this as-applied challenge is whether *application* of the exemption comports with Congress's stated purpose.  *See Bowen v. Kendrick*, 487 U.S. 589, 602, 621 (1988) (remanding for evaluation of whether application demonstrated impermissible purpose); *McCreary*, 545 U.S. at 862 ("'implementation of the statute'" can reveal impermissible purpose) (citation omitted).

Application of the exemption here does not comport with Congress's stated purpose of avoiding governmental evaluations of "books and records" regarding "churches and their religious activities." OSF is not a church, and no church established, maintained, administers, or participates in the Plans.  OSF is a multi-billion-dollar hospital system that competes in a heavily regulated healthcare

_____

[22] *Medina* cited statements from Conable and Talmadge related to the 1980 amendments, 877 F.3d 1230-31, but Conable and Talmadge made clear that their amendments were intended to further Congress' *original* purpose.  *See* 124 Cong. Rec. 12,106 ("In 1974, when we enacted [ERISA], we exempted church plans ... to avoid excessive Government entanglement[.]") (ADD6); 125 Cong. Rec. 10,052 (expressing concern about "Government entanglement" "[i]f we have enacted a statute that may require the church plans to ... *file reports*, be subject to *the examination of books and records* and possible foreclosure of church property to satisfy plan liabilities[.]") (emphasis added) (ADD13).

marketplace, *see* A793, 795-802, and already voluntarily discloses its financial records and relationships in detail, A178 ¶ 54 (admitting that OSF "complies with all federal and state regulations and reporting requirements" and "at all times shares its consolidated financial statements and other financial information to rating agencies and the public in connection with, among other things, the issuance of tax-exempt revenue bonds."); A779-94, A838-911, *see also* A885-94 (disclosing information regarding the Pans). *See generally Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000) (policy "not necessary to further any of [the stated secular] purposes").

Yet even if Congress's stated purpose—regardless of its applicability to OSF—was sufficient to satisfy *Lemon*'s purpose prong, it is irrelevant to whether application of the exemption has a permissible effect. *See, e.g., Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 528 (7th Cir. 2009) (*Lemon*'s effect prong "requires no inquiry into the government's intent"); *Elmbrook*, 687 F.3d at 853 n.16. Because OSF is not a church and already discloses its financial records in great detail, an exemption from ERISA's reporting requirements would not alleviate government entanglement in church books and records; its

primary—indeed, only—effect would be to advance religious adherents over non-adherents.

### 3. The District Court Mistakenly Relied on *Amos* and Other Valid Religious Accommodations.

The district court next emphasized that *Lemon*'s effects test requires that "the government itself has advanced religion through its own activities and influence." SA15 (citing *Amos*, 483 U.S. at 337). *Amos* explained that when the government accommodates religious exercise by alleviating a religious burden, the government is merely allowing other entities to freely exercise religion. 483 U.S. at 337.[23] But the Supreme Court has made clear that the government itself advances or endorses religion if it exempts religious, but not secular, entities from a generally applicable statute absent a need to alleviate religious entanglement or burden. *See Tex. Monthly*, 489 U.S. at 15; *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 793 (1973) (tax exemptions for parents of children in sectarian schools "cannot be

---

[23] *Amos* also cited the tax exemption upheld in *Walz v. Tax Commission*, 397 U.S. 664 (1970), which unlike the church plan exemption, was available to religious *and secular* entities. *Id.* at 673. *Amos* explained that a generally available tax exemption merely "*allows* churches to advance religion." 483 U.S. at 337.

squared with the principle of neutrality[;] … their purpose and inevitable effect are to aid and advance those religious institutions").

The district court also stated there "is no principled distinction between" the church plan exemption and other statutory exemptions, such as a provision in the Americans with Disabilities Act permitting religious entities to consider religion in employment decisions. *See* SA15 (citing, e.g., 42 U.S.C. § 12113(d)). *See also Medina*, 877 F.3d at 1232 (citing religious accommodations). But neither the district court nor *Medina* addressed the distinction at the heart of this case: that unlike valid religious accommodations, *see supra* pp. 59-63, an ERISA exemption for religiously affiliated hospital systems is *unnecessary*. *See generally Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 702 (7th Cir. 2005) ("The Supreme Court, and this court, have emphasized the case-by-case nature of a court's review of an alleged Establishment Clause violation.") (citations omitted). Because application of ERISA to religiously affiliated hospital systems like OSF would not entangle the government in religion or impose substantial religious burdens, an exemption for these hospital systems would have no effect other than to favor religious hospital systems over secular ones.

### C. A Religious Accommodation Must Be Measured to Avoid Burdening Nonbeneficiaries.

Even if the application of the church plan exemption could be viewed as a religious accommodation, it still would impermissibly advance religion because it is imposed at the expense of nonbeneficiaries. "[A]n accommodation must be measured so that it does not override other significant interests." *Cutter*, 544 U.S. at 722. Specifically, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Id.* at 720 (citing *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985)). *See also Tex. Monthly*, 489 U.S. at 15 (religious tax exemption that "burdens nonbeneficiaries markedly" violates Establishment Clause).

In *Caldor*, the Supreme Court held that a statute that provided employees an unqualified right to time off on their chosen Sabbath day violated the Establishment Clause because it "would require the imposition of significant burdens on other employees required to work in place of the Sabbath observers." 472 U.S. at 710. Here, the burdens of the church plan exemption are imposed primarily upon OSF's employees, who receive no benefit from the exemption and instead are denied all ERISA protections, including minimum funding protections

and PBGC insurance of their benefits. *See also United States v. Lee*, 455 U.S. 252, 261 (1982) ("[A]n exemption from social security taxes [for] an employer … impose[s] the employer's religious faith on the employees."). Application of the exemption also impermissibly burdens OSF's secular competitors, who must make ERISA contributions and pay PBGC insurance premiums.

It simply cannot be said that the church plan exemption, as applied in this context, is "measured" to avoid "overrid[ing] other significant interests." *Cutter*, 544 U.S. at 722. Indeed, the exemption is not "measured" at all. Although Congress was concerned with government evaluations of church records, *see supra* pp. 66-68, it did not enact a narrow exemption from reporting or recordkeeping requirements; it enacted a blanket exemption from all of ERISA, including minimum funding and PBGC insurance requirements.[24]

---

[24] Notably, if any aspect of ERISA substantially burdens a hospital's religious exercise, Congress has provided a much narrower means of relief: that entity may seek relief under RFRA. *See generally Hobby Lobby*, 134 S. Ct. at 2760-75. RFRA would provide a narrow exemption from the particular provision that burdened religion; the hospital would not receive complete immunity from the entirety of ERISA. *See Cutter*, 544 U.S. at 720 (noting that under RLUIPA, which is analogous to RFRA, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries").

Because application of the exemption "unyielding[ly] weigh[s]" the religious interests of OSF "over all other interests," including the interests of its employees, application of the exemption "has a primary effect that impermissibly advances" religion. *Caldor*, 472 U.S. at 710.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment on the question of whether the Plans qualify as ERISA-exempt church plans and vacate its decision regarding the Establishment Clause. However, if this Court affirms that the Plans qualify as church plans, it should reverse the district court's grant of summary judgment with respect to the Establishment Clause.

RESPECTFULLY SUBMITTED this 10th day of December.

KELLER ROHRBACK L.L.P.

By: *s/ Matthew M. Gerend*
Matthew Gerend (*Lead Attorney*)
Lynn L. Sarko
Laura R. Gerber
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

KELLER ROHRBACK L.L.P.
Ron Kilgard
3101 N. Central Ave., Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088

COHEN MILSTEIN SELLERS & TOLL PLLC
Karen L. Handorf
Michelle C. Yau
Mary Bortscheller
Scott M. Lempert
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel.: (202) 408-4600

IZARD, KINDALL & RAABE, LLP
Mark P. Kindall
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel.: (860) 493-6292

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I, Matthew M. Gerend, certify that:

1.     This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 13,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook font.

Dated this 10th day of December, 2018.

By  /s/ Matthew M. Gerend

Keller Rohrback L.L.P.
1201 Third Ave., Suite 3200
Seattle, WA  98101
Tel.: (206) 623-1900

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2018, I electronically filed

the foregoing with the Clerk of the Court for the United States Court of

Appeals for the Seventh Circuit by using the CM/ECF system. I certify

that counsel for all the parties to this appeal are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.


 /s/ Matthew M. Gerend

# ADDENDUM

# TABLE OF CONTENTS

Page No.

Full Text of 1974 Version of Church Plan Definition,
Pub. L. No. 93-406, § 3(33), 88 Stat. 829 (1974) .............................ADD1

Full Text of 1980 Version (Current) of Church Plan Definition,
ERISA § 3(33), 29 U.S.C. § 1002(33) ......................................... ADD2–3

124 Cong. Rec. 10,464 (1978) .............................................................ADD4

124 Cong. Rec. 11,103 (1978) .............................................................ADD5

124 Cong. Rec. 12,106-08 (1978) ....................................................ADD6–8

124 Cong. Rec. 16,518-19 (1978) ................................................. ADD9–10

125 Cong. Rec. 1,356 (1979) .............................................................ADD11

125 Cong. Rec. 10,042, 10,052-58 (1979)................................. ADD12–19

126 Cong. Rec. 23,049 (1980) ........................................................ ADD20

*Hearings Before the Subcommittee on Private Pension Plans
and Employee Fringe Benefits of the Committee on Finance, United
States Senate,*
96th Cong. 363-66 (Dec. 4-5, 1979) ......................................... ADD21–25

*Stenographic Transcript of Hearings Before the Committee
on Finance, United States Senate, Executive Session,*
96th Cong. 1, 39-42 (June 12, 1980) ........................................ ADD26–31

# 1974 Version of Church Plan Definition

**(A)**  The term "church plan" means

  (i)  a plan established and maintained for its employees by a church or by a convention or association of churches which is exempt from tax under section 501 of the Internal Revenue Code of 1954, or

  (ii)  a plan described in subparagraph (C).

**(B)**  The term "church plan" (notwithstanding the provisions of subparagraph (A)) does not include a plan

  (i)  which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of the Internal Revenue Code of 1954), or

  (ii)  which is a plan maintained by more than one employer, if one or more of the employers in the plan is not a church (or a convention or association of churches) which is exempt from tax under section 501 of the Internal Revenue Code of 1954.

**(C)**  Notwithstanding the provisions of subparagraph (B)(ii), a plan in existence on January 1, 1974, shall be treated as a "church plan"

  if it is established and maintained by a church or convention or association of churches for its employees and employees of one of more agencies of such church (or convention or association) for the employees of such church (or convention or association) and the employees of one or more agencies or such church (or convention or association), and

  if such church (or convention or association) and each such agency is exempt from tax under section 501 of the Internal Revenue Code of 1954.

The first sentence of this subparagraph shall not apply to any plan maintained for employees of an agency with respect to which the plan was not maintained on January 1, 1974. The first sentence to this subparagraph shall not apply with respect to any plan for any plan year beginning after December 31, 1982.

Pub. L. No. 93-406, § 3(33), 88 Stat. 829 (1974) (indentations added for clarity).

**Full Text of Current Version of Church Plan Definition,
ERISA § 3(33), 29 U.S.C. § 1002(33)**

**(A)** The term 'church plan' means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

**(B)** The term 'church plan' does not include a plan--

**(i)** which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of Title 26), or

**(ii)** if less than substantially all of the individuals included in the plan are individuals described in subparagraph (A) or in clause (ii) of subparagraph (C) (or their beneficiaries).

**(C)** For purposes of this paragraph--

**(i)** A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

**(ii)** The term employee of a church or a convention or association of churches includes--

**(I)** a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

**(II)** an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches; and

**(III)** an individual described in clause (v).

**(iii)** A church or a convention or association of churches which is exempt from tax under section 501 of Title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

**(iv)** An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

**(v)** If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches, the church plan shall not fail to meet the requirements of this paragraph merely because the plan--

> **(I)** retains the employee's accrued benefit or account for the payment of benefits to the employee or his beneficiaries pursuant to the terms of the plan; or

> **(II)** receives contributions on the employee's behalf after the employee's separation from such service, but only for a period of 5 years after such separation, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7) of Title 26) at the time of such separation from service.

**(D)**    **(i)** If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26 fails to meet one or more of the requirements of this paragraph and corrects its failure to meet such requirements within the correction period, the plan shall be deemed to meet the requirements of this paragraph for the year in which the correction was made and for all prior years.

**(ii)** If a correction is not made within the correction period, the plan shall be deemed not to meet the requirements of this paragraph beginning with the date on which the earliest failure to meet one or more of such requirements occurred.

**(iii)** For purposes of this subparagraph, the term "correction period" means—

> **(I)** the period ending 270 days after the date of mailing by the Secretary of the Treasury of a notice of default with respect to the plan's failure to meet one or more of the requirements of this paragraph; or

> **(II)** any period set by a court of competent jurisdiction after a final determination that the plan fails to meet such requirements, or, if the court does not specify such period, any reasonable period determined by the Secretary of the Treasury on the basis of all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or

> **(III)** any additional period which the Secretary of the Treasury determines is reasonable or necessary for the correction of the default,

whichever has the latest ending date.


ERISA § 3(33), 29 U.S.C. § 1002(33)

Mr. PATTISON of New York.
Mr. STARK in two instances.
Mr. FASCELL in two instances.
Mr. RYAN.
Mr. RICHMOND in two instances.
Mr. SOLARZ.
Mr. DOWNEY.

## ADJOURNMENT

Mr. SIKES. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 5 o'clock and 12 minutes p.m.), under its previous order, the House adjourned until Wednesday, April 19, 1978, at 12 o'clock noon.

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

3887. A communication from the President of the United States, transmitting proposed supplemental appropriations for fiscal year 1978 for the Small Business Administration (H. Doc. No. 95-321); to the Committee on Appropriations and ordered to be printed.

3888. A letter from the Chairman, Advisory Council on Historic Preservation, transmitting a draft of proposed legislation to amend the act of October 15, 1966 (80 Stat 915), as amended, establishing a program for the preservation of additional historic properties throughout the Nation, and for other purposes; to the Committee on Interior and Insular Affairs.

3889. A letter from the Chairman, Development Coordination Committee, transmitting the 1977 annual report of the President on actions of the United States affecting the development of low-income countries, pursuant to section 640B(d) of the Foreign Assistance Act of 1961, as amended; to the Committee on International Relations.

3890. A letter from the Secretary of Transportation, transmitting the eighth annual report on operations under the Airport and Airway Development Act of 1970, pursuant to section 24 of the act; to the Committee on Public Works and Transportation.

3891. A letter from the Acting General Counsel of the Treasury, transmitting notice of the determination of the Secretary of the Treasury to temporarily waive countervailing duties on nonrubber footwear imports from Uruguay which are subject to bounties or grants, together with the reasons therefor, pursuant to 88 Stat. 2051 (19 U.S.C. 1303(e)) (H. Doc. No. 95-322); to the Committee on Ways and Means and ordered to be printed.

3892. A letter from the Deputy Fiscal Assistant Secretary of the Treasury, transmitting the 22d annual report on the financial condition and results of the operations of the highway trust fund, covering fiscal year 1977, pursuant to section 209(e)(1) of the Highway Revenue Act of 1956, as amended (H. Doc. No. 95-323); to the Committee on Ways and Means and ordered to be printed.

3893. A letter from the Deputy Fiscal Assistant Secretary of the Treasury, transmitting the seventh annual report on the financial condition and results of the operations of the Airport and Airway Trust Fund, covering fiscal year 1977, pursuant to section 208(e)(1) of the Airport and Airway Revenue Act of 1970, as amended (H. Doc. No. 95-324); to the Committee on Ways and Means and ordered to be printed.

3894. A letter from the Secretary of Agriculture, transmitting the fiscal year 1978 global assessment report of food production and needs, pursuant to section 408(b) of Public Law 83-480, as amended (91 Stat. 552); jointly to the Committee on Agriculture and International Relations.

3895. A letter from the Comptroller General of the United States, transmitting a report on the National Aeronautics and Space Administration's Landsat project (PSAD-78-58, April 17, 1978); jointly, to the Committee on Government Operations and Science and Technology.

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar, as follows:

Mr. MAHON: Committee on Appropriations. H.R. 9279. A bill to amend title 5, United States Code to provide for retention of grade and pay for certain employees, and for other purposes (Report No. 95-987, Pt. II). Referred to the Committee of the Whole House on the State of the Union.

Mr. KASTENMEIER: Committee on the Judiciary. H.R. 9400. A bill to authorize actions for redress in cases involving deprivations of rights of institutionalized persons secured or protected by the Constitution or laws of the United States; with amendment (Rept. No. 95-1058). Referred to the Committee of the Whole House on the State of the Union.

Mr. ULLMAN: Committee on Ways and Means. H.R. 5551. A bill to suspend for a 3-year period the duty on 2-Methyl, 4-chlorophenol; with amendment (Rept. No. 95-1059). Referred to the Committee of the Whole House on the State of the Union.

Mr. ULLMAN: Committee on Ways and Means. H.R. 11005. A bill to provide authorization of appropriations for the United States International Trade Commission for fiscal year 1979; with amendment (Rept. No. 95-1060). Referred to the Committee of the Whole House on the State of the Union.

Mr. ULLMAN: Committee on Ways and Means. H.R. 11711. A bill to improve the operation of the adjustment assistance programs for workers and firms under the Trade Act of 1974; with amendment (Rept. No. 95-1061). Referred to the Committee of the Whole House on the State of the Union.

Mr. THOMPSON: Committee on House Administration. H.R. 10392. A bill to establish a Hubert H. Humphrey Fellowship in Social and Political Thought at the Woodrow Wilson International Center for Scholars at the Smithsonian Institution and to establish a trust fund to provide a stipend for such fellowship (Rept. No. 95-1062). Referred to the Committee of the Whole House on the State of the Union.

Mr. MEEDS: Committee on Rules. House Resolution 1139. Resolution providing for the consideration of H.R. 8494. A bill to regulate lobbying and related activities (Rept. No. 95-1063). Referred to the House Calendar.

Mr. THOMPSON: Committee on House Administration. Senate Joint Resolution 106. Joint resolution to provide for the reappointment of A. Leon Higginbotham, Jr., as a citizen regent of the Board of Regents of the Smithsonian Institution (Rept. No. 95-1064). Referred to the House Calendar.

Mr. THOMPSON: Committee on House Administration. Senate Joint Resolution 107. Joint resolution to provide for the reappointment of John Paul Austin as a citizen regent of the Board of Regents of the Smithsonian Institution (Rept. No. 95-1065). Referred to the House Calendar.

Mr. THOMPSON: Committee on House Administration. Senate Joint Resolution 108. Joint resolution to provide for the appointment of Anne Legendre Armstrong as citizen regent of the Board of Regents of the Smithsonian Institution (Rept. No. 95-1066). Referred to the House Calendar.

Mr. THOMPSON: Committee on House Administration. S. 2220. An act to authorize the Secretary of the Treasury to designate an Assistant Secretary to serve in his place as a member of the Library of Congress Trust Fund Board (Rept. No. 95-1067). Referred to the House Calendar.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 5 of rule X and clause 4 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. ANDERSON of California (for himself, and CHARLES H. WILSON of California):
H.R. 12168. A bill to amend title 28 of the United States Code to provide that the U.S. District Court for the Central District of California may be held at Long Beach; to the Committee on the Judiciary.

By Mr. ANDERSON of California (for himself, Mr. ALLEN, Mr. ASHLEY, Mr. BINGHAM, Mr. FORD of Tennessee, Mr. GREEN, Mr. HANLEY, Mr. HANNAFORD, Mr. RANGEL, and Mr. WON PAT):
H.R. 12169. A bill to regulate the trapping of mammals and birds on Federal lands, and for other purposes; jointly, to the Committees on Merchant Marine and Fisheries, Interstate and Foreign Commerce, and the Judiciary.

By Mr. BRODHEAD (for himself, Mr. MOSS, Mrs. BURKE of California, Mr. STARK, and Mr. DELLUMS):
H.R. 12170. A bill to provide for reimbursement to States experiencing high rates of insured unemployment; to the Committee on Ways and Means.

By Mr. BROOKS:
H.R. 12171. A bill to strengthen the right of access of the Comptroller General to public and certain private records, to allow for limited auditing of unvouchered expenditures, and for other purposes; to the Committee on Government Operations.

By Mr. CONABLE:
H.R. 12172. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Ways and Means.

By Mr. CONABLE (for himself, Mr. ARCHER, Mr. BURKE of Massachusetts, and Mr. SCHULZE):
H.R. 12173. A bill to reinstate the tax treatment with respect to annuity contracts with reserves based on a segregated asset account as they existed prior to issuance of Revenue Ruling 77-85; to the Committee on Ways and Means.

By Mr. ROBERT W. DANIEL, JR.:
H.R. 12174. A bill to provide for the addition of Eppes Manor to Petersburg National Battlefield, and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. GAYDOS:
H.R. 12175. A bill to provide special consideration by CETA prime sponsors for Opportunity Industrialization Centers to provide, in cooperation with private industry, new preskills training and skills training opportunities, and to other national community-based organizations, to provide comprehensive employment services, to create new training and job opportunities in the private sector; to the Committee on Education and Labor.

By Mr. GEPHARDT (for himself, Mr. HOLLAND, Mr. STEIGER, Mr. FRENZEL, Mr. FORD of Tennessee, Mr. TUCKER, and Mr. DUNCAN of Tennessee):
H.R. 12176. A bill to amend the Internal Revenue Code of 1954 to clarify standards for determining status of individuals for em-

By Mr. SPELLMAN:
H.R. 12305. A bill to amend title 5 of the United States Code to increase the amounts of group life insurance currently available to Federal employees, to decrease the amount of employee deductions for such insurance, to lessen current restrictions on continuation of regular and optional life insurance, to provide additional optional life insurance on Federal employees and family members, and for other purposes; to the Committee on Post Office and Civil Service.

By Mr. BOB WILSON:
H.R. 12306. A bill to defer from income certain amounts deferred pursuant to State or local public employee deferred compensation plans; to the Committee on Ways and Means.

By Mr. YOUNG of Texas:
H.R. 12307. A bill providing for Federal maintenance of the Conn Brown Harbor Annex, Texas; to the Committee on Public Works and Transportation.
H.R. 12308. A bill to modify the project for the mouth of the Colorado River, Texas, and for other purposes; to the Committee on Public Works and Transportation.

By Mr. BOWEN:
H.R. 12309. A bill to amend the Packers and Stockyards Act of 1921 to the Committee on Agriculture.
H.R. 12310. A bill to change target and loan prices on upland cotton; to the Committee on Agriculture.

By Mr. BURKE of Massachusetts:
H.R. 12311. A bill to amend the Social Security Act and the Internal Revenue Code of 1954 to provide for Federal participation in the costs of the old-age, survivors, and disability insurance program and the medicare program, with appropriate reductions in social security taxes to reflect such participation, and with a substantial increase in the amount of an individual's annual earnings which may be counted for benefit and tax purposes; to the Committee on Ways and Means.

By Mr. CONABLE:
H.R. 12312. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; jointly, to the Committees on Education and Labor and Ways and Means.

By Mr. DODD (for himself, Mr. CORNWELL, Mrs. SCHROEDER, and Mr. STARK):
H.R. 12313. A bill to authorize the Secretary of Health, Education, and Welfare to make grants to the States to reimburse the costs of studies to assess the cost of compliance with section 504 of the Rehabilitation Act of 1973 with respect to educational programs, and to make grants to educational institutions to pay the Federal share of the costs of such compliance, and for other purposes; to the Committee on Education and Labor.

By Mr. HOLLAND (for himself, Mr. BROYHILL, Mr. PEPPER, Mr. CORRADA, Mr. SABASIN, Mr. ERTEL, Mr. CLEVELAND, Mr. LOTT, Mr. LEDERER, Mr. RINALDO, Mr. YOUNG of Missouri, Mr. SISK, Mr. RICHMOND, Mr. GAMMAGE, Mr. EILBERG, Mr. SPENCE, Mr. SANTINI, Mr. COHEN, Mr. KINDNESS, Mr. OTTINGER, Mr. ROSE, Mr. RODINO, Mr. EDWARDS of Alabama, Mr. HIGHTOWER, and Mr. BINGHAM):
H.R. 12314. A bill to amend the Trade Act of 1974; to the Committee on Ways and Means.

By Mr. KEMP:
H.R. 12315. A bill to amend parts A and D of title IV of the Social Security Act, and

title XX of such act, to make needed reforms in the AFDC and child support programs and in the child care provisions of the social services program, to assist the States and localities in meeting welfare costs, and for other purposes; to the Committee on Ways and Means.

By Mr. LAFALCE:
H.R. 12316. A bill to extend for 1 year, through fiscal year 1979, the authorization for the National Center for Productivity and Quality of Working Life; to the Committee on Banking, Finance and Urban Affairs.

By Mr. MONTGOMERY:
H.R. 12317. A bill to provide for the conveyance to the Holmes County School District of all the right, title, and interest of the United States in and to a certain tract of land in Holmes County, Miss.; to the Committee on Agriculture.

By Mr. PATTEN:
H.R. 12318. A bill to establish in the Smithsonian Institution the Thomas A. Edison Centennial Commission, to establish a grant program to assist the collecting, compiling, editing, and publishing of The Papers of Thomas A. Edison, and for other purposes; to the Committee on House Administration.

By Mr. PANETTA (for himself, Mr. WALGREN, Mr. RICHMOND, Mr. ROE, Mr. MILLER of California, Mr. MATHIS, Mr. EDWARDS of California, Mr. BONIOR, Mr. GORE, Mr. RAILBACK, Mr. STOKES, Mr. STARK, Mr. HARRINGTON, and Mr. SPELLMAN):
H.R. 12319. A bill to amend the Congressional Budget Act of 1974 to provide for a 2-year budgeting cycle, to provide for separate and timely consideration each of authorizing legislation, budget resolutions, and appropriations, and for other purposes; to the Committee on Rules.

By Mr. PERKINS:
H.R. 12320. A bill to amend title I of the Water Resources Development Act of 1974; to the Committee on Public Works and Transportation.

By Mr. RANGEL:
H.R. 12321. A bill to amend the Internal Revenue Code of 1954 to reduce the foreign tax credit for taxpayers found to be in violation of certain principles of fair employment in the Republic of South Africa, and for other purposes; to the Committee on Ways and Means.

By Mr. ROSE:
H.R. 12322. A bill to amend the Rural Electrification Act of 1936, as amended, to provide for the financing of telecommunication facilities for cable television and other broadband services in small towns and rural areas; to the Committee on Agriculture.

By Mr. STOCKMAN (for himself, Mr. KEMP, and Mr. STEIGER):
H.R. 12323. A bill to amend the Internal Revenue Code of 1954 to provide for tax reform, and for other purposes; to the Committee on Ways and Means.

By Mr. TEAGUE:
H.R. 12324. A bill to amend the Atomic Energy Act of 1954 with respect to the prices charged by the Federal Government for uranium enrichment services; jointly, to the Committees on Interior and Insular Affairs, Interstate and Foreign Commerce, Science and Technology, and Rules.

By Mr. McCLOSKEY:
H.J. Res. 866. Joint resolution relative to the President's authority to implement petroleum rationing; to the Committee on Interstate and Foreign Commerce.

By Mr. MURPHY of Pennsylvania (for himself and Mr. RAHALL):
H.J. Res. 867. Joint resolution to postpone the implementation of the enforcement provisions of the Surface Mine Control and Reclamation Act of 1977, Public Law 95-87 for a period of 6 months; to the Committee on Interior and Insular Affairs.

By Mr. BRINKLEY:
H. Con. Res. 571. Concurrent resolution disapproving proposed regulations of the Department of the Treasury requiring centralized registration of firearms and other matters; jointly, to the Committees on the Judiciary, and Ways and Means.

By Mr. FARY:
H. Con. Res. 572. Concurrent resolution expressing the sense of the Congress that the President should do everything possible to expedite the return to the United States from the Soviet Union of John Jodwalis and Lorraine Jodwalis Valcekauskiene; to the Committee on International Relations.

By Mr. ZABLOCKI (for himself, Mr. WRIGHT, Mr. FOUNTAIN, Mr. FASCELL, Mr. HAMILTON, Mr. BINGHAM, Mr. RYAN, Mr. WOLFF, Mr. SOLARZ, Mrs. MEYNER, Mr. PEASE, Mr. BROOMFIELD, Mr. DERWINSKI, Mr. FINDLEY, Mr. BUCHANAN, Mr. WINN, and Mr. LAGOMARSINO):
H. Con. Res. 573. Concurrent resolution denouncing the Government of Cambodia for its disregard of basic human rights; to the Committee on International Relations.

By Mr. CORNWELL (for himself, Mr. ARCHER, Mr. BROWN of California, Mr. CARR, Mr. GIBBONS, Mr. FOUNTAIN, Mr. D'AMOURS, Mr. GOLDWATER, Mr. KAZEN, Mr. McHUGH, Mr. MAGUIRE, Mr. RYAN, Ms. SCHROEDER, and Mr. WEISS):
H. Res. 1147. Resolution expressing the sense of the House of Representatives with respect to the killing of some 1,000 dolphins by Japanese fishermen in February 1978, and encouraging the Government of Japan to reassess its policy in permitting such killing; to the Committee on International Relations.

By Mr. SISK:
H. Res. 1148. Resolution to amend the Rules of the House of Representatives to extend the filing date this year under rule XLIV to June 30, 1978; to the Committee on Rules.

## MEMORIALS

Under clause 4 of rule XXII, memorials were presented and referred as follows:

376. By the SPEAKER: Memorial of the Legislature of the State of Colorado, relative to the use of antibiotics in animal feed grains; to the Committee on Interstate and Foreign Commerce.

377. Also, memorial of the Legislature of the Commonwealth of Pennsylvania, requesting that Congress call a convention for the purpose of proposing an amendment to the Constitution of the United States relative to the protection of the right to life of the unborn human fetus; to the Committee on the Judiciary.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

Mr. DORNAN introduced a bill H.R. 12325 for the relief of Claire Hamada Bach; which was referred to the Committee on the Judiciary.

## PETITIONS, ETC.

Under clause 1 of rule XXII,

448. The SPEAKER presented a petition of the National Drug Abuse Conference of 1978, Seattle, Wash., relative to expressing confidence in the leadership of Dr. Robert L. Du Pont as Director of the National Institute on Drug Abuse; which was referred to the Committee on Interstate and Foreign Commerce.

legislation which provides the vehicle for establishing integrated resource and environmental data on the natural and managed rivers as well as other North Coast watersheds and tributaries. The investigations and surveys we have underway are:

Northern California Streams.

The Humboldt Bay Baseline Survey.

The Russia River Basin Comprehensive Investigation.

The Eel River Streambank Erosion Demonstration Project.

Eel River Delta Alternatives to Levees.

The Eel River Comprehensive Basin Investigation.

The latter study and the Russian Comprehensive were unique in that it provided the Corps a new role in water resource planning and assistance. These basin resolutions direct the Corps to investigate all facets of the watershed, from forestry and fishing to water quality and flood control.

For the Eel Delta, we've authorized the Corps to evaluate and develop non-structural flood control alternatives such as flood proofing of buildings, possible relocation, dredging, channel stabilization and cattle evacuation plans. While it would not control a major flood such as in 1964, it could minimize damage and afford some protection and security from the lesser floods that occur.

In Lake County, there has also been a concentrated effort to deal with the water quality and supply problems at Clear Lake with nonstructural alternatives. In this endeavor, EDA, EPA, Bureau of Reclamation and the Corps have all been involved.

These ideas of a new and more flexible role for the Corps are being accepted. Recently, Lt. General John Morris, Chief of Engineers, in a speech to the Water Resources Congress, entitled "Where are We Headed" noted, "Water resources problems will continue to arise from population growth, economic expansion and unpredictable natural events will force more effective national water conservation measures supported by a proper blend of structural and non-structural solutions which are well engineered and developed. The key to resolving water resource problems is the formulation of clear, comprehensive national water policies which are in tune with today's public and national objectives." These changes in thinking by the Corps are indicative of the re-evaluations of National Water Policy currently taking place in the Congress and the Administration. One administration report advises the President to propose laws and adopt procedures that would require federal and state planners to consider much more carefully the building of huge government-financed water projects. This same report also recommends that states should be required to pay in advance 10% of the cost of the new water projects that they want built. Of course, Congress would have to assist and/or approve the establishment of any new water policy.

This Congress has approved our committee's new "clean water" program which authorizes comprehensive waste water management and includes my new innovative technology incentives amendments for communities that develop re-cycling, re-use and land treatment management alternatives.

The implications of all of this are far-reaching. For sure, it points to the need for building a cohesive political support group in the North Coast that will be able to articulate representative and clearly defined positions on the water related issues that affect you. I believe that your joint-powers agreement is the first step toward meeting that objective. Your program is a program *of*, *by* and *for* the areas of origin on the North Coast . . . you have perceived the potential for action by other interests in the

state and you are taking early-on action to make sure that our interests are protected. It is not a narrow, parochial, "them versus us" interest, but the legitimate interest in seeing that you have a say in what affects our communities . . . and the North Coast.

Your joint-powers agreement is properly predicated on the strong role that local government should and must play in determining public policy that you will establish and implement and I totally support the fundamental concepts of your agreement. The real challenge to all of us will come when we develop the specifics of our plan of action.

The Miami and Muskingum watershed conservancy programs in Ohio are excellent examples of what can be done by local units of government joining together to address common water resource related problems. These organizations were initially formed to control the tremendous floods that used to frequent the Miami and Muskingum Valleys in Ohio. Over the years, they have matured into multi-purpose water management organizations whose primary goal was flood control and the maintenance of water quality in their regions. They are actively involved in waste management, flow-augmentation, stream appearance, recreation facilities and other problems that affect water quality. I would strongly recommend that those who will be immediately involved in directing your joint-powers agreement look to the Miami and Muskingum programs as models of what can be done.

The Corps will cooperate with you in developing its studies and resource inventories. Last week in Washington I met with Colonel John Atsid, of the San Francisco District. We talked of this joint-powers agreement and he re-affirmed his commitment to provide support. He also indicated that Charlie Elmore, whom most of you know and who is here today, would be designated as the Corps' liaison person to work directly with you. I think the Corps is the best federal agency to provide coordination in this area because of its long-standing knowledge of our region and its water resources.

We also have to arrive at our area tremendous talent and human resources that you can tap in developing your information base. I have discussed with the Presidents of Humboldt State, Sonoma State and the Community Colleges in the North Coast the idea of involving their forestry, fishery, remote sensing, environmental science and biology departments in your efforts. They have all expressed a ready willingness to participate.

Given such a broad-based support effort we can continue to work at the Federal level to provide a mechanism to consolidate the tremendous amount of information that would be forthcoming. Several ideas that I have in mind might be the construction of a hydrology model of our North Coast, similar to the San Francisco Bay Model that the Corps operates in Sausalito. Or a computer simulation model of the region, like the one used to monitor water quality in the Miami Conservancy Program.

Only after the establishment of such a data base and resource inventory will you be in a position to make the kinds of management and policy decisions that you envision in your joint-powers agreement.

So, in conclusion, let us restate our purposes and objectives.

As I stated in my 1971 speech advocating the Basin Watershed Conservancy concept, "The challenge to the North Coast is to strike a balance between conservation and development of our natural resources. The present and future economy of our area is tied directly to the way in which we meet this challenge."

I want to assure you that I fully support your actions to date and I believe we are in unison toward meeting this challenge.

The purposes of the Watershed Conservancy program is to provide information, direction and expertise necessary for the continued management, development, use and treatment of the surface and ground water of the Russian and Eel Basin so as to meet the water quality standards set by the State and approved by the federal government under our "Clean Water" program.

Simply put, our objectives are to say that the waters of the Russian and Eel Watersheds must be suitable for all uses at all places at all times.

Water quality is everybody's business.

Water management is our mutual responsibility.

Water is one of this nation's treasures. We cannot survive without it.

A nation is no more than the sum of its natural resources and its people and only when the people and their governments properly manage their natural resources can they or the nation survive.

Working together, we, on the North Coast of California, can demonstrate to our people the kind of enlightened leadership required to meet this challenge. The people we are privileged to represent have a right to expect the best from all of us. Give us at the state and federal level a vehicle to work with and maybe we can supply some of the fuel. But, you the elected representatives of the North Coast will be in the drivers seat.

In addition to the water management I've discussed, I look forward to working with you on transportation and economic development programs that will revitalize and diversify the economies of our area.●

---

## PENSION PLANS OF CHURCHES AND CHURCH-RELATED ORGANIZATIONS

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from New York, (Mr. CONABLE) is recognized for 10 minutes.

● Mr. CONABLE. Madam Speaker, I wish to discuss a bill, H.R. 12172, which I recently introduced to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan. The major church denominations of this country all agree that they are seriously affected by the definition of church plan we provided in section 414(e) of the Internal Revenue Code.

For many years our church plans have been operating responsibly and providing retirement coverage and benefits for the clergymen and lay employees of the churches and their agencies. Some of the church plans are extremely old, dating back to the 1700's. The median age of church plans is at least 40 years. Churches are among the first organizations to found retirement plans in the United States.

In 1974, when we enacted the Employee Retirement Income Security Act of 1974, popularly called ERISA, we exempted church plans from the provisions of the act to avoid excessive Government entanglement with religion in violation of the first amendment to the Constitution. We provided that a church plan is a plan established and maintained for its employees by a church or by a convention

or association of churches which is exempt from tax under section 501. At the same time we provided that a church plan, if it were to continue to be identified as such, could not provide coverage to employees of church agencies not participating in the plan in 1974, nor could it provide coverage for employees of any agencies after 1982.

Mr. Speaker, I believe that our definition of church plan should be revised. It does not take into account the special needs of our churches, ministers, and lay persons, or the structural differences of our denominations.

Under the existing definition of church plan, the churches must by 1982 divide their plans into two parts, one covering employees of the church and one covering employees of church agencies. Present law fails to recognize that the church agencies are parts of the church in its work of disseminating religious instruction and caring for the sick, needy, and underprivileged. Estimates of the initial costs of the division of church plans that have been in existence for many years and of the additional continuing costs of maintaining two separate plans are so significant that reduced benefits may result.

Some of these additional costs must of necessity be shifted to the local churches and agencies. Churches and church agencies are often very small and operate marginally, being staffed by two or three persons who work at a personal sacrifice. Plan contributions for churches and agencies are generally dependent upon tithes and offerings. There is virtually no way to pass on higher plan costs to the consumer as businesses can. If forced by the 1982 deadline to establish a retirement plan separate from the denominational plan and to comply with the paperwork and other requirements of ERISA, many of the agencies might decide to abandon their retirement plans.

Mr. Speaker, the division of the church plans will also hurt the work of our churches. The churches consider their agencies as an extension of their mission. A significant number of ministers and lay employees move frequently from church to agency and back in pursuance of their careers. A church may ask a rabbi to serve in an agency where his services are most needed. The rabbi may then return to pulpit work. The present definition of church plan does not satisfy the unique need of our churches to cover continuously their employees in one plan. If ministers and lay persons cannot be continuously covered by one plan, gaps in coverage will result, and they will not be free to pursue their work for the denomination as they should.

Also, many ministers serve their faith outside of the denominational structure as chaplains in prisons, universities, hospitals, and elsewhere. In some cases the employment relationship is not easily discernible or does not exist. For example, evangelist ministers may have no employer. The present definition of church plan could be interpreted to exclude them from coverage either now or in 1982.

One of the most important binding influences within a religious denomination is the pension and welfare benefits program. The division of the church plans may lessen the unity of the church. Some churches fear that division of their plans will destroy the sense of oneness within the church and weaken the dedication of agency employees to the denomination.

Moreover, in a congregational denomination, if the plan covering the agencies is required to comply with ERISA, the denomination would not be able to require an agency either to join in the plan or to observe the requirements of ERISA. In the congregational type of denomination, the local churches and agencies are self-governing. Unlike corporate structures, no lines of authority exist from the denomination.

The existing definition of church plan has also created many technical problems. The large majority of church plans of the congregational denominations are administered by a pension board, a unit separate from, but controlled by, the denomination. It is not clear whether a plan administered by a pension board of a congregational church is a plan established and maintained for its employees by a church. A pension board is usually incorporated because the church does not want the funds set aside for retirement purposes to be subject to the general creditors of the church.

This structure raises a question whether a plan maintained by a pension board is maintained by a church. In the congregational denominations, ministers and lay employees are considered employees of the local churches and other units, rather than of the denomination. As mentioned, congregational churches have little control over local churches and agencies. Some differences in plan provisions, therefore, necessarily occur, and the question is also raised whether the plan is maintained by the church (denomination) for its employees or by a local church for its employees.

Under section 1 of the bill, effective as of January 1, 1974, a church plan may continue after 1982 to cover the employees of its church-associated organizations, both those participating in 1974 and those that begin participation after 1974. This recognizes the special nature of church agencies and of their special problems in complying with ERISA. It also recognizes the unique needs of ministers and denominational employees to move about within the denominational structure and still stay within the church plan.

The bill achieves this result by retaining the basic definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churches exempt from tax under section 501. The term "employee", however, is redefined to include: First, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; second, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and

third, certain former employees who participated in a church plan before separation from service. Under the bill an organization is "associated" with a church if it shares common religious bonds and convictions with that church.

For purposes of section 414(e), all such employees are deemed to be employed by the denomination. The combined effect of these provisions is to treat both hierarchical and congregational denominations in the same manner for purposes of the church plan definition. The bill, thus, accommodates the differences in beliefs, structures, and practices among our religious denominations.

By including ordained ministers within the definition of employee without requiring an employment relationship, the bill permits a church plan to continue to cover a minister who serves in the exercise of his ministry outside of the denominational structure. Thus, a minister serving as a prison chaplain or teaching religious studies in a university could receive coverage. An evangelist minister who has no employer would also be entitled to participate in the church plan.

The bill provides that a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service.

A typical example would be a minister or lay employee who reaches a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the denomination. During such a transitional period, the denomination may permit the individual to continue to be covered by the church plan for a time even though he has separated from service.

The bill would permit a church plan to continue to receive contributions for an individual who is a participant in a church plan at the time of his separation from service, but only for a period of 5 years. No such time limit is placed upon employees who are separated from service because of disability.

The bill also recognizes pension boards as acceptable funding media for church plans. A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of this organization is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church.

The organization must also be controlled by or associated with a church exempt from tax under section 501(a). It is intended that no church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in plan provisions among the local employers.

The bill also corrects a very harsh position taken by the Treasury Department

in its proposed regulations defining church plan which provide that once a church plan fails to meet the requirements of a church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

My bill provides a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the bill is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Mr. Speaker, I believe that when we enacted ERISA, we required far more of our churches than we intended. We certainly did not in 1974 intend to draft a definition of church plan that fails to take into consideration the way our church plans are operated or that is disruptive of church affairs. Our 1974 legislation requires the church plans to reconstitute their plans after decades, even centuries, of responsible experience.

The problems the churches face are immediate. They are concerned today that their plans may be presently disqualified as church plans. This is a matter we must not put off until 1982.

Therefore, Mr. Speaker, I urge my distinguished colleagues to support this measure, and I ask unanimous consent that the bill be printed in the Record.

The bill follows:

H.R. 12172

A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. Section 414(e) of the Internal Revenue Code of 1954 is amended to read, as follows:

"(e) CHURCH PLAN.—

"(1) IN GENERAL.—For purposes of this part the term 'church plan' means a plan established and maintained (to the extent required in paragraph (2)(B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501.

"(2) CERTAIN PLANS EXCLUDED.—The term 'church plan' does not include a plan—

"(A) which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513); or

"(B) which includes individuals less than substantially all of whom are described in paragraphs (1), (3)(B), or (3)(E) (or their beneficiaries).

"(3) DEFINITIONS AND OTHER PROVISIONS.—For purposes of this subsection—

"(A) A plan established and maintained by a church or by a convention or association of churches shall include a plan established and maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

"(B) The term 'employee' of a church or a convention or association of churches shall include—

"(i) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

"(ii) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 and which is controlled by or associated with a church or a convention or association of churches; and

"(iii) an individual described in paragraph (3)(E).

"(C) A church or a convention or association of churches which is exempt from tax under section 501 shall be deemed the employer of any individual included as an employee under paragraph (3)(B).

"(D) An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

"(E) If an employee who is included in a church plan separates from the service of a church or a convention or association of churches or an organization described in clause (ii) of paragraph (3)(B), the church plan shall not fail to meet the requirements of this subsection merely because it—

"(i) retains his accrued benefit or account for the payment of benefits to him or his beneficiaries pursuant to the terms of the plan; or

"(ii) receives contributions on his behalf after his separation from such service, but only for a period of five years after the employee's separation from service, unless the employee is disabled (within the meaning of the disability provisions of the church plan or, if there are no such provisions in the church plan, within the meaning of section 72(m)(7)) at the time of such separation from service.

"(4) CORRECTION OF FAILURE TO MEET CHURCH PLAN REQUIREMENTS.—If a plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 fails to meet one or more of the requirements of this subsection and corrects its failure to

meet such requirements within the correction period, the plan shall be deemed to meet the requirements of this subsection for the year in which the correction was made and for all prior years. If a correction is not made within the correction period, the plan shall not be deemed to meet the requirements of this subsection beginning with the date on which the earliest failure to meet one or more of such requirements occurred. The term 'correction period' means the period ending with the later of the following: (1) 270 days after the date of mailing by the Secretary of a notice of default with respect to the plan's failure to meet one or more of the requirements of this subsection; (2) such period as may be set by a court of competent jurisdiction after a determination that has become final that the plan fails to meet such requirements, or, if the final court determination does not specify such period, a reasonable period depending upon all the facts and circumstances, but in any event not less than 270 days after the determination has become final; or (3) any additional period which the Secretary determines is reasonable or necessary for the correction of the default."

SEC. 2. The amendments made by this Act shall be effective as of January 1, 1974. ●

## HALL PEOPLE

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Illinois (Mr. MICHEL) is recognized for 15 minutes.

● Mr. MICHEL. Madam Speaker, yesterday I inserted in the RECORD a Washington Post article that gave a disturbing and enlightening look at Washington, D.C., education. Today I am going to offer the second in that series. This time we follow the aimless wanderings of a student called "Frank." Frank wants to be famous, rich, and successful. But he feels he should not be asked to work or study or in any way make any serious effort to accomplish his goals. He skips most of his classes and spends most of his time in the hallways of his school avoiding schoolwork. He is yet another in a generation that has been led to believe life owes him fame and fortune. At the same time he has been given the impression that working for such success is a sign of shame.

Perhaps we should call Frank a member of the "time-bomb" generation. The inevitable frustration he will feel when he discovers his current values are useless in dealing with reality will eventually explode in anti-societal behavior. And he is not alone.

At this point I wish to insert in the RECORD, "Hall People Are Rarely in Class," from the Washington Post, May 1, 1978:

[From the Washington Post, May 1, 1978]

"HALL PEOPLE" ARE RARELY IN CLASS
(By Juan Williams)

Frank rolled over and sighed. His eyes quickly opened, then closed. Something had awakened him. "... Get up, Frank, you'll be late," his mother yelled again. He let his eyes slide back into a light sleep. She yelled upstairs once more, and he pulled the blanket tight. Frank was going to be late again for the start of classes at Eastern High.

"We can't get him in the bed and when we get him in . . ." Frank's father said, "we can't get him out of bed."

Out of bed and standing in Eastern High's hallway in an olive Army fatigue jacket, smoking cigarettes, maybe a joint, or looking

Postmaster General to issue a postage stamp commemorating the landing by Sir Francis Drake in the Golden Hinde on the California Coast in the summer of 1579.

"Whereas, The summer of 1979 will be the quadricentennial of the landing by Sir Francis Drake in the Golden Hinde on what is now the California coast during his historic circumnavigation of the world; and

"Whereas, In the summer of 1579 Captain Francis Drake discovered and named part of Western America, Nova Albion; and

"Whereas, The Native Americans did with great ceremony and dignity present a crown and scepter and the title of Hioh to Captain Francis Drake; and

"Whereas, Captain Francis Drake did then declare these people to be subjects of Her Majesty Queen Elizabeth of England, the first non-Europeans to be so honored; and

"Whereas, Nova Albion was the founding overseas dominion in the British Commonwealth of Nations; and

"Whereas, Nova Albion was the first Elizabethan discovery claim of what was to become the United States and directly contributed to the English interest in the new world which manifested itself with Sir Humphrey Gilbert's voyage to Newfoundland in 1583 and Sir Walter Raleigh's colony in Virginia in 1585; and

"Whereas, New England was given that name by Captain John Smith because Sir Francis Drake had named the opposite shore Nova Albion in honor of the oldest known name for Britain; and

"Whereas, Francis Drake was the first British navigator to circle the world and perform this 'famous voyage' in fulfillment of the Elizabethan doctrine that the 'air and the sea is common to all nations'; now, therefore, be it

"*Resolved* by the Assembly and Senate of the State of California, jointly, That the Legislature of the State of California respectfully memorializes the President and the Congress of the United States and the United States Postal Service to authorize the issuance of a commemorative stamp in honor of the landing by Sir Francis Drake in the Golden Hinde on the California Coast in the summer of 1579; and be it further

"*Resolved*, That the Chief Clerk of the Assembly transmit copies of this resolution to the President and Vice President of the United States, to the Speaker of the House of Representatives, to each Senator and Representative from California in the Congress of the United States, and to the Postmaster General of the United States Postal Service."

POM–686. A concurrent resolution adopted by the Legislature of the State of Louisiana; to the Select Committee on Small Business:

"HOUSE CONCURRENT RESOLUTION No. 136

"A concurrent resolution to memorialize the Congress and President of the United States to direct the Small Business Administration to sponsor a loan forgiveness program to speed the economic recovery of Louisiana citizens affected by the recent flood in federally declared disaster area comprising the parishes of Orleans, Jefferson, St. Charles, St. Bernard, and St. John the Baptist

"Whereas, the recent nine and one-half inch rain on May 2, 1978, caused sudden and disastrous flooding in the parishes of Orleans, Jefferson, St. Charles, St. Bernard, and St. John the Baptist; and

"Whereas, the area suffered untold damage and wreaked havoc in the lives of its residents as to result in federal declaration of these parishes as a disaster area; and

"Whereas, in the aftermath of this great disaster, the Small Business Administration can most effectively aid those residents of the inundated area to whom it has loaned money by forgiving a portion of those loans. Therefore, be it

"*Resolved* by the House of Representatives of the Legislature of Louisiana, the Senate concurring herein, that the Congress and President of the United States are hereby memorialized to direct the Small Business Administration to take immediate steps to initiate and sponsor a loan forgiveness program to aid the residents of the disaster area declared by the federal government to be comprised of the parishes of Orleans, Jefferson, St. Charles, St. Bernard, and St. John the Baptist who were adversely affected by the flood of May 2, 1978 and to thereby speed their economic recovery. Be it further

"*Resolved* that a copy of this Resolution shall be transmitted to the President of the United States, the Speaker of the House of Representatives, the President of the Senate of the United States Congress, and to each member of the Louisiana delegation in Congress."

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. HART, from the Committee on Armed Services, with an amendment and an amendment to the title:

S. 2635. A bill to authorize the disposal of eleven materials from the national and supplemental stockpiles (together with additional views) (Rept. No. 95–925).

By Mr. PROXMIRE, from the Committee on Banking, Housing, and Urban Affairs:

Special Report on Spending Allocations (Rept. No. 95–926).

By Mr. HART, from the Committee on Armed Services, without amendment:

S. Res. 474. An original resolution waiving section 402(a) of the Congressional Budget Act of 1974 with respect to the consideration of S. 2635. Referred to the Committee on the Budget.

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of committees were submitted:

By Mr. TALMADGE, from the Committee on Agriculture, Nutrition, and Forestry:

The following-named persons to the Members of the Federal Farm Credit Board, Farm Credit Administration:

George Warren Lacey, of Montana;
John D. Nail, Jr., of Arkansas; and
Dwight L. Tripp, Jr., of Maine.

(The above nominations from the Committee on Agriculture, Nutrition, and Forestry were reported with the recommendation that they be confirmed, subject to the nominees' commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.)

By Mr. EASTLAND, from the Committee on the Judiciary:

Peter F. Vaira, Jr., of Illinois, to be U.S. Attorney for the Eastern District of Pennsylvania.

Russell T. Baker, Jr., of Maryland, to be U.S. Attorney for the District of Maryland.

(The above nominations from the Committee on the Judiciary were reported with the recommendation that they be confirmed, subject to the nominees' commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.)

## ORDER FOR STAR PRINT OF REPORT ON S. 3033

Mr. LEAHY. Mr. President, a number of clerical and typographical errors were made in the printing of the report on S. 3033 (Rept. No. 95–879). In order to correct the errors, I ask unanimous consent that the report be star printed.

The PRESIDING OFFICER. Without objection, it is so ordered.

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first time and, by unanimous consent, the second time, and referred as indicated:

By Mr. DOLE:

S. 3165. A bill for the relief of William Armstrong and Rita Armstrong; to the Committee on the Judiciary.

S. 3166. A bill to amend the Internal Revenue Code of 1954 to exclude from gross income a portion of each individual's personal service income to reflect the loss in the purchasing power of that income attributable to inflation; to the Committee on Finance.

S. 3167. A bill to establish a Commission to prepare and recommend a Federal constitutional amendment to balance the Federal Budget, and for other purposes; to the Committee on Governmental Affairs.

S. 3168. A bill to amend the Congressional Budget Act to limit increases in total Federal budget outlays and new budget authority to existing real dollar levels; to the Committee on Governmental Affairs and the Committee on the Budget, jointly, pursuant to the order of August 4, 1977, and if one committee orders the bill reported, the second committee has 30 days of continuous session in which to act.

By Mr. DURKIN:

S. 3169. A bill for the relief of Rocio Edmondson; to the Committee on the Judiciary.

By Mr. BAYH (for himself and Mr. METZENBAUM):

S. 3170. A bill to provide financial assistance to States in order to expand educational programs in juvenile and adult correctional institutions to assist in the rehabilitation of criminal offenders, and for other purposes; to the Committee on the Judiciary.

By Mr. GRIFFIN:

S. 3171. A bill to amend the Tariff Schedules of the United States to provide duty-free treatment for certain gloves and trousers which incorporate protective features designed specifically for use in forestry; to the Committee on Finance.

By Mr. TALMADGE (for himself and Mr. BENTSEN):

S. 3172. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance.

S. 3173. A bill to amend section 403(b) of the Internal Revenue Code of 1954 with respect to computation of the exclusion allowance for ministers and lay employees of the church, and to amend sections 403(b) (2) (B), 415(c) (4), 415(d) (1), and 415(d) (2) and to add a new section 415(c) (8) to extend the special elections for section 403(b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Finance.

By Mr. INOUYE:

S. 3174. A bill for the relief of Kimiko Tengan Watanabe and Richard Kiyoshi Uyehara; to the Committee on the Judiciary.

By Mr. MARK O. HATFIELD:

S. 3175. A bill to facilitate the exchange of certain lands in the State of Oregon, and for other purposes; to the Committee on Energy and Natural Resources.

By Mr. LAXALT:

S. 3176. A bill to amend section 118 of the Internal Revenue Code of 1954 to clarify the treatment of contributions in aid of construction to regulated electric or gas utilities; to the Committee on Finance.

By Mr. NUNN (for himself, Mr. TALMADGE, and Mr. SASSER):

S. 3177. A bill to amend the Federal Property and Administrative Services Act of 1949 to permit State and County extension services to obtain excess property from the United States; to the Committee on Governmental Affairs.

By Mr. CHILES (for himself, Mr. PACKWOOD, Mr. HEINZ, and Mr. DECONCINI):

S. 3178. A bill to provide for the resolution of claims and disputes relating to Government contracts awarded by executive agencies; to the Committee on Governmental Affairs and the Committee on the Judiciary, jointly, by unanimous consent.

By Mr. NUNN (for himself, Mr. CHILES, Mr. HUDDLESTON, and Mr. JOHNSTON):

S. 3179. A bill to amend the Small Business Act to create a Small Business and Capital Ownership Development Program; to the Select Committee on Small Business.

By Mr. BAYH (for himself, Mr. NELSON, Mr. ABOUREZK, and Mr. WILLIAMS:)

S. 3180. A bill to amend the Animal Welfare Act to prohibit the use of live animals as visual lures in dog racing and training, and for other purposes; to the Committee on Environment and Public Works.

By Mr. DECONCINI (by request):

S. 3181. A bill to provide for nationwide service of subpoenas in all suits involving the False Claims Act, and for other purposes; to the Committee on the Judiciary.

By Mr. TALMADGE (for himself and Mr. BENTSEN):

S. 3182. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; the Committee on Finance and the Committee on Human Resources, jointly, by unanimous consent.

By Mr. DOLE:

S.J. Res. 138. Joint resolution proposing an amendment to the Constitution to provide that, except in time of national emergency declared by the Congress, expenditures of the Government may not exceed the revenues of the Government during any fiscal year; to the Committee on the Judiciary.

By Mr. INOUYE (for himself and Mr. MATSUNAGA):

S.J. Res. 139. Joint resolution establishing the Aboriginal Hawaiian Claims Settlement Study Commission, and for other purposes; to the Select Committee on Indian Affairs.

---

## STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. DOLE:

S. 3165. A bill for the relief of William Armstrong and Rita Armstrong; to the Committee on the Judiciary.

(The remarks of Mr. DOLE when he introduced the bill appear elsewhere in today's proceedings.)

By Mr. DOLE:

S. 3166. A bill to amend the Internal Revenue Code of 1954 to exclude from gross income a portion of each individual's personal service income to reflect

the loss in the purchasing power of that income attributable to inflation; to the Committee on Finance.

S. 3167. A bill to establish a commission to prepare and recommend a Federal constitutional amendment to balance the Federal Budget, and for other purposes; to the Committee on Governmental Affairs.

S. 3168. A bill to amend the Congressional Budget Act to limit increases in total Federal budget outlays and new budget authority to existing real dollar levels; to the Committee on Governmental Affairs and the Committee on the Budget, jointly, pursuant to the order of August 4, 1977, and if one committee orders the bill reported, the second committee has 30 days of continuous session in which to act.

S.J. Res. 138. A joint resolution proposing an amendment to the Constitution to provide that, except in time of national emergency declared by the Congress, expenditures of the Government may not exceed the revenues of the Government during any fiscal year; to the Committee on the Judiciary.

(The remarks of Mr. DOLE when he introduced the bills and joint resolution appear elsewhere in today's proceedings.)

---

By Mr. BAYH (for himself and Mr. METZENBAUM):

S. 3170. A bill to provide financial assistance to States in order to expand educational programs in juvenile and adult correctional institutions to assist in the rehabilitation of criminal offenders, and for other purposes; to the Committee on the Judiciary.

FEDERAL CORRECTIONAL EDUCATION ASSISTANCE ACT

● Mr. BAYH. Mr. President, there can be little dispute that American prisons have not been effective in rehabilitating criminals. Recidivism studies document that at least one-third of the offenders released from prison will be reincarcerated within 5 years. What is more, even those ex-prisoners who do extricate themselves from the cycle of release and reimprisonment usually do not lead what society would deem a successful or useful life. Studies have shown that the unemployment rate among ex-offenders is three times the rate for the general public, that those who do find jobs often work in low income, semi-skilled positions, and that many ex-felons end their lives in suicide.

There is no single explanation for this tremendously high rate of postprison failure, but we do know for certain that learning disabilities and educational deficiencies are widespread among juvenile and adult offenders in this country. The Federal Bureau of Prisons has estimated that as many as 20 to 50 percent of the adults incarcerated in American prisons are illiterate. Up to 90 percent are school dropouts. A 1974 survey of prisoners in State correctional institutions showed that 61 percent of the inmates had terminated their formal schooling before receiving a high school diploma. This compares with 38.7 percent of the general population. About 25 percent of the

general population had some college training, compared with only 9 percent among the inmate population.

Education and success in life are integrally related in this society. Studies have found a relationship between educational failure and inability to compete in the job market as well as a relationship between employment and the ability to stay out of prison. A Bureau of Prisons study indicates that whenever unemployment of males over 20 goes up, the population of the Federal prison system goes up correspondingly. It seems obvious that if an ex-convict is to break away from the criminal cycle, he or she must at least be able to read and write and have some marketable job skill.

Of course, there are those who would argue that we have already tried a variety of educational, counseling, and other treatment techniques, many of which have failed miserably. Some contend that the majority of offenders simply cannot be rehabilitated, at least not by any of the currently known methods, and that we should turn our emphasis from rehabilitation to punishment and incapacitation. In response, I would point out that due to poor funding and inadequate resources, corrections education has not been given a realistic chance to succeed. Examining the allocation of resources for corrections in this country reveals that at least 80 percent of all expenditures are for custody and administration, while only 20 percent are for rehabilitative programs, including education. Three recent studies in particular have confirmed how woefully inadequate our corrections education programs have been so far.

The Corrections Task Force of the National Advisory Commission on Criminal Justice Standards and Goals concluded that education within the American correctional system has not kept pace with the social, economic, political, and technological realities of society. Therefore, the quality and relevance of educational programs in institutions have suffered tremendously. These findings were further detailed by a study prepared for the U.S. Department of Labor. The report, "Vocational Preparation in U.S. Correctional Institutions: A 1974 Survey," concluded that "vocational preparation in correctional institutions is generally inadequate" and represents "a serious waste of human and material resources." Major findings of the study included the following:

Only half of the directors of vocational training programs regarded as important the development of job skills to enable an inmate to obtain outside employment. Vocational guidance, counseling and follow-up were often lacking.

More than half the inmates interviewed wanted types of training that were unavailable at their institutions.

There was an apparent lack of relationship of job training to individual and local market needs.

Less than half of the inmates who participated in training said that the job they eventually obtained upon release was related to the training they received in prison.

Institutions with vocational training programs spent on the average less than

port on the Department's disposal of foreign excess property during fiscal year 1978, pursuant to section 404(d) of the Federal Property and Administrative Services Act of 1949, as amended; to the Committee on Government Operations.

485. A letter from the Secretary, American Battle Monuments Commission, transmitting a report on the Commission's activities under the Freedom of Information Act during calendar year 1978, pursuant to 5 U.S.C. 552 (d); to the Committee on Government Operations.

486. A letter from the General Counsel, Securities and Exchange Commission, transmitting notice of proposed changes in an existing records system, pursuant to 5 U.S.C. 552a(o); to the Committee on Government Operations.

487. A letter from the Comptroller General of the United States, transmitting a list of reports issued or released by the General Accounting Office during December 1978, pursuant to section 234 of the Legislative Reorganization Act of 1970; to the Committee on Government Operations.

488. A letter from the Secretary of the Interior, transmitting notice of the bidding systems to be used and the tracts to be offered in OCS Lease Sale No. 49, pursuant to section 8(a)(8) of the Outer Continental Shelf Lands Act, as amended (92 Stat. 60); to the Committee on Interior and Insular Affairs.

489. A letter from the Clerk, U.S. Court of Claims, transmitting a copy of the court's judgment order in docket Nos. 13-F, 15-I, 29-G, 133-C, 141 and 308, *James Strong et al. and Related Cases* v. *The United States*; to the Committee on Interior and Insular Affairs.

490. A letter from the Assistant Secretary of State for Congressional Relations, transmitting notice of the State Department's intention to consent to a request by the Government of Iran for permission to transfer certain U.S.-origin military equipment to the Government of Pakistan, pursuant to section 3(a) of the Arms Export Control Act; to the Committee on International Relations.

491. A letter from the Chief Commissioner, U.S. Court of Claims, transmitting the reports of the Trial Commissioner and the Review Panel on Congressional Reference Cases 2-74 and 1-75, *Marlin Toy Products, Inc.* v. *The United States*, pursuant to 28 U.S.C. 2509; to the Committee on the Judiciary.

492. A letter from the Secretary of the Army, transmitting a Corps of Engineers report on Madaket Harbor, Nantucket, Mass., pursuant to section 219 of the River and Harbor Act of 1968; to the Committee on Public Works and Transportation.

493. A letter from the Secretary of the Army, transmitting a Corps of Engineers report on Mill Creek at Ripley, W. Va., in response to a resolution of the House Committee on Public Works adopted July 18, 1963; to the Committee on Public Works and Transportation.

494. A letter from the President, Legal Services Corporation, transmitting the Corporation's budget request for fiscal year 1980, pursuant to section 1105(e)(2) of the Economic Opportunity Act, as amended (88 Stat. 380); jointly, to the Committees on Appropriations, and the Judiciary.

495. A letter from the Comptroller General of the United States, transmitting a report on Navy's shore-based ship maintenance support in the Western Pacific and Indian Oceans (LCD-78-426, January 26, 1979); jointly, to the Committees on Government Operations, and Armed Services.

496. A letter from the Comptroller General of the United States, transmitting a report on the Navy's shore-based ship maintenance support in the Western Pacific and Indian Oceans (LCD-78-426A, January 26, 1979); jointly, to the Committees on Government Operations, and Armed Services.

497. A letter from the Mayor of the District of Columbia, transmitting his response to the Comptroller General's report on mental health services at St. Elizabeth's Hospital (HRD-78-31, September 27, 1978), pursuant to section 736(b)(3) of Public Law 93-198; jointly, to the Committees on Government Operations, and the District of Columbia.

498. A letter from the Comptroller General of the United States, transmitting a report on the development of a domestic common carrier telecommunications policy (CED-79-18, January 24, 1979); jointly, to the Committees on Government Operations, and Interstate and Foreign Commerce.

499. A letter from the Deputy Assistant Secretary of Energy for Environment, transmitting certification that a safe container for air transport of plutonium has been developed and tested which will not rupture under crash and blast testing equivalent to the crash and explosion of a high-flying aircraft, pursuant to section 501 of Public Law 94-187; jointly, to the Committees on Armed Services, Science and Technology, and Interior and Insular Affairs.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 5 of rule X and clause 4 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. ASHLEY:
H.R. 1566. A bill to amend section 521 of the Housing Act of 1949; to the Committee on Banking, Finance and Urban Affairs.

By Mr. BRINKLEY:
H.R. 1567. A bill to amend title 38, United States Code, to grant eligibility for home, condominium, and mobile home loan benefits to certain persons who are serving or have served in the Selected Reserve of the Ready Reserve of any of the reserve components of the Armed Forces; to the Committee on Veterans' Affairs.

By Mr. PHILLIP BURTON:
H.R. 1568. A bill for the relief of certain natives of the Philippines who served in the U.S. Armed Forces during World War II; to the Committee on the Judiciary.

By Mr. CARR:
H.R. 1569. A bill to amend the Employee Retirement Income Security Act of 1974 to provide that benefits paid by the Pension Benefit Guaranty Corporation under terminated employee benefit plans be adjusted annually by the percentage change in the Consumer Price Index; to the Committee on Education and Labor.

H.R. 1570. A bill to amend the Employee Retirement Income Security Act of 1974 to require the Pension Benefit Guarantee Corporation to insure certain nonbasic benefits; to the Committee on Education and Labor.

H.R. 1571. A bill to amend the Internal Revenue Code of 1954 to deny the business deduction for amounts paid or incurred for lobbying before Congress or other legislative bodies; to the Committee on Ways and Means.

H.R. 1572. A bill to provide for equalizing the costs of unemployment compensation, revising the extended benefits program, and for other purposes; to the Committee on Ways and Means.

By Mr. CARTER:
H.R. 1573. A bill to authorize the Secretary of Agriculture to convey any interest held by the United States in certain lands located in Bell County, Ky., to the Board of Education, Bell County, Ky.; to the Committee on Agriculture.

By Mr. COLLINS of Texas:
H.R. 1574. A bill to amend the U.S. Housing Act of 1937 for the purpose of assuring energy savings with respect to rental units assisted under such act; to the Committee on Banking, Finance and Urban Affairs.

By Mr. CONABLE:
H.R. 1575. A bill to amend the Internal Revenue Code of 1954 to exclude certain mission societies and their missionary members from social security taxes; to the Committee on Ways and Means.

H.R. 1576. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Ways and Means.

H.R. 1577. A bill to amend section 403(b) of the Internal Revenue Code of 1954 with respect to computation of the exclusion allowance for ministers and lay employees of the church, and to amend sections 403(b)(2)(B), 415(c)(4), 415(d)(1), and 415(d)(2) and to add a new section 415(c)(8) to extend the special elections for section 403 (b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Ways and Means.

H.R. 1578. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church, and to make certain clarifying amendments to the definition of church plan; jointly to the Committees on Education and Labor, and Ways and Means.

By Mr. EDWARDS of Alabama:
H.R. 1579. A bill to amend the Communications Act of 1934 to establish orderly procedures for the consideration of applications for renewal of broadcast licenses to the Committee on Interstate and Foreign Commerce.

H.R. 1580. A bill to reaffirm the intent of the Congress with respect to the structure of the common carrier telecommunications industry rendering services in interstate and foreign commerce; to reaffirm the authority of the States to regulate terminal and station equipment used for telephone exchange service in certain instances; to require the Federal Communications Commission to make certain findings in connection with Commission actions authorizing specialized carriers; and for other purposes; to the Committee on Interstate and Foreign Commerce.

H.R. 1581. A bill to amend the Internal Revenue Code of 1954 to exclude certain service performed on fishing boats from coverage for purposes of unemployment compensation; to the Committee on Ways and Means.

H.R. 1582. A bill to disregard, for purposes of certain taxes imposed by the Internal Revenue Code of 1954 with respect to employees, certain changes since 1975 in the treatment of individuals as employees; to the Committee on Ways and Means.

H.R. 1583. A bill to amend the Internal Revenue Code of 1954 to provide income tax incentives to improve the economics of recycling waste paper; to the Committee on Ways and Means.

Mr. EVANS of Georgia (for himself and Mr. PEASE):
H.R. 1584. A bill to amend section 203 of the Federal Property and Administrative Services Act of 1949 to require, prior to disposal, that notice and first right of refusal be given to certain previous holders of surplus real property; to the Committee on Government Operations.

By Mr. FRENZEL:
H.R. 1585. A bill to amend title 18 of the United States Code to eliminate racketeering in the sale and distribution of cigarettes, and for other purposes; to the Committee on the Judiciary.

H.R. 1586. A bill to authorize the Secretary of Transportation to make grants for the

CONSOLIDATED REPORT OF EXPENDITURE OF FOREIGN CURRENCIES AND APPROPRIATED FUNDS FOR FOREIGN TRAVEL BY MEMBERS AND EMPLOYEES OF THE U.S. SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION, EXPENDED BETWEEN JAN. 1 AND MAR. 31, 1979

| Name and country | Name of currency | Per diem | | Transportation | | Miscellaneous | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency |
| Barclay, Charles M.: Jamaica | U.S. dollars | | 375.00 | | | | | | 375.00 |
| Cannon, Howard W.: Jamaica | U.S. dollars | | 225.00 | | | | | | 225.00 |
| Total | | | 600.00 | | | | | | 600.00 |

HOWARD W. CANNON,
Chairman, Committee on Commerce, Science, and Transportation

Apr. 4, 1979.

CONSOLIDATED REPORT OF EXPENDITURE OF FOREIGN CURRENCIES AND APPROPRIATED FUNDS FOR FOREIGN TRAVEL BY MEMBERS AND EMPLOYEES OF THE U.S. SENATE COMMITTEE ON THE JUDICIARY, SUBCOMMITTEE ON IMMIGRATION AND REFUGEES, EXPENDED BETWEEN NOV. 12 AND DEC. 19, 1978

| Name and country | Name of currency | Per diem | | Transportation | | Miscellaneous | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency | Foreign currency | U.S. dollar equivalent or U.S. currency |
| Sidney B. Rawitz | | | | | | | | | |
| Portugal | Escudo | 10,472 | 225.00 | | 700.00 | | | | 925.00 |
| England | Pound | 213.03 | 426.60 | | | | | | 426.60 |
| Switzerland | Swiss franc | 352.40 | 218.00 | | 1,588.00 | | | | 1,806.00 |
| France | French franc | 1,134.75 | 267.00 | | | | | | 267.00 |
| Jerry M. Tinker: Switzerland | Swiss franc | 486.65 | 285.00 | | 1,121.00 | | | | 1,406.00 |
| Total | | | 1,421.60 | | 3,409 | | | | 4,830.06 |

EDWARD M. KENNEDY,
Chairman.

Apr. 23, 1979.

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second time by unanimous consent, and referred as indicated:

By Mr. GOLDWATER:

S. 1077. A bill to amend the Act of December 22, 1974, and for other purposes; to the Select Committee on Indian Affairs.

By Mr. JAVITS (for himself, Mr. GOLDWATER, Mr. DOMENICI, Mr. WILLIAMS, and Mr. PELL):

S. 1078. A bill to amend the Internal Revenue Code of 1954 to provide for the the taxation of artists' income and estates; to the Committee on Finance.

By Mr. PRESSLER (for himself and Mr. YOUNG):

S. 1079. A bill to amend the Internal Revenue Code of 1954 to permit farmers and small businesses to obtain the investment credit for used section 38 property acquired from a related party; to the Committee on Finance.

By Mr. RIBICOFF (by request):

S. 1080. A bill to amend the Energy Reorganization Act of 1974, as amended, to provide for statutory creation of the Office of Inspection and Enforcement of the Nuclear Regulatory Commission; to the Committee on Governmental Affairs.

By Mr. COHEN:

S. 1081. A bill to terminate the authorization for the Dickey-Lincoln School project, Saint John River, Maine; to the Committee on Environment and Public Works.

By Mr. GRAVEL:

S. 1082. A bill to repeal limits placed on public compensation for personal and property damage caused by nuclear power accidents; to the Committee on Environment and Public Works and the Committee on Energy and Natural Resources, jointly, provided that if and when ordered reported by one committee, the other committee have 60 days to report, exclusive of any period the Senate is not in session for more than 3 days, by unanimous consent.

By Mr. BAUCUS:

S. 1083. A bill to amend section 5 of the Department of Transportation Act, relating to rail service assistance; to the Committee on Commerce, Science, and Transportation.

By Mr. RIBICOFF (by request):

S. 1084. A bill to amend Section 301(a)(1) of the Energy Reorganization Act of 1974, as amended, 42 U.S.C. 5841(a)(1); to the Committee on Governmental Affairs.

By Mr. COCHRAN (for himself and Mr. CHAFEE):

S. 1085. A bill to amend the Internal Revenue Code of 1954 to provide that the mileage rate used to determine the amount allowable as a deduction for the business use of automobiles shall be the same as the rate used to reimburse Federal employees; to the Committee on Finance.

By Mr. McGOVERN:

S. 1086. A bill for the relief of Bharat Persaud; to the Committee on the Judiciary.

S. 1087. A bill for the relief of Kenneth Robert Gibb; to the Committee on the Judiciary.

By Mr. CRANSTON (for himself and Mr. LUGAR):

S. 1088. A bill to amend the National Housing Act in order to improve the mobile home financing programs administered by the Department of Housing and Urban Development; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. BENTSEN:

S. 1089. A bill to amend the Internal Revenue Code of 1954 and the Employee Retirement Income Security Act of 1974 to simplify compliance with Federal employee benefit plan requirements; to the Committee on Finance and the Committee on Labor and Human Resources, jointly, by unanimous consent.

By Mr. TALMADGE (for himself, Mr. BENTSEN, and Mr. BOREN):

S. 1090. A bill to amend the Employee Retirement Income Security Act of 1974 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance and the Committee on Labor and Human Resources, jointly, by unanimous consent.

S. 1091. A bill to amend the Internal Revenue Code of 1954 to permit a church plan to continue after 1982 to provide benefits for employees of organizations controlled by or associated with the church and to make certain clarifying amendments to the definition of church plan; to the Committee on Finance.

S. 1092. A bill to amend section 403(b) of the Internal Revenue Code of 1954 with respect to computation of the exclusion allowance for ministers and lay employees of the church, and to amend sections 403(b)(2)(B), 415(c)(4), 415(d)(1), and 415(d)(2) and to add a new section 415(c)(8) to extend the special elections for section 403(b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Finance.

By Mr. PRESSLER (for himself and Mr. MATHIAS):

S.J. Res. 74. Joint resolution authorizing and requesting the President to issue a proclamation designating May 11, 1979, as "CARE Day"; considered and passed.

## STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. GOLDWATER:

S. 1077. A bill to amend the act of December 22, 1974, and other purposes; to the Select Committee on Indian Affairs.

AMENDMENT OF THE NAVAHO-HOPI SETTLEMENT ACT OF 1974

● Mr. GOLDWATER. Mr. President, today I am introducing legislation to amend the Navaho-Hopi Settlement Act of 1974. This public law was the result of congressional attempts to resolve a 100-year-old dispute between the Navahos

clusion allowance for ministers and lay employees of the church, and to amend sections 403(b)(2)(B), 415(c)(4), 415(d)(1), and 415(d)(2) and to add a new section 415(c)(8) to extend the special elections for section 403(b) annuity contracts to employees of churches, conventions, or associations of churches, and their agencies and to permit a de minimis contribution amount in lieu of such elections; to the Committee on Finance.

LEGISLATION REGARDING CHURCH PENSION PLANS AND RELATED REFORM OF ERISA

● Mr. TALMADGE. Mr. President, with my colleagues Senators BENTSEN and BOREN, I am reintroducing legislation to amend the definition of "church plan" found at section 414(e) of the Internal Revenue Code and section 3(33) of the Employee Retirement Income Security Act of 1974, which I introduced in the 95th Congress. All of the major church denominations in this country—Protestant, Catholic, and Jewish—are of one accord in this matter. They need and desire relief.

When we enacted ERISA in 1974, we set 1982 as the date beyond which a church plan could no longer provide retirement and welfare benefits for employees of church agencies. We also forbade the church plans to provide any new agency coverage after 1974. Moreover, as I will explain later, the church plan definition is so narrow that it almost completely fails to consider the way our church plans have for decades operated. At this moment our churches are justifiably concerned that their plans do not meet the church plan requirements and are, therefore, subject to ERISA. In 1974, we did not recognize the unique character and needs of our church plans.

The church plans in this country have historically covered both ministers and lay employees of churches and church agencies. These plans are some of the oldest retirement plans in the country. Several date back to the 1700's. The average age of a church plan is at least 40 years. To comply with ERISA by 1982, the churches must divide their plans into two so that one will cover church employees and the other, agency employees. It is no small task to break up a plan that has been in existence for decades, even centuries.

The estimated legal, actuarial, and accounting costs of the initial division of church plans and the additional continuing costs of maintaining two separate plans are so significant that reduced retirement and other benefits may result unless they can be assimilated. To offset these additional costs, the churches are confronted with a very large, and possibly not absorbable, economic burden, merely to provide pre-ERISA level of benefits. There is no imposition by ERISA of such moment on the plans of other organizations.

Church agencies are essential to the churches' mission. They are for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches. As a practical matter, it is doubtful that the agency plans would survive subjection to ERISA. There is an essential difference between the plans of business and the plans of church institutions. If a business incurs increased plan maintenance costs, it merely passes these on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the additional costs of complying with ERISA. The churches fear that many of the agencies would abandon their plans. We are concerned today that the requirements of ERISA has made the maintenance of plans too expensive and demanding even for businesses which have the capacity to absorb additional costs. The impact of ERISA on church agencies would be many times as serious as that on businesses.

Ministers and lay employees have a unique need to be covered by one plan. Employment is extremely fluid within our denominations. A minister will frequently move from church to agency, or wherever his services are most needed. If he cannot be covered by one plan, gaps in coverage may occur because the agency may not have a plan or may have a waiting period before participation. If the church plan definition is allowed to remain, ministers and lay employees will not be able to pursue their missions nearly as freely as they have in the past. It is inescapable that the way our churches have functioned will be directly affected.

As I mentioned earlier, the church plan definition is so narrowly drawn that it does not in many ways even approximate the way church plans are organized or operated. For example, this definition can be interpreted to require a minister or lay employee of a church to be a current employee. Many ministers serve their faith outside the denominational structure—as chaplains in prisons, hospitals, universities, and elsewhere. Evangelist ministers are usually self-employed and have no employer. There is no valid reason for denying these persons the benefits of retirement and welfare coverage.

This type of problem is less apt to occur in a hierarchical denomination because a minister may continue to be considered an employee even though he is serving outside the church structure.

Most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from, but controlled by, the denomination. Under the church plan definition, there is a question whether the plan is established by a church, as it must be, or by a pension board. This requirement also points up the inapplicability of the church plan definition to congregational churches. In this type of church, the denomination has little, if any, control over the local churches. Some differences in plan provisions occur, because the denomination cannot enforce uniformity, and the question whether the plan is maintained by the denomination or by the local churches is raised.

The inability of a congregational denomination to control its agencies makes it difficult to see how the church agency plan could meet the requirements of ERISA. In a corporate structure lines of authority are clear. One plan covering the employees of a parent and its subsidiaries can easily meet the requirements of law because of the control executed by the parent. As I have stated, a congregational denomination cannot force the agencies to observe the requirements of ERISA. Accordingly, there is little hope that a plan established by a congregational church for its agencies could comply with ERISA.

Mr. President, these and other problems over the church plan definition under present law confront the churches today. They are worried that their plans do not now meet the church plan requirements and concerned over the impending restructuring of their plans. It is time we remove the churches from this statutory cloud. If we have enacted a statute that may require the church plans to come under ERISA, file reports, be subject to the examination of books and records and possible foreclosure of church property to satisfy plan liabilities, it must be changed because we have clearly created an excessive Government entanglement with religion.

Under the provisions of our proposals, effective as of January 1, 1974, a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan. Our legislations retains the definition of church plan as a plan established and maintained for its employees by a church or by a convention or association of churchs exempt from tax under section 501. However, to accommodate the differences in beliefs, structures, and practices among our religious denominations, all employees are deemed to be employed by the denomination. The term employee is also redefined to include: First, a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry; second, an employee of an organization which is exempt from tax and which is controlled by or associated with the church; and third, certain former employees who participated in the church plan before separation from service.

Under our legislation an organization is "associated" with a church if it shares common religious bonds and convictions with that church. Thus, by including an ordained minister as an employee without the requirement of an actual employment relationship, the church plan may continue to cover a minister who serves outside of the denominational structure, provided the service is in the exercise of his ministry. Accordingly, a minister serving as a prison chaplain or teaching religious studies at a university or an evangelist minister by who no employer would be entitled to participate in the church plan.

Under our legislation a church plan will not have to remove from its rolls an employee who has left the denominational group but may retain his accrued benefit or account for the eventual payment of benefits under the plan. There

is no real reason why a church plan should be forced to pay a former employee his accrued benefit in cash and, thus, destroy his retirement benefits. Some denominations continue to accept plan contributions for disabled employees and, temporarily, for employees who have separated from service. A minister or lay employee may reach a point in his career where he wants time to decide whether he will spend the rest of his life in the service of the church. During this period the denomination may permit the individual to continue to be covered by the church plan even though he is separated from service. Under our legislation a church plan may continue to receive contributions for an individual who is a participant in the church plan at the time of his separation from service but only for a period of 5 years. A time limit is not placed upon employees who separated from service because of disability.

A plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, will be considered a church plan, provided the principal purpose or function of the pension board is the administration or funding of a plan or program for the provision of retirement or welfare benefits for the employees of a church. The pension board must also be controlled by or associated with a church exempt from tax under section 501. No church plan administered or funded by a pension board would be disqualified merely because it is separately incorporated or merely because of variations in the plan provisions among the local employers.

Our legislation also corrects a very harsh position taken by the Treasury Department in its proposed regulations defining church plans. These proposed regulations provide that once a church plan fails to meet the requirements of church plan it can never thereafter be a church plan. This rule requires perpetual disqualification of church plan status for the smallest violation of rules that are not now clearly understood and that will take years to resolve.

Our proposals provide a mechanism whereunder a church plan will be disqualified as such only after it receives appropriate notice that it has violated the church plan requirements and does not within a certain period of time correct its default. The term "correction" as used in the legislation is not intended necessarily to require a church plan to undo the default completely or to put itself and other parties in precisely the same position they would have been in had the default never occurred. The degree of correction required should depend upon the equities of the situation.

For example, a possible violation of the church plan requirements would be the coverage of an impermissible number of individuals who are not defined as employees. A complete correction of this type of default would require the plan to refund to these individuals all contributions made on their behalf. Such a correction may cause the distributions to be included in the incomes of innocent persons and, hence, work a hardship on them.

In this type of situation, the default should be considered corrected if the church plan were permitted to retain the accrued benefits or accounts of these individuals for the eventual payment of benefits upon their death or retirement. But the plan should accept no further contributions with respect to them.

Mr. President, with my distinguished colleagues Senators BENTSEN and BOREN, I today reintroduce legislation to amend several provisions of the Internal Revenue Code that inequitably prevent the satisfactory accumulation of retirement benefits for the majority of clergymen and lay employees of church denominations in this country. This legislation is a large step in the direction of assuring our ministers and lay employees of an adequate retirement allowance.

It is well known that clergymen and lay employees are not well compensated. The beginning salary for a minister may be from $5,000 to $10,000 a year. Prior to retirement his salary may have increased to $15,000 or $20,000. Lay employees generally receive less compensation than ministers. Moreover, the retirement incomes of ministers and lay employees from church retirement plans are very small, being on the order of from $2,000 to $3,000 a year.

Most of our church denominations provide for the retirement of their ministers and lay employees in the form of annuities governed by section 403(b) of the code. The amount that can be contributed for the purchase of such an annuity, without income tax consequences to the employee, is limited by the "exclusion allowance" of section 403(b) (2). The amount of the exclusion allowance for any year is the excess of (1) 20 percent of the employee's includable compensation for the year times the employee's years of service with his or her employer over (2) the aggregate tax-sheltered contributions made by the employer for the employee in prior years. The exclusion allowance is designed to permit larger than usual retirement annuity contributions to be made late in the employee's career to compensate for the years when contributions may not have been made. These are called catchup contributions. The opportunity for making catchup contributions is extremely important to poorly paid persons such as ministers and lay employees. A minister who is paid $7,500 a year at the beginning of his career will need all of his income for many years to support his family and educate his children. During these years, because of the minister's low level of salary, pension contributions made on his behalf by his church will be minimal. However, when he reaches 50 years or so, his living expenses will tend to decrease. Then he or his employer may be in a position to make significant catchup contributions to his retirement annuity.

However, two provisions of the code inequitably prevent the making of catchup contributions in the case of many ministers and lay employees. In 1974 when we enacted section 415(c)(1) of the code, we placed a limitation on the amounts that can be contributed to a

defined contribution plan, such as a 403 (b) annuity arrangement. This limitation, which operates independently of the exclusion allowance, is the lesser of $25,000 (adjusted by increases in the cost of living) or 25 percent of the participant's compensation. In imposing this limitation, we recognized that it would have a serious effect on the ability to make catchup contributions and provided in section 415(c)(4) certain elections that a participant could make in order to override the 25-percent ceiling. However, these elections are available only to employees of educational organizations, hospitals, and home health service agencies. Obviously, we were not then aware of the extensive use of section 403(b) annuities by our churches.

The second problem area is the provision in section 403(b)(2) which limits the "years-of-service" factor of the exclusion allowance to years of service with the employee's current employer. In computing the exclusion allowance for any year, the employee is not given credit for any years of service with prior employers. It is common in many denominations for a minister or lay employee to move from one church to another within the denomination or among various agencies of the denomination during the course of their careers. Under current law each church or denominational agency for which the minister or lay employee works is treated as a separate employer for purposes of the years-of-service factor. The minister or lay employee is accordingly not given credit for all of his or her services with the denomination in the computation of the exclusion allowance. For an employee who has changed jobs frequently, as do the ministers and lay employees of many denominations, this rule severely reduces the exclusion allowance and the ability to make catchup contributions.

Mr. President, our legislation would correct the first inequity by extending the right to make the elections in section 415(c)(4) to employees of churches, and their agencies. We believe that these persons should have the right to make the same elections as employees of educational organizations, hospitals, and home health service agencies. Our legislation also provides a de minimis amount of $10,000 which may be contributed, subject to the exclusion allowance, without the necessity of making the section 415(c)(4) elections. This de minimis amount is parallel to the de minimis amount provided for defined benefit plans in section 415(b)(4) of the code. The term "agency" of a church is also defined in our legislation as an exempt organization which is either controlled by or associated with a church or a convention or association of churches. We further provide that an organization is "associated" with a church or a convention or association of churches if it shares common religious bonds and convictions with that church.

Our legislation also would treat the service of a minister or lay employee with any church or church agency of a religious denomination as the service with a single employer for purposes of computing the exclusion allowance. All

the years of service of a minister or lay employee for churches or agencies of the denomination would be aggregated in determining the exclusion allowance for taxable years beginning after 1977. It would make no difference whether the years of service being aggregated occurred before 1978 or after 1977. Our legislation will enable contributions to be made by and on behalf of ministers and lay employees in order to provide them with retirement benefits based upon the years of service with the denomination, rather than with the current employer.

Mr. President, I have received numerous letters from officials of various denominations endorsing the legislative proposals I am making today regarding church pension plans and related reform of ERISA. I ask unanimous consent that they be printed at this point in the RECORD.

There being no objection, the letters were ordered to be printed in the RECORD, as follows:

THE RABBINICAL PENSION BOARD,
*New York, N.Y., May 2, 1979.*
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Union of American Hebrew Congregations was incorporated in 1873 by an act of the Ohio legislature for the purpose of . . .

"To encourage and aid the organization and development of Jewish Congregations.

To promote Jewish education and to enrich and intensify Jewish life.

To maintain the Hebrew Union College-Jewish Institute of Religion."

Some 35 years ago, the Union of American Hebrew Congregations and the Central Conference of American Rabbis organized the Rabbinical Pension Board for the purpose of administering pensions and other group insurance plans for the benefit of rabbis, religious educators, congregational administrators and other synagogue professionals who are engaged in work on behalf of the Reform Jewish Movement within the United States.

The Rabbinical Pension Board, through its two parent bodies, represents some eight hundred Reform Jewish congregations and some eleven hundred participating rabbis and other congregational professionals. The Rabbinical Pension Board is managed by a Board of Trustees elected by the Board of the Union of American Hebrew Congregations and the Central Conference of American Rabbis.

Mr. Robert L. Adler of Chicago, the chairman of the Rabbinical Pension Board, and I, share a great concern about the facts of the Employee Retirement Income Security Act of 1974 ("ERISA") on our retirement annuity and welfare benefit program. We are particularly concerned about the "intrusion of the Internal Revenue Service into the affairs of church groups and their agencies by presuming to define what is and what is not an integral part of these religious groups" and we are supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that agencies such as ours are recognized as part of a church or convention of churches and are entitled to participate in such a church plan."

We appreciate your introducing and co-sponsoring with Senator Lloyd Bentsen last year legislation designed to clarify and define the church plan and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced in this legislative session in the House of Representatives by Representative Barber B. Conable, Jr. of New York as H.R. 1576, 1577 and 1578.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA, of which we are a member, during this session of the Congress will be most appreciated.

We feel that it is most important that this be accomplished as speedily as possible.

Sincerely,
THEODORE K. BROIDO,
*Secretary, Rabbinical Pension Board.*

JOINT RETIREMENT BOARD.
OF RABBINICAL ASSEMBLY.
*New York, N.Y., April 27, 1979.*
Senator HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: I wish to thank you for having introduced legislation in the 95th session of Congress sponsored by the Church Alliance for Clarification of ERISA and showing your interest in helping the millions of participants in Church and Synagogue sponsored pension plans.

I would very much appreciate it and would deem it an honor if you could find time to introduce and sponsor similar legislation in the 96th session of Congress.

If there is any way we can be of help, please do not hesitate to let us know.

Sincerely,
LEO. J. LANDES.

WORKER BENEFIT PLANS,
*St. Louis, Mo., April 20, 1979.*
Hon. HERMAN E. TALMADGE,
*U.S. Senate*
*Washington, D.C.*

DEAR SENATOR TALMADGE: First, I want to express on behalf of our church body my deep appreciation to you for the interest and efforts you demonstrated on behalf of the church pension programs by introducing legislation in the last session of Congress which would have benefited the many workers presently enrolled in the various denominational pension programs.

If the present definition of "church plan" as same is contained in the Employee Retirement Income Security Act of 1974 ("ERISA") is not changed as was outlined in the legislation you introduced into the Senate last year, the pension program of The Lutheran Church-Missouri Synod will have to be divided into two programs, one for ministers who are serving church agencies and another for those ministers serving what the present definitions call "church". This splitting up of our programs is going to be a costly procedure and can only be borne out of the program monies, which means out of the pension monies available to our already underpaid church workers. Our church body certainly does not look favorably upon the fact that the Internal Revenue Service is attempting to define what is and what is not "church" and how the mission of the church is to be carried out.

Senator Talmadge, The Lutheran Church-Missouri Synod pension programs are not the only church pension programs facing a problem over the effects of ERISA. All major denominations are involved as evidenced by the formation of the Church Alliance for Clarification of ERISA. Your assistance is needed and we certainly hope you will again introduce and co-sponsor legislation to clarify the church plan definition of ERISA

and also allow church workers to have greater retirement benefits.

Your continued interest and support in this matter is greatly appreciated.

Sincerely yours,
EARL E. HAAKE,
*Administrator.*

PRESBYTERIAN CHURCH IN AMERICA,
*Columbus, Ga., April 27, 1979.*
Senator HERMAN E. TALMADGE,
*Washington, D.C.*

DEAR MR. TALMADGE: The Presbyterian Church in America has expressed its support of the various bills being suggested to exempt the church pension funds from the provisions of ERISA.

Whatever you can do to help us would be greatly appreciated.

Yours truly,
Dan M. Moore,
*Business Administrator.*

THE BOARD OF PENSIONS,
*Philadelphia, Pa., April 18, 1979.*
Hon. HERMAN E. TALMADGE,
*U.S. Senate,*
*Washington, D.C.*

MY DEAR SENATOR: On behalf of the Board of Pensions of the United Presbyterian Church in the U.S.A., may I express to you our sincere appreciation for your introduction and co-sponsorship last year of legislation designed to clarify the ERISA definition of a "church plan." From the standpoint of this Board and similar units of other religious denominations, such clarifying legislation is essential to remove the present uncertainty concerning the intent of this definition.

Absent the needed clarification, church plans will be unable to serve all employees of churches and church agencies without becoming subject to the administrative requirements of ERISA. The expenses that would result from meeting these administrative requirements would necessarily result in a reduction of the pension benefits that would otherwise be payable to plan beneficiaries. Because of the low salaries paid to church workers, their pensions are already small—they can ill afford to be reduced.

We believe that the legislation you sponsored last year would correct important defects of ERISA. Therefore, we urge you to reintroduce and co-sponsor similar legislation in the present session of Congress. In so doing you will be helping to assure that church pension plans will be able to maintain their service to church workers and their families on an efficient, cost-effective basis.

Very truly yours,
ARTHUR W. BROWN,
*President, Board of Pensions.*

BOARD OF PENSIONS,
LUTHERAN CHURCH IN AMERICA,
*Minneapolis, Minn., April 18, 1979.*
SENATOR HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Last year you introduced and co-sponsored legislation with Senator Lloyd Bentsen designed to clarify the church plan definition of the Employee Retirement Income Security Act of 1974 (ERISA) and to allow denominational workers to have greater retirement annuity benefits. Clergy and lay members of the Board of Pensions of the Lutheran Church in America appreciate your efforts and only regret that the legislation failed to be enacted.

Companion legislation has now been reintroduced in this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578.

You have already received a summary statement of some of the problems related to ERISA and church plans that require legislative attention. An additional copy of that

members of the Church Alliance for Clarification of ERISA is enclosed for your review.

We are deeply concerned about the effects of ERISA on our denomination's retirement annuity benefit programs. Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA in this session will be appreciated.

Such support will be considerable help to us and other church pension plans in utilizing as much of available resources as possible for the benefit of our many retired ministers and church lay workers.

Sincerely,

MANFRED HOLCK, JR.,
*Comptroller.*

PENSION FUND OF
THE CHRISTIAN CHURCH,
*Indianapolis, Ind., April 12, 1979.*
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: Every religious communion that has been around long has a church pension plan. One needn't wonder why for long, when they understand the nature and commitment of the ministry and others who serve the Church, plus the desire of the Church to be true to its teachings in social and economic practices. This, I am confident, is true for all groups, be they Catholic, Protestant, or Hebrew.

By and large these institutions are served by devoted persons who make sacrifices—rarely own property—live on limited income—and serve wherever they are called.

Early in our history, the need arose for the provisions for them in case of their age or disability or their survivors in time of death. Consequently, Church pension plans are older than the life insurance industry in the United States.

Because the communion I serve is one of the younger communions, our Board began its operation in 1895 and has operated under a charter here in Indiana since then.

Because of certain things included and also omitted in the Employee Retirement and Income Security Act of 1974 (ERISA), this denomination, along with most other denominations, has become increasingly aware of the effect that is occurring upon our church pension plan and benefit programs.

This is a strange one. As a matter of fact, in regard to vesting and funding, our plans exceed the requirements expected under ERISA. However, in regard to reporting requirements in relationship to the units serving the Church in its various benevolent, missionary and educational enterprises, the law as now written would separate us from almost a century of service to such institutions by 1982. In addition to that, there are other injustices placed upon ministers and church employees who are not accorded the same retroactive computation advantages for their employers to build up their pensions in their final years that are accorded employees of other institutions.

This concern was registered and expressed by a resolution passed in the last General Assembly of the Christian Church (Disciples of Christ) meeting in Kansas City, Missouri in October, 1977.

We are grateful to you and Senator Bentsen, as well as Representative Conable, of New York, for introducing legislation in the last session that would have corrected many of these ills. We are calling upon many of our concerned senators and representatives to join you in this session to see that this matter does have the legislative correction so sorely needed. Along with representatives of some twenty-five or thirty other denominations participating in the Church Alliance for Clarification of ERISA, we have been attempting to express a mutual concern, since we have no regular Church organization of this broad base—Catholic, Protestant and Jewish, in order to make such a presentation

legislation.

Your introduction and co-sponsoring of the legislation needed in this session is most appreciated.

Cordially yours,

WILLIAM MARTIN SMITH.

THE AMERICAN LUTHERAN CHURCH,
*Minneapolis, Minn., April 18, 1979.*
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The American Lutheran Church (ALC) has been established as a "union of congregations to which the Gospel of reconciliation has been given," the specific purposes to be "the proclamation and propagation of the christian faith, and the quickening and sanctification of the members of its congregations through the use of the means of Grace."

A copy of the stated purpose, chapter 2 of the Constitution of The ALC, is enclosed with this letter for your information. Please note that Section 2.28 specifically recognizes the establishment and maintenance of the work of the Board of Pensions by The ALC.

Many people of our 2.4 million member church body are deeply concerned about the seeming intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan." We share a great concern about the effects of the Employee Retirement Income Security Act of 1974 ("ERISA") on our denomination's retirement annuity and welfare benefit programs.

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been introduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as H.R. 1576, 1577 and 1578.

Enclosed is a summary of some of the problems related to ERISA and matters requiring legislative attention.

Senator Talmadge, members of our twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA. Our Pension Board is an active participant.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

HENRY F. TREPTOW,
*Executive Secretary.*

REORGANIZED
CHURCH OF JESUS CHRIST,
OF LATTER DAY SAINTS,
*April 27, 1979.*

Re: Church Plans
Hon. HERMAN E. TALMADGE,
*U.S. Senate, Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Reorganized Church of Jesus Christ of Latter Day Saints was organized in accordance with the laws of New York on June 6, 1830 as a religious organization. Since the early days of the Church,

have been provided for prior to and upon retirement.

As Presiding Bishop and Chief Financial Officer of the Reorganized Church of Jesus Christ of Latter Day Saints, I have a concern about the effects of the Employee Retirement Income Security Act of 1979 (ERISA) on our denomination's retirement annuity and welfare benefit programs. We are also concerned about the Internal Revenue Service's attempt to define what is and what is not a part of our denomination's mission.

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits. Comparable legislation has been reintroduced this session by Representative Barber B. Conable, Jr. of New York as HB 1576, 1577, and 1578 which we support.

Your introduction and co-sponsoring the legislation is supported by the Reorganized Church of Jesus Christ of Latter Day Saints and is most appreciated.

Sincerely,

F. E. HANSEN,
*Presiding Bishop.*

THE PENSION BOARDS,
UNITED CHURCH OF CHRIST,
*April 17, 1979.*
Re: Employee Retirement Income Security Act of 1974 and church plans
Hon. HERMAN E. TALMADGE,
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Pension Boards of the United Church of Christ include three pension corporations and a common investment corporation that had been individually or jointly serving the ministry and the employees of the United Church of Christ since 1914.

The United Church of Christ is a denomination formed out of the merger of the Congregational Christian Church and the Evangelical and Reformed Church. Both of these denominations date back to colonial times, the Congregational Christian Church growing out of the church of the Pilgrims, while the Evangelical and Reformed Church grew out of the colonial settlers coming from Germany and other parts of middle Europe.

Over the years that the Pension Boards have served the ministers and employees of the United Church of Christ, their record has been outstanding in providing benefits for those participants who are covered under the program. The Pension Boards have been ahead of their time in facing up to the responsibility of providing retirement income for their employees and have maintained standards that, in most areas, were ahead of those required by the Employee Retirement Income Security Act of 1974, long before that Act was even contemplated by the Congress. When that Act was ultimately passed by the Congress, one of the first actions by the Pension Boards was to review that Act and assure that we met the standards of vesting and non-discrimination established by the Act, even though, as a church plan, we were probably not covered by the Act during the current years.

Notwithstanding our general compliance with the intent of the Act, many of the Act's provisions would be a substantial detriment to the Pension Boards, and a dissipation of the funds of the Pension Boards for administrative detail that will neither serve the participants, nor the Government. In addition, the Pension Boards carry on a substantial relief function of the Church which cannot be accommodated within the strict provisions of ERISA. For these reasons, and others, we greatly appreciated your introducing and co-sponsoring during the last session of the Congress, legislation intended

to clarify the exemption of churches from the provisions of ERISA and to provide for the coverage of church agencies and ministers, wherever carrying out their ministry, within the church plan.

As you are aware, Senator Talmadge, the major religious denominations have a substantial concern over the effects of ERISA, and have joined together to form the Church Alliance for the Clarification of ERISA. The legislation desired by the Church Alliance for the Clarification of ERISA, which you introduced in the Senate last year, and which was introduced in the House last year by Representative Barber B. Conable, Jr. of New York, has been reintroduced in the House by Barber Conable in this legislative session. We sincerely hope that you will introduce and co-sponsor that legislation in the Senate during this session. Copies of the legislation have been forwarded to you by Mr. Darold H. Morgan, President of the Annuity Board of the Southern Baptist Convention.

Thank you for your consideration in this matter.

Sincerely,

JOHN D. ORDWAY,
*Executive Vice President.*

THE PENSION DEPARTMENT OF
THE A.M.E. CHURCH,
*Nashville, Tenn., April 17, 1979.*
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: I am writing you in reference to bill H.R. 1576 as it relates to Church Pension Plans and ERISA. We appreciate your efforts heretofore in meeting with church representatives to get a clear understanding of difficulties imposed on the church by the government. Your effort on our behalf has been deeply appreciated and we continue to ask your support in the passage of bill H.R. 1576 in this Congress.

Yours sincerely,

J. M. GRANBERRY, JR.,
*Secretary-Treasurer.*

ANNUITY BOARD OF THE
SOUTHERN BAPTIST CONVENTION.
*Dallas, Tex., April 4, 1979.*

Re: Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Southern Baptist Convention was incorporated in 1845 by an act of the Georgia legislature for "the purpose of eliciting, combining, and directing the energies of the Baptist Denomination of Christians for the propagation of the gospel."

In 1918, what is now the Annuity Board of the Southern Baptist Convention was chartered to provide relief, support benefits and annuities for ministers of the gospel and other denominational workers within the of the Southern Baptist Convention. Our Annuity Board is managed by a Board of Trustees elected annually by action of the Southern Baptist Convention.

Dr. Jimmy Allen, the President of the Southern Baptist Convention (the present pastor of the First Baptist Church of San Antonio), Dr. Porter Routh, the Executive Secretary of the Executive Committee of the Southern Baptist Convention headquarters in Nashville, Tennessee, and I share a great concern about the effects of the Employee Retirement Income Security Act of 1974 ("ERISA") on our denomination's retirement annuity and welfare benefit programs.

The messengers to the 1976 annual session of the Southern Baptist Convention adopted resolutions (copies enclosed) protesting "the intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission" and supporting "legislation to amend Section 3(33)

tirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan."

We appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578. Enclosed as exhibits to this letter are texts of remarks made last year when similar legislation was first introduced. Also enclosed is a summary of some of the problems related to ERISA and matters requiring legislative attention.

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

DAROLD H. MORGAN,
*President, Annuity Board of the Southern Baptist Convention.*

CHRISTIAN REFORMED CHURCH IN
N.A. MINISTERS' PENSION FUND,
*April 25, 1979.*

Re Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The Christian Reformed Church was determined to be exempt from Federal Income Tax under section 501 (c) (2) on October 7, 1971 as a non-profit corporation organized for the purpose of propagation of the Christian gospel.

As of January 1, 1970, the Christian Reformed Synod appointed a Ministers' Pension Committee to administer for Synod a pension plan for retired and disabled ministers or their widows.

Our Christian Reformed Church Ministers' Pension Committee is responsible to the Christian Reformed Synod. It is greatly concerned about the effects of the Employee Retirement Income Security Act of 1974 (ERISA) on our denomination's benefit programs. The Christian Reformed Church Ministers' Pension Committee asked me as Administrator of the Ministers' Pension Plan to register our protest against a possible intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission and supporting "legislation to amend Section 3(33) of the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan."

We sincerely appreciate your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement benefits.

We are pleased that companion legislation has been reintroduced this legislative session in the House by Representative Barber D. Conable, Jr. of New York as HR 1576, 1577 and 1578. Our church envisions problems related to ERISA particularly in the adminis-

Senator Talmadge, members of over twenty-five religious denominations share a mutual concern about the effects of ERISA on traditional church pension programs. These concerns have been expressed individually and through the Church Alliance for Clarification of ERISA.

Your introducing and co-sponsoring the legislation supported by the Church Alliance for Clarification of ERISA this session would be most appreciated.

Sincerely,

GARRETT C. VAN DE RIET,
*Administrator.*

THE MINISTERS AND MISSIONARIES
BENEFIT BOARD OF THE AMERI-
CAN BAPTIST CHURCHES.
*New York, N.Y., April 23, 1979.*
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: The American Baptist Churches Ministers and Missionaries Benefit Board serves ministers, missionaries and lay employees of churches and institutions related to the American Baptist Churches. Our denomination is composed of approximately 6,000 churches with 1½ million members. The Ministers and Missionaries Benefit Board provides a variety of benefits for the protection of over 9,000 active and retired members, including surviving spouses and dependent children. These benefits include the ABC Retirement Plan, The Annuity Supplement, the Death Benefit Plan, The American Baptist Medical Plan and a wide variety of non-contractual supplementary benefits funded by the Board's endowment.

We were most appreciative of your leadership in introducing and co-sponsoring legislation with Senator Bentsen last year which, if enacted, would clarify the implication of ERISA for the American Baptist Churches. Present ER'SA legislation and the proposed regulations issued by the Internal Revenue Service creates serious problems for us. Unless clarified by legislation, the proposed regulations could result in reduced benefits for our members. Your remarks in introducing this legislation last year, as published in the Congressional Record, indicated an understanding of these problems.

We are writing to encourage you to reintroduce this legislation in the Senate as a companion to H.R. 1576, 1577 and 1578 introduced in the House by Representative Barber B. Conable, Jr. of New York with whom we have been working.

We join with the members of the Church Alliance for the Clarification of ERISA, which represents every major religious group in the United States, in expressing our appreciation for assisting us in this effort.

Sincerely yours,

DEAN R. WRIGHT,
*Executive Director.*

THE CHURCH PENSION FUND,
*April 27, 1979.*

Re: Church Plans
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR TALMADGE: In 1914, The Church Pension Fund was created by The General Convention of The Episcopal Church to provide pension benefits for aged and disabled ministers of the Episcopal Church. Our Board is managed by a Board of Trustees elected triennially by action of the General Convention.

We share the concern of all denominational pension boards about the intrusion of the Internal Revenue Service into the affairs of church groups and their agencies, by presuming to define what is and what is not an integral part of these religious groups' mission. We completely support the introduction in

... the Employee Retirement Income Security Act of 1974 (ERISA) and Section 414(e) of the Internal Revenue Code of 1974 (Code) relating to the definition of 'church plan' so that church related agencies are recognized as part of a church or convention of churches and entitled to participate in a church plan.

We greatly appreciated your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to allow denominational workers to have greater retirement annuity benefits.

Companion legislation has been reintroduced this legislative session in the House by Representative Barber B. Conable, Jr. of New York as HR 1576, 1577 and 1578. Members of over twenty-five religious denominations have expressed their concerns about the effects of ERISA on traditional church pension programs through the Church Alliance for Clarification of ERISA.

On behalf of the Trustees of The Church Pension Fund and the active and retired ministers of the Episcopal Church, I most earnestly appeal for your continued support of all clergy and all religious organizations by reintroducing and co-sponsoring in this session the legislation supported by the Church Alliance for Clarification of ERISA.

Sincerely,

ROBERT A. ROBINSON,
President.

UNITARIAN UNIVERSALIST ASSOCIATION,
Boston, Mass., April 30, 1979.

Re Church Plans
Senator HERMAN E. TALMADGE,
Russell Senate Office Building,
Washington, D.C.

DEAR SENATOR TALMADGE: Last year the Universalist Association (UUA) joined the Church Alliance for Clarification of ERISA because of its concern about the many questions raised of the impact of ER'SA on church pension plans, such as the one maintained by the UUA.

Your support of the clarifying legislation last year was greatly appreciated; and the decision by you to reintroduce the legislation this year would also be much appreciated.

I am scheduled to meet with the Pension Plan Study Committee that was appointed by the UUA Board of Trustees at its January 26, 1979 meeting on May 24, 1979. If you have decided to re-file the legislation prior to that date, please let me know so that I can inform the Committee members of our favorable action.

Thank you for your consideration of these matters.

Very truly yours,

WILLIAM B. DUFFY, Jr.,
General Counsel.

GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS,
Washington, D.C., April 18, 1979.

Subject: Church Retirement Plans
Senator HERMAN E. TALMADGE,
Russell Senate Office Building,
Washington, D.C.

DEAR SENATOR TALMADGE: The Seventh-day Adventist Church was one of the first religious or business organizations to initiate a private pension plan for the benefit of its employees. Our retirement plan was started in 1911 and has been a continuous operation since then. As of December 31, 1978 approximately 35,000 clergy and lay employees of our church and agencies were covered by this plan and 5,500 were receiving retirement benefits. During 1978 benefit payments amounted to just over $26 million.

Our retirement plan is a "promise to pay" type plan and would technically be classified as an "unfunded" type retirement plan since we do not keep individual accounts for covered employees and no attempt has been made to fund the liabilities on an accrual basis. The cost of the yearly benefits is con-

sidered a current operating expense of the Church. However, a reserve equivalent to three years benefit expense is kept on hand at all times. Our Church feels that it is just as much obligated to pay retirement benefits as to pay the salaries of active employees. The entire assets of the Church are back of the retirement plan and its has always lived up to its obligations in this regard.

The Seventh-day Adventist Church, along with over twenty-five other religious denominations, has a major concern about the effects that the Employee Retirement Income Security Act 1974 (ERISA) would have on the operation of our retirement plan. We have been an active member of the Church Alliance for the Clarification of ERISA and fully support the efforts of this association to effect needed changes in the Act. For one thing, the funding requirements would be a major problem for us if we have to comply with ERISA requirements. They would place an oppressive burden on the Church as large sums of money would have to be taken from the funding of other church ministries and used instead to fund the past service liabilities for the retirement benefits of employees of church agencies.

The possibility of having to separate the employees of the so-called church agencies from our retirement plan is another of our major concerns.

Our Church has always considered its agencies as directly involved in the total ministry and outreach of the Church. In our theology and philosophy of church operations our institutions have from their inception been integral parts of the Church, direct instruments in the carrying out of its divine commission. Those who serve in these institutions of the Church, whether in the fields of publishing, health, education, or any other, have dedicated their lives to the Church's mission. To separate these workers from the Church plan will create a problem of portability as there is considerable movement of employees from one type of organization to another.

The efforts of the Internal Revenue Service to define what constitutes a church and what does not in our opinion is a violation of the principle of separation of church and state, but has characterized our nation from its beginning. If the church can be trusted to administer pension benefits for its ministers and other employees who in the opinion of government are working directly for the church, it would seem that the church could also be trusted to provide retirement benefits for employees of its agencies without being regulated by the government.

Our Church plan is presently being revised to comply with nearly all of the standards of ER'SA regarding eligibility and benefits. In addition it provides many additional benefits that are not mandated by ERISA, such as an annual cost of living increase. Coming under the jurisdiction of ERISA will not really benefit our employees, but instead the excessive administration and reporting burdens would no doubt result in a reduction in the pension benefits of our employees.

We appreciated very much your introducing and co-sponsoring legislation with Senator Lloyd Bentsen last year designed to clarify the church plan definition of ERISA and to bring about other needed corrections in this Act. Your introducing and co-sponsoring similar legislation in this session of Congress will be greatly appreciated.

Sincerely,

K. H. EMMERSON,
Treasurer.

GENERAL BOARD OF PENSIONS OF
THE UNITED METHODIST CHURCH,
Evanston, Ill., May 1, 1979.

Senator HERMAN E. TALMADGE,
Russell Senate Office Building,
Washington, D.C.

DEAR SENATOR TALMADGE: The general United Methodist denomination is a vol-

untary religious movement and connectional network of millions of persons, known as "members," and literally tens of thousands of units, variously designated as local churches, charges, conferences, boards, commissions, councils, and agencies. These many units operate in religious service and mission throughout the United States of America and numerous foreign countries. They are related and brought together in worship and service through local Church, Charge, District, Annual, Jurisdictional (regional), and the General Conference in a connectional manner which is fundamentally characteristic of the denomination in its entirety. To assist in its work, the denomination known as the United Methodist Church, through an "Administrative Order," has created certain organizations at a denominational level to assist all other units in performing certain specialized tasks. One such General Agency is the General Board of Pensions of the United Methodist Church. In writing to you in support of legislation proposed by the Church Alliance for Clarification of ERISA, the General Board of Pensions of the United Methodist Church is acting within its specific and delegated authority, on behalf of all persons and organizations which comprise the denomination known as the United Methodist Church.

A fundamental tenet of the United Methodist doctrine is that the "wholeness of the gospel is manifest in the totality of the Church." From its earliest days, United Methodists have been active in the support of many institutions, of education, health care, and in other areas, and millions of persons have benefited from these efforts over the years. The legislation which we now support, in our opinion, will aid our denomination and other religious denominations in continuing such work (much of which is of such special benefit to individual persons in this country).

We would not presume to suggest that, because the United Methodist denomination is identified as a "church," it is therefore "above the law," "outside the law," or entitled to "special treatment by the law". Nevertheless, the fact remains that churches, even more than non-profit organizations in general, by their very nature, organization, and function are unique. I daresay that no two religious denominations are organized or function in exactly the same manner. Efforts, by legislatures or other bodies, to lump all "churches" together for identical treatment, particularly when legislation has been drafted initially to deal primarily with the commercial or business world, pose very serious and, we presume, generally unintended difficulties for such church groups. We respectfully submit that the Congress has a clear and justifiable interest in seeing that legislation passed by it presents no unnecessary handicap to bona fide religious denominations for the work of their denominations in the areas affected by such laws. If, because of the unique structure and operation of the various individual churches, specific legislation is required in order to minimize or eliminate such undue restrictions on churches, then we feel that specific legislation should receive the prompt and careful attention of all members of the Congress.

In the interest of time, we shall mention only two (of the many) instances in which the proposed legislative changes would be of special significance with respect to the United Methodist denomination. "The itinerant system is the accepted method of The United Methodist Church by which ministers are appointed by the bishops to fields of labor." As presently provided, the law would require the General Board of Pensions of the United Methodist Church to switch its ordained clergy in and out of differing pension plans each time such ministers changed appointments from local churches into what

are known as "special appointments," in such areas as the chaplaincy, church-related and other educational institutions, and other areas of work. Such a requirement—to move a person in and out of a "church plan"—is unduly burdensome and provides no benefit for the individual involved. The proposed legislation would permit the inclusion of ordained ministries in a single pension plan regardless of where those ministers are serving at any given point in time.

Along the same line, the present definition of a "church plan" is too restrictive. The present definition simply will not accommodate the needs of the United Methodist denomination in its efforts to provide pensions for its ordained clergy and lay employees of churches and church-related institutions. The United Methodist Church has licensed clergy, two levels of ordination, a separate Diaconal ministry classification, and lay employees in various degrees of relationship to the various units of the church. To require a multitude of different pension plans, each having to be tailored for the specific status of each such group is again unduly burdensome and provides no benefits for the individuals concerned. The legislation proposed, by broadening the definition of a "church plan" would permit the General Board of the General Board of the United Methodist Church to consolidate the number of different pension plans it must administer, thus providing a multitude of benefits for the plan participants.

For these, and other similar reasons, we urge your support of the legislation proposed and submitted under the Church Alliance for Clarification of ERISA.

Yours sincerely,

JAMES M. WALTON-MYERS.

BOARD OF PENSIONS OF THE
CHURCH OF GOD,
*Anderson, Ind., April 17, 1979.*
Re Church Plans.
Senator HERMAN E. TALMADGE,
*Senate Office Building,
Washington, D.C.*

DEAR SENATOR TALMADGE: Thank you for introducing in last year's Senate the legislation supported by the Church Alliance for Clarification of ERISA. Since the Senate did not have time to act on this legislation, it is our hope and prayer that you will reintroduce the legislation this year.

The Church of God Pension Plan came into existence in 1948. We are a small church in comparison to many large denominations, yet our heritage dates back 100 years. We have approximately 4,000 ministers and congregations. Our ministers have never earned large salaries, and retirement benefits for them will be minimal in comparison to many persons who have worked for industry and who have gone on pension.

If our church plan is required to abide by all the demands of ERISA after 1982, we will have to lower our retirees' retirement income even more for there is no way we can take on added work-loads without increasing the operational costs to run our plan.

Since our plan is only 30 years old, and a voluntary plan, many of our ministers have a very small accumulation in their retirement fund. Our hope is that Government regulations will permit churches like educational institutions to make retro-active (tax-sheltered) contributions to a minister's retirement account for years of service when he was not a member of the voluntary pension program sponsored by his denomination.

If the Senate does not permit Church Agencies to remain a part of our Church Pension Plan, our office will find it necessary to run two pension programs. Operational costs will nearly double and our low income church employees and ministers will again be made to suffer.

From the foregoing information, you can readily see the frustrations we face as Church Pension Plans. Our ministers and church employees, even though academically qualified and often highly trained have been underpaid during their working days because they found themselves in service oriented positions, and they will also find themselves short-changed in retirement.

Our Communion and I'm sure all churches affiliated with the Alliance for Clarification of ERISA will be most appreciative for any help you give us in the Legislature pertaining to these matters.

Sincerely yours,

HAROLD A. CONRAD,
*Executive Secretary.*

CATHOLIC MUTUAL
RELIEF SOCIETY OF AMERICA,
*Omaha, Nebr., May 3, 1979.*
Re: Church Plan
Senator HERMAN E. TALMADGE,
*Russell Senate Office Building,
Washington, D.C.*

DEAR SENATOR TALMADGE: The Catholic Mutual Relief Society is a nonprofit, charitable, religious and benevolent association organized in 1889 by a member of members of the hierarchy of the Roman Catholic Church in North America for the purpose of protecting and preserving properties of such Church and to further aid and assist the Members of the Hierarchy and Religious in the discharge of their Canonical Duties. The management of this Society is vested in a Board of Trustees, all of whom must be Archbishops or Bishops of the Roman Catholic Church. Currently there are twenty-one Bishops and Archbishops acting as Trustees of the Society.

Through its many members, the Society has learned of the concern of church groups and their agencies for their continued operation in the face of increasing interference by the Internal Revenue Service. As a service to our members, we have helped support the Church Alliance For The Clarification of ERISA in its attempts to amend ERISA to at least recognize the present state of church retirement plans for churches and their agencies.

We thank you for your co-sponsorship of the legislation with Senator Bentsen in the last session of Congress attempting to clarify the church plan definition contained in ERISA and allowing greater retirement annuity benefits to those people working within the denominations. While ours is a Roman Catholic organization, our association with the Church Alliance has made us aware of the many problems caused by ERISA to our brothers in the Protestant and Jewish organizations.

You are aware of the many problems created by ERISA which the Church Alliance has addressed. Your continued support and co-sponsorship of legislation proposed by the Church Alliance For The Clarification of ERISA is very much appreciated. We would respectfully urge you to reintroduce the Church Alliance legislation in this session of Congress.

Sincerely,

THOMAS J. HANRAHAN,
*Executive Vice President.*

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that a bill introduced by Mr. TALMADGE, for himself and others, relating to ERISA, be jointly referred to the Committee on Finance and the Committee on Labor and Human Resources.

The PRESIDING OFFICER. Without objection, it is so ordered.

By Mr. PRESSLER (for himself
and Mr. MATHIAS):

S.J. Res. 74. Joint resolution authorizing and requesting the President to issue a proclamation designating May 11, 1979, as "CARE Day"; considered and passed.

(The remarks of Mr. PRESSLER when he introduced the joint resolution appear elsewhere in today's proceedings.)

ADDITIONAL COSPONSORS

S. 80

At the request of Mr. NELSON, the Senator from Kentucky (Mr. HUDDLESTON) was added as a cosponsor of S. 80, a bill to amend section 201 of the Agricultural Act of 1949, as amended, to extend until September 30, 1981, the requirement that the price of milk be supported at not less than 80 per centum of the parity price thereunder.

S. 199

At the request of Mr. INOUYE, the Senator from Virginia (Mr. WARNER) was added as a cosponsor of S. 199, a bill to amend the Shipping Act, 1916, to strengthen the provisions prohibiting rebating practices in the U.S. foreign trades.

S. 446

At the request of Mr. WILLIAMS, the Senator from Iowa (Mr. JEPSEN) was added as a cosponsor of S. 446, the Equal Employment Opportunity for the Handicapped Act of 1979.

S. 582

At the request of Mr. NELSON, the Senator from California (Mr. CRANSTON) was added as a cosponsor of S. 582, the Farm Entry Assistance Act.

S. 715

At the request of Mr. BELLMON, the Senator from West Virginia (Mr. RANDOLPH) was added as a cosponsor of S. 715, a bill to authorize the Robert A. Taft Institute of Government Trust Fund.

S. 819

At the request of Mr. PRESSLER, the Senator from Indiana (Mr. LUGAR) and the Senator from Nevada (Mr. LAXALT) were added as cosponsors of S. 819, a bill to amend the Clean Air Act to promote the use of alcohol as a motor fuel and as an additive to motor vehicle fuels, and for other purposes.

S. 918

At the request of Mr. HUDDLESTON, the Senator from Arkansas (Mr. BUMPERS), the Senator from Montana (Mr. BAUCUS), the Senator from Alabama (Mr. STEWART), the Senator from Michigan (Mr. LEVIN), the Senator from Utah (Mr. HATCH), the Senator from New Mexico (Mr. SCHMITT), and the Senator from Montana (Mr. MELCHER) were added as cosponsors of S. 918, a bill to authorize the Small Business Administration to establish small business development centers.

S. 1006

At the request of Mr. COCHRAN, the Senator from North Dakota (Mr. YOUNG), the Senator from Texas (Mr. TOWER), and the Senator from Alabama (Mr. HEFLIN) were added as cosponsors of S. 1006, to permit the emergency use of the pesticide mirex on imported fire ants in accordance with health and safety standards of the EPA.

● Mr. ULLMAN. Mr. Speaker, H.R. 3904, the Multiemployer Pension Plan Amendments Act, is the product of many months of hard work and cooperation between the Committee on Ways and Means and the Committee on Education and Labor. The House version of this legislation passed the House without a dissenting vote on May 22. The deadline for mandatory guarantee of pension benefits under multiemployer pension plans has passed. Thus, the law that Congress enacted in 1974 is now in effect.

There is little disagreement that present law is inadequate. It does not provide a sound guaranty program which the Pension Benefit Guaranty Corporation can administer properly. And it leaves the multiemployer pension community in a very uncertain position as to the rights and duties of the parties. This situation must not continue. The adoption of the rule now under consideration is the quickest way to solve these problems.

The rule allows for an amendment that accepts several Senate changes in H.R. 3904. However, the balance of the House version of the bill is not substantially disturbed. Among the Senate changes that would be accepted under the motion are three provisions relating to unemployment compensation. The first would modify the Federal law that took effect on April 1 of this year requiring States to reduce a person's unemployment compensation benefits by the amount of any work-related retirement or pension income the person is receiving. The amendment would reduce the scope of this requirement, allowing States to disregard social security benefits as well as pensions that are based on employment prior to that which is considered in determining an individual's eligibility for unemployment benefits.

The second provision would extend from 90 days to 1 year the period of active duty an individual would have to serve in order for his or her military service to be counted in determining eligibility for unemployment benefits upon separation from the service.

The third unemployment compensation provision would prohibit an individual from collecting more than 2 weeks of extended unemployment benefits if he or she moves into a State in which extended benefits are not payable.

The House would agree with the "church plan" amendment providing that the current ERISA definition of church plan would be continued without reference to dates. The definition would be clarified to include plans maintained by a pension board maintained by a church. The definition of the term "employee" of a church would be expanded to include for example, a church minister in the exercise of his ministry, regardless of the source of his compensation, and certain former church plan participants. In addition, a notice and correction procedure for the amendment of church plans would be created.

The House would also agree to a Senate amendment that would allow an employer who sells his business to a State government to claim a current tax deduction for contributing an amount to

its pension plan sufficient to fund accrued benefits. In addition, the House agrees in substance to Senate amendments that would preserve present law guarantees for retirees and employees within 3 years of retirement, clarify provisions of withdrawal liability applicable to the entertainment industry, provide a special definition of employee pension benefit plan for certain employees who lost benefits before the effective date of ERISA, allow certain supplemental payment plans and severance pay plans to be treated as welfare plans rather than pension plans under ERISA, and allow for the refund to employers of certain mistaken contributions to plans.●

GENERAL LEAVE

Mr. THOMPSON. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks on the motion to concur.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

Mr. THOMPSON. Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore. Pursuant to House Resolution 764, the previous question is ordered.

The question is on the motion offered by the gentleman from New Jersey (Mr. THOMPSON).

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. THOMPSON. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The vote was taken by electronic device, and there were—yeas 363, nays 0, not voting 69, as follows:

[Roll No. 487]

YEAS—363

| | | |
|---|---|---|
| Addabbo | Brown, Calif. | Dingell |
| Akaka | Brown, Ohio | Donnelly |
| Albosta | Broyhill | Dornan |
| Ale ander | Buchanan | Dougherty |
| Ambro | Burr ener | Downey |
| Andrews, N.C. | Burlison | Drinan |
| Andrews, | But er | Duncan, Oreg. |
| N.Dak. | Byron | Duncan, Tenn. |
| Annunzio | Campbell | Early |
| Anthony | Carr | Eckhardt |
| Archer | Carter | Edgar |
| Ashbrook | Chappell | Edwards, Calif. |
| Ashley | Cheney | Emery |
| Atkinson | Clausen | English |
| AuCoin | Clay | Erdahl |
| Badham | Cleveland | Erlenborn |
| Bafalis | Clinger | Ertel |
| Bailey | Coelho | Evans, Del. |
| Bailus | Coleman | Evans, Ind. |
| Barnard | Co llins, Ill. | Fary |
| Barnes | Collins, Tex. | Fascell |
| Bauman | Conable | Fenwick |
| Beard, R.I. | Conte | Ferraro |
| Beard, Tenn. | Corcoran | Findley |
| Bedell | Corman | Fish |
| Beilenson | Cotter | Fisher |
| Benjamin | Coughlin | Fithian |
| Bennett | Courter | Flippo |
| Bereuter | Crane, Daniel | Florio |
| Bethune | Crane, Philip | Foley |
| Bevill | D'Amours | Ford, Mich. |
| Bingham | Daniel, Dan | Fountain |
| Blanchard | Daniel, R. W. | Fowler |
| Boland | Danielson | Frenzel |
| Boner | Dannemeyer | Frost |
| Bonker | Daschle | Fuqua |
| Bouquard | Davis, Mich. | Gaydos |
| Brademas | de la Garza | Gephardt |
| Breaux | Deckard | Gibbons |
| Brinkley | Derrick | Gilman |
| Brodhead | Derwinski | Gingrich |
| Brooks | Devine | Ginn |
| Broomfield | Dicks | Glickman |

| | | |
|---|---|---|
| Goldwater | Luken | Rosenthal |
| Gonzalez | Lu ncan | Rostenkowski |
| Goodling | Lungren | Roth |
| Gore | McClory | Roybal |
| Gradison | McCloskey | Royer |
| Gramm | McCormack | Ruud |
| Gray | McDade | Russo |
| Green | McDonald | Santini |
| Grisham | McHugh | Sawyer |
| Guarini | McKay | Scheuer |
| Gunter | McKinney | Schroeder |
| Hagedorn | Madigan | Schulze |
| Hall, Ohio | Maguire | Sebelius |
| Hall, Tex. | Markey | Seiberling |
| Hamilton | Marks | Sensenbrenner |
| Hammer- | Marlenee | Sharp |
| schmidt | Marriott | Shelby |
| Hance | Martin | Shumway |
| Hanley | Matsui | Shuster |
| Hansen | Mattox | Simon |
| Harkin | Mavroules | Skelton |
| Harris | Mazzoli | Smith, Iowa |
| Harsha | Mica | Smith, Nebr. |
| Hawkins | Michel | Snowe |
| Hefner | Mikulski | Snyder |
| Heftel | Miller, Calif. | Solarz |
| Hightower | Miller, Ohio | Solomon |
| Hillis | Mineta | Spellman |
| Hinson | Minish | Spence |
| Holland | Mitchell, Md. | St. Germain |
| Hollenbeck | Mitchell, N.Y. | Stack |
| Holt | Moakley | Stangeland |
| Hopkins | Moffett | Stanton |
| Horton | Montgomery | Stark |
| Howard | Moore | Stenholm |
| Hubbard | Moorhead, | Stokes |
| Huckaby | Calif. | Stratton |
| Hughes | Mottl | Studds |
| Hutchinson | Murphy, Ill. | Stump |
| Hutto | Murphy, Pa. | Swift |
| Hyde | Murtha | Symms |
| Ichord | Musto | Synar |
| Ireland | Myers, Ind. | Tauke |
| Jacobs | Natcher | Tauzin |
| Jeffords | Neal | Taylor |
| Jeffries | Nelson | Thompson |
| Jenkins | Nowak | Tra ler |
| Jenrette | O'Brien | Trible |
| Johnson, Calif. | Oakar | Udall |
| Johnson, Colo. | Oberstar | Ullman |
| Jones, N.C. | Obey | Van Deerlin |
| Jones, Okla. | Ottinger | Vanik |
| Jones, Tenn. | Panetta | Vento |
| Kastenmeier | Pashayan | Volkmer |
| Kazen | Patten | Walgren |
| Kelly | Patterson | Walker |
| Kildee | Pease | Weaver |
| Kindness | Perkins | Weiss |
| Kostmayer | Petri | White |
| Kramer | Peyser | Whitehurst |
| LaFalce | Pickle | Whitley |
| Lagomarsino | Porter | Whittaker |
| Latta | Preyer | Whitten |
| Leach, Iowa | Price | Williams, Mont. |
| Leath, Tex. | Pritchard | Wilson, Tex. |
| Lee | Quillen | Winn |
| Lehman | Rahall | Wirth |
| Leland | Railsback | Wolff |
| Lent | Rangel | Wolpe |
| Levitas | Ratchford | Wright |
| Lewis | Regula | Wyatt |
| Livingston | Reuss | Wydler |
| Lloyd | Rhodes | Wylie |
| Loeffler | Richmond | Yates |
| Long, La. | Rinaldo | Yatron |
| Long, Md. | Ritter | Young, Fla. |
| Lott | Robinson | Young, Mo. |
| Lowry | Roe | Zablocki |
| Lujan | Rose | Zeferetti |

NOT VOTING—69

| | | |
|---|---|---|
| Abdnor | Evans, Ga. | Pepper |
| Anderson, | Fazio | Pursell |
| Calif. | Ford, Tenn. | Quayle |
| Anderson, Ill. | Forsythe | Roberts |
| Applegate | Garcia | Rodino |
| Aspin | Giaimo | Rousselot |
| Biaggi | Grassley | Sabo |
| Boggs | Guyer | Satterfield |
| Bolling | Heckler | Shannon |
| Bonior | Holtzman | Staggers |
| Bowen | Kemp | Steed |
| Burton, John | Kogovsek | Stewart |
| Burton, Phillip | Leach, La. | Thomas |
| Carney | Lederer | Vander Jagt |
| Cavanaugh | McEwen | Wampler |
| Chisholm | Mathis | Watkins |
| Conyers | Mollohan | Waxman |
| Davis, S.C. | Moorhead, Pa. | Williams, Ohio |
| Dellums | Murphy, N.Y. | Wilson, Bob |
| Dickinson | Myers, Pa. | Wilson, C. H. |
| Dixon | Nedzi | Young, Alaska |
| Dodd | Nichols | |
| Edwards, Ala. | Nolan | |
| Edwards, Okla. | Paul | |

# MISCELLANEOUS PENSION BILLS

## HEARINGS

BEFORE THE

### SUBCOMMITTEE ON PRIVATE PENSION PLANS AND EMPLOYEE FRINGE BENEFITS

OF THE

### COMMITTEE ON FINANCE
### UNITED STATES SENATE

NINETY-SIXTH CONGRESS

FIRST SESSION

ON

### S. 209, S. 511, S. 989, S. 1089, S. 1090, S. 1091, S. 1092, S. 1240, and S. 1958

DECEMBER 4 AND 5, 1979

PART 1 OF 2 PARTS

(December 4, 1979)



Printed for the use of the Committee on Finance

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1980

56-943 O

HG 96-61


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

the 7-11 Store profit sharing plan which owned multipurpose buildings in 40 states. The conference committee action inadvertantly required all existing small company profit sharing plans to divest themselves of their employer real property within ten years and has prevented and new plan from beginning to invest in employer real property by acquiring a single piece of property.

Since the passage of ERISA, real estate investments have provided a higher return with less risk than almost all forms of equity investment. The ability of employees to take pride in the land or building owned by their profit sharing plan will be restored by the passage of S. 1958. The safeguards that have been required in the several exemption approvals of the Department of Labor are provided for in the bill. Each proposed employer real property investment will have to be very carefully reviewed to meet the investment safeguards of the bill.

It deserves your favorable consideration.

Respectfully submitted.

Senator MATSUNAGA. Our last panel of witnesses consists of the following: Dr. Darold Morgan, president, Annuity Board of the Southern Baptist Convention; Dr. Charles Cowsert, executive secretary, Board of Annuities and Relief, Presbyterian Church in the United States; Rev. Gordon Smith, treasurer, the Ministers and Missionaries, Benefit Board of the American Baptist Church; Mr. Leo Landes, representative, Joint Retirement Board of the United Synagogue of America; Dr. John Ordway, executive vice president, United Church of Christ Pensions Board; and Mr. Gary Nash, secretary, Church Alliance for Clarification of ERISA.

Senator Talmadge, the sponsor of S. 1090, 1091, and 1092 is not able to be here this afternoon because of a conflict in his schedule. He has asked me, however, to express his strong support for these bills and his appreciation to the representatives of the church groups today for your participation in this hearing.

Senator Talmadge has requested that I submit his statement in support of his bills for the record.

Without objection, Senator Talmadge's statement will appear in the record.

[The statement of Senator Talmadge follows. Oral testimony continues on p. 374.]

### STATEMENT OF HON. HERMAN E. TALMADGE, U.S. SENATOR

Mr. Chairman, I am pleased that your Subcommittee has scheduled this hearing on my bills, S. 1090, S. 1091, and S. 1092.

I strongly support this legislation, and I am hopeful that the Finance Committee and the Senate will act favorably on these measures in the near future. I am delighted that representatives of the Church Alliance for Clarification of ERISA have this opportunity to present their views in support of S. 1090, S. 1091, and S. 1092 to this Subcommittee. I would like to thank Dr. Darold Morgan, President of the Annuity Board of the Southern Baptist Convention, Dr. Charles Cowsert, Executive Secretary of the Board of Annuities and Relief, Presbyterian Church in the United States, Reverend Gordon Smith, Treasurer, The Ministers and Missionaries Benefit Board of the American Baptist Churches, Mr. Leo Landes, Representative of the Joint Retirement Board of United Synagogue of America, Dr. John Ordway, Executive Vice President, United Church of Christ Pensions Board, Mr. Gary Nash, Secretary of the Church Alliance for Clarification of ERISA, Mr. Dick Kelly, United States Catholic Conference, Mr. Walter Donnelly, Treasurer of the Church Pension Fund of the Episcopal Church, Mr. John McCracken, Counsel, The Church Pension Fund of the Episcopal Church, Mr. Pat Persons, Counsel to the Ministers and Missionaries Benefit Board of the American Baptist Churches, and Dr. Charles V. Bergstrom, Executive Director, Office for Governmental Affairs, Luthern Council in the U.S.A. for participating in these hearings.

The Church Alliance for Clarification of ERISA consists of the chief executive officers of the pension programs of nearly all of our large church denominations, Protestant, Jewish, and Catholic, some twenty-seven in number. A list of these churches is attached. The Church Alliance was formed because of the growing

Generated for Courtney de Vries (University of Washington) on 2015-09-03 21:15 GMT / http://hdl.handle.net/2027/mdp.39015083098452
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

ADD22

Generated for Courtney de Vries (University of Washington) on 2015-09-03 21:15 GMT / http://hdl.handle.net/2027/mdp.39015083098452
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

concern of the churches as to the effect of certain provisions of the Employee Retirement Income Security Act of 1974 on their pension and welfare benefit programs. These bills, S. 1090, 1091, and 1092 were introduced by my colleagues, Senators Bentsen and Boren, and myself to respond to those concerns. Identical bills have been introduced in the House of Representatives by Congressmen Conable and Corman. A number of the members of both Houses have indicated that they support our bills and would like to be identified as cosponsors.

The plans of our churches were among the first in this country to provide retirement and welfare benefits for employees. Several of these plans date back to the 1700's. The retirement plans of the Church Alliance have been in existence in their present form on an average of at least forty years. Most provide retirement benefits in the form of fully-vested and fully-funded annuities. They are professionally managed and have been operated responsibly, and have provided benefits to the ministers and lay employees of the churches, including the agencies carrying out their religious missions, for a long period of time.

In drafting the Employee Retirement Income Security Act of 1974, which is called ERISA, Congress recognized that there were serious Constitutional objections to subjecting the churches, through their plans, to the examination of books and records and possible levy on church property to satisfy plan liabilities. As a consequence, "church plans" were excluded from the purview of ERISA. However, the exclusionary language was drafted in terms of hierarchical churches and did not give consideration to the special problems of religious organizations that are operated on a congregational basis. Equally important, at the last moment in the drafting process, it was decided that the church plan exemption would not apply if church agencies were retained in church plans. A transitional rule does permit church plans in existence at the time of ERISA to cover church agencies until December 31, 1982. Finally, ERISA extended to certain exempt organizations, but not to churches or their agencies, relief from the limitations on contributions to Section 403(b) annuity programs.

S. 1090 and 1091 are companion bills dealing with the definition of church plan in Title I of ERISA and the Internal Revenue Code, respectively. These would clarify the definition of church plan and permit such a plan to cover agencies carrying out the religious missions of the church. S. 1092 is a revenue bill which would extend to our churches and agencies the special relief provisions now applicable to educational organizations, hospitals, and home health service agencies for contributions to Section 403(b) annuity programs, which are widely utilized in church plans.

A church plan is presently defined as a plan established and maintained for its employees by a church or by a convention or association of churches.[1] The definition further provides that until December 31, 1982, the plan may cover the employees of a church agency, but not after that date if it is to be considered a church plan. Even where this transitional rule applies, a church plan has been precluded from including the employees of agencies if the plan was not maintained for those agencies on January 1, 1974.

The churches of this country are faced with the dilemma of subjecting their pension and welfare benefit plans to the provisions of ERISA if they wish to retain their agencies in these plans after 1982. It is unreasonable of us to expect a church to waive its Constitutional privileges by continuing to cover agency employees after that date. Therefore, by 1983 the churches must choose between two alternatives. They may establish a separate plan meeting ERISA standards for the employees of their agencies, or they may abandon the coverage of agency employees. Either choice will be a costly and painful experience. It is impossible at this time to predict what alternative the churches will choose, but the costs of undoing years of experience and establishing and maintaining two separate plans may be too much for the churches and agencies to bear. In this case, agencies whose employees are now covered by the church plan will be forced to abandon their retirement and welfare programs or, in the alternative, seek coverage from non-church sources, which may prove to be too expensive or too burdensome to undertake, particularly in the case of small agencies. To those of us who are sponsoring these bills, this result seems unfair and inconsistent with the principles of ERISA which were to foster retirement and welfare benefit coverage.

Church agencies are such eleemosynary institutions as schools, colleges, missions, convents, hospitals, orphanges, summer camps, drug abuse centers, inner city agencies, nursing and retirement homes, and day care centers. They are considered by the churches as one means by which they fulfill their missions. They are also considered as part of the churches. Many are very small and rely on contributions to meet operating expenses. If they are forced out of church plans in 1983, they may

---

[1] Section (3)(33), Title I, ERISA; Section 414(e), IRC.

Digitized by     Original from
UNIVERSITY OF MICHIGAN

be unable to incur the increased costs of providing alternatives. Many, we fear, will cease to provide retirement and welfare benefit coverage. The Comptroller General and The Pension Benefit Guaranty Corporation have studied the impact of ERISA on small retirement plans. These studies indicate that a significant number of small plans have terminated since 1974. Of these, a large number have cited ERISA as a major factor. My colleagues and I do not want ERISA to be the cause of the termination of retirement and welfare benefit programs for church agencies.

S. 1090 and 1091 will permit a church plan to continue to provide retirement and welfare benefits for agency employees, including the employees of agencies coming into existence after January 1, 1974, without sacrificing its church plan exemption. This concept of one plan for both church and agency employees is critical for a further reason. It allows ministers and lay employees to move from church to agency and back without gaps in plan coverage and with coverage by one retirement system. These two bills also make a number of technical corrections in the church plan definition, mainly to take into account the structural differences between our congregational denominations and our hiearchical denominations.

S. 1092 provides the same measure of limited relief to the ministers and lay employees of our churches, which is already accorded employees of educational organizations, hospitals, and home health service agencies. A great many church plans provide retirement benefits in the form of annuity arrangements described in Section 403(b) of the Internal Revenue Code. These are classified as defined contribution plans for purposes of the limitations on contributions found in Section 415(c)(1), enacted by ERISA. This limitation is the lesser of $25,000, adjusted by increases in the cost of living, or 25 percent of an employee's compensation. The 25 percent limitation curbs all but minimal contributions to the plans of poorly paid employees. Thus, there is virtually no way of making larger than normal or "catch-up" contributions to compensate for those years when contributions were small because of low salaries. We recognized this problem in 1974 by providing in Section 415(c)(4) a series of elections to override the 25 percent limitation under limited circumstances. However, we extended these elections only to the employees of educational institutions, hospitals, and home health service agencies.

The starting salary of a minister is only from $5,000 to $10,000 a year. It may increase to $15,000 or $20,000 at the time of retirement but rarely over that figure. A typical pension of a minister is only from $2,000 to $3,000 a year. Lay employees generally receive less than these amounts. Section 415(c)(4) grants employees of other exempt organizations, who expect to be poorly paid throughout their careers, the opportunity to have catch-up contributions made to their plans late in their careers. Then, their children will be educated, and their personal expenses may decline. They will be in a better position than they were earlier in life to afford larger plan contributions and to make up for the years when contributions were necessarily small. Ministers and lay employees need the same elections that the employees of other institutions have to raise their retirement incomes to an acceptable level.

The Section 415(c)(1) limitation is out of line with the generous limitations for defined benefit plans. Under Section 415(b), annual retirement benefits may be as great as the lesser of $75,000, adjusted by increases in the cost of living, or 100 percent of the employee's average compensation for his high three years. We also provided in 1974 that these limitations need not be considered if the annual benefit does not exceed $10,000, which is also indexed by cost of living increases.

S. 1092 would extend the elections of Section 415(c)(4) to our ministers and lay employees. It also provides that the elections need not be considered if a contribution does not exceed $10,000. This $10,000 amount is indexed, as are several other figures in Section 415, and is comparable to the $10,000 amount for defined benefit plans. These limitations are all subject to the limitation of the exclusion allowance in Section 403(b)(2).

S. 1092 also makes an amendment to the exclusion allowance formula in Section 403(b)(2). One factor in computing the exclusion allowance is an employee's years of service with his present employer. Many ministers and lay employees change jobs within their denominations quite frequently. Since only service with the present employer is considered in computing the exclusion allowance and since most employees in congregational churches are technically employees of their immediate employer and not the church itself, frequent changes of position penalize the employee by diminishing the exclusion allowance. S. 1092 would amend Section 403(b)(2) so that all years of service by a minister or lay employee for employers within the denomination would be considered as years of service for one employer.

Generated for Courtney de Vries (University of Washington) on 2015-09-03 21:15 GMT / http://hdl.handle.net/2027/mdp.39015083098452
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by  Google

Original from
UNIVERSITY OF MICHIGAN

Mr. Chairman, my remarks in the Congressional Record accompanying the intro-
duction of these bills explain them in more depth than I have here. I am, therefore,
appending these remarks to this statement.

### CHURCH ALLIANCE FOR CLARIFICATION OF ERISA

An alliance of the chief executive officers of the pension programs of the following
church denominations and other organizations:
Union of American Hebrew Congregations
United Presbyterian Church in The U.S.A.
Church of God
Presbyterian Church in the United States
Reorganized Church of Jesus Christ of Latter Day Saints
Unitarian Universalist Association of Congregations in North America
African Methodist Episcopal Church
The Lutheran Church-Missouri Synod
Catholic Mutual Relief Society
United Methodist Church
United Synagogue of America
Southern Baptist Convention
Presbyterian Church in America
General Conference of Seventh-day Adventists
United Church of Christ
Church of God in North America
Episcopal Church
The Christian Church (Disciples of Christ)
The Wesleyan Church
Church of the Brethren
The American Lutheran Church
Christian Reformed Church in North America
Lutheran Church in America
Church of the Nazarene
American Baptist Churches
Mennonite Churches
A.M.E. Zion Church



Original from
UNIVERSITY OF MICHIGAN

Generated for Courtney de Vries (University of Washington) on 2015-09-03 21:15 GMT / http://hdl.handle.net/2027/mdp.39015083098452
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Stenographic Transcript Of

HEARINGS

Before The

Reproduced at the National Archives

ORIGINAL

# 14

COMMITTEE ON FINANCE

# UNITED STATES SENATE

EXECUTIVE SESSION

Washington, D. C.

June 12, 1980

Alderson Reporting Company, Inc.

Official Reporters

300 Seventh St., S. W.   Washington, D. C.

554-2345

Reproduced at the National Archives

1

United States Senate,

Committee on Finance,

Washington, D. C.

The committee convened at 10:05 a.m., in Room 2221, Dirksen Senate Office Building, the Hon. Herman Talmadge presiding.

Present: Senators Talmadge, Nelson, Bentsen, Moynihan, Matsunaga, Baucus, Boren, Bradley, Dole, Packwood, Heinz, Chafee, and Durenberger.

Senator Talmadge. The committee will please come to order. We have two back-to-back votes in the Senate at 12:00. That means for all practical purposes we will have to try to finish this bill by 12:00. I would suggest that we follow the procedure of letting the staff proceed as they did on Tuesday, with the staff recommendations, and then vote on them, and then vote on any amendments that may be offered by members of the committee. Is that agreeable?

Senator Packwood. Mr. Chairman, that is agreeable if we can finish this by 12:00. I am going to Oregon this afternoon for some hearings on the damage to the Columbia River because of the Mt. St. Helens eruption. If there is a possibility. If we get to about eleven o'clock and it appears we might not make it, I

ADD27

Reproduced at the National Archives

over a private transit system, in the State of New Jersey. And the state will not accept the responsibility for the unfunded pension payments. The private corporation that is selling it says that they will. I just want to nail down that when the state takes over the stock of the company and the private company says they will continue to assume the liability for the unfunded pension payments, that when they make those payments they will be able to get that tax deduction.

Senator Bentsen. Mr. Chairman, that certainly appears to be equitable.

Senator Talmadge. Any objection? Without objection it is agreed to. Now, Senator Packwood I believe had something.

Senator Packwood. My amendment relates to Senator Durenberger's presentation, and I will wait until he comes back.

Senator Talmadge. All right. Now I have one. I will state it very briefly. This is cosponsored by Senator Bentsen and Boren, working closely with representatives of 27 major church denominations from across the nation. I introduced this 1090 and its companion tax bill, S. 1091, to protect the viability of church retirement plans.

The problem that church plans face is one of definition. Under current law, both ERISA and the Internal Revenue Code, define such plans to include not only church plans covering church employees but also plans covering employees of church-affiliated organizations.

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

Reproduced at the National Archives

For example, the church plan might cover the employees of a church-related hospital, university or retirement home. As you might expect, this is a common practice of many churches throughout the United States. However, unless we act to preserve the longstanding definition of church plans, the law as it currently reads will phase out this definition beginning in 1983.

S. 1090 and S. 1091 make the amendments necessary to continue the current church plan definition. The definition would also be expanded to include church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church.

In addition, the definition of the term "employee of a church" would be expanded to include a church minister in the exercise of his or her ministry regardless of the source of compensation, as well as certain former church plan participants.

The bills would also create a notice and correction procedure for the amendment of a church plan.

Senator Dole.

Senator Dole. I just want to say as a cosponsor I support everything you said.

Senator Talmadge. Any objection? Mr. Halperin of the Treasury Department.

Mr. Halperin. Mr. Chairman, we have objected to certain provisions of that bill, and let me just point out what we see

ALDERSON REPORTING COMPANY, INC.

ADD29

Reproduced at the National Archives

1    as the most serious concern.

2        What that bill would permit, it would exclude church

3    agencies from the protection of ERISA, and that would mean that

4    if somebody works for a hospital or a school that happens to be

5    affiliated with a church it would be permissible for that plan

6    to provide no retirement benefits unless they work until age 65,

7    for example.

8        So it could deny benefits for people who might have 20 or

9    30 or even more years of service with the school or the hospital.

10   Now maybe they don't want to go that far, and we have had

11   conversations with these people for a number of years and we have

12   always offered to talk about each particular provision of

13   ERISA and find out which of them create problems for them because

14   it certainly would be reasonable to modify some of them to deal

15   with the particular problems of churches.  But to say that the

16   vesting provisions, the eligibility provisions do not apply

17   across the board so that we can return to the situation where

18   long-service employees get no pensions seems to us to be

19   objectionable, Mr. Chairman.

20       Senator Talmadge.  I think we have got a question of

21   separation of church and state here, number one, gentlemen, and,

22   number two, I don't believe we ought to get a row with every

23   religious faith in the country -- Jewish, Catholic, Protestant,

24   and otherwise.

25       All in favor please say "aye."

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

Reproduced at the National Archives

1   (A chorus of "ayes.")

2   Opposed, "no."

3   (No response.)

4   The "ayes" have it, and the amendment is agreed to.

5   Senator Dole.  Mr. Chairman?

6   Senator Talmadge.  Senator Dole.

7   Senator Dole.  I was going to propose, I don't see it in the

8   staff recommendations, and that would be a sunset date on this

9   legislation of June 30, 1983.  I think what we are looking about

10  we talked about sunset legislation in the general sense.  I am

11  not certain this legislation will answer all the concerns we

12  have.  It will force Congress to take another look at it, give

13  us time to see how it works, and give us time to make any

14  necessary changes.  I might add that 1983 is a nonpolitical

15  year.

16  We want to make certain that we provide income security

17  to employees, but if employers cannot  survive, then we are going

18  to have a question of PBGC paying substantial benefits.  This

19  may require very high premiums or could even in some circum-

20  stances lead to going to the general revenues for funding.

21  I haven't discussed this amendment with the staff or with

22  PBGC, but I think what we need to --

23  Senator Talmadge.  What date in 1983 do you  suggest, Senator

24  Dole?

25  Senator Dole.  June 30.

ALDERSON REPORTING COMPANY, INC.

ADD31

# SHORT APPENDIX

## TABLE OF CONTENTS

Page No.

Memorandum and Order, Dist. Ct. Dkt. 196 ................................ SA1–16

Judgment, Dist. Ct. Dkt. 197 ....................................................... SA17–18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SHEILAR SMITH, et al., On Behalf of Themselves and All Others Similarly Situated, and On Behalf of the OSF Plans** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 16-CV-467-SMY-RJD** |
| **vs.** | ) ) | |
| **OSF HEALTHCARE SYSTEM, et al.,** | ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (Doc. 147). Plaintiffs filed a Response (Doc. 191) and Defendants filed a Reply (Doc. 194). For the following reasons, the motion will be **GRANTED.**

### INTRODUCTION

Defendant OSF Healthcare System ("OSF") is an Illinois 501(c)(3) non-profit corporation, founded by The Sisters of the Third Order of St. Francis ("St. Francis Order"). (Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, Doc. 148 at 8-9. OSF operates eleven acute care hospitals, home health care services and other health care facilities in Illinois and Michigan. OSF has defined-benefits plans covering its own direct employees ("St. Francis Plan") and employees of the recently-acquired St. Anthony's Health Center ("St. Anthony's Plan").

Defendant Retirement Committee for the Retirement Plan for Employees of Saint Anthony's Health Center ("St. Anthony's Committee") is the administrator of the St. Anthony's

Plan. Defendant Sisters of the Third Order of St. Francis Employees Pension Plan Administrative Committee ("St. Francis Committee") is the administrator of the St. Francis Plan.

Plaintiffs Sheilar Smith and June Schwierjohn were employed at Saint Anthony's Health Center ("SAHC") until 2015 and 2016 respectively. Both are vested participants in the St. Anthony's Plan. Plaintiffs Kasandra Anton, Bonnie Bailey, and Peggy Wise were employed by OSF and are vested participants in the St. Francis Plan.

This case involves claims asserted under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. 93–406, 88 Stat. 840 as amended. Specifically, Plaintiffs claim OSF and related entities have improperly treated the St. Anthony's Plan and St. Francis Plan (collectively, "the Plans") as "church plans" exempt from the requirements of ERISA. Plaintiffs allege that as a result, OSF has failed to fund the Plans' trust accounts to the levels required under ERISA to cover all accrued benefits, that the defendants failed to follow certain notice, disclosure and managerial requirements, and that the defendants have breached their fiduciary duties. (Fourth Amended Complaint, Doc. 138 at 41-56).[1] Plaintiffs also assert a claim for declaratory judgment, seeking a declaration that the church plan exemption as applied violates the Establishment Clause of the First Amendment, and is therefore unconstitutional. (Id. at 56-60).

## BACKGROUND

OSF is a nonprofit healthcare system. (Doc. 138, ¶¶ 17, 32). In 1880, the Sisters of the Third Order of St. Francis, an order of Franciscan sisters, incorporated as an Illinois nonprofit under the name "Sisters of the Third Order of St. Francis," with the stated objective of "conducting hospitals" (Doc. 150-1 at 1-6). The name of the corporation was changed to OSF

---

[1] Plaintiffs Fourth Amended Complaint added five "alternative" causes of action "for relief under State law if the Court determines that the OSF Plans are 'church plans' exempt from ERISA." (Docs. 120 and 138 at n. 4). These state law claims were subsequently dismissed. (Doc. 142).

Healthcare System in 1989, and the St. Francis Order formed a new Illinois nonprofit corporation named The Sisters of the Third Order of St. Francis ("STOSF") to "serve as an integral part of the Roman Church and to carry out its mission; [and] to carry on the corporal works of the mercy of the Roman Catholic Congregation of Sisters."  (Declaration of Sister Diane Marie McGrew, President of OSF, Doc. 150 at ¶¶11; Doc. 150-1 at 10-14; Doc. 150-4 at 2-6, 26).  The Sisters in the St. Francis Order are the only members of STOSF, which in turn is the sole member of OSF.  (Doc. 150 at ¶ 9; Doc. 150-3 at 3).  STOSF's authority over OSF is governed by OSF's governing documents and the canonical and civil guidelines pertaining to Church properties.  (Doc. 150-3 at 5).  In 2014, SAHC, a nonprofit Catholic hospital operated by The Sisters of St. Francis of the Martyr of St. George in Thuine ("St. George Order"), merged into OSF with the permission of the applicable Roman Catholic Church department and the endorsement of the Bishop of Springfield.  (Doc. 150 at ¶¶ 18-21; Doc. 150-6 at 11-14; Doc. 150-7).

OSF requires that its President and a majority of its Board of Directors be Sisters.  (Doc. 150-3 at 5, 11).  All directors (including lay members) are required to meet certain qualifications, including "Commitment to the Philosophy, Mission, Values and Vision of [STOSF,]" and "Commitment to uphold the Catholic Code of Ethics in all dealings and deliberations pertaining to the Board's responsibilities."  (Id. at 5-6).   Among the powers reserved to STOSF (as sole member of OSF) is the power to appoint, approve or remove OSF's chairperson, vice-chairperson, chief executive officer, president, chief medical officer/chief clinical officer, regional CEOs, and operating division presidents and CEOs.  (Id. at 3-4).  STOSF also has the power to "approve the introduction or termination of value sensitive ministries or services, and to eliminate services or activities which are in conflict with the philosophy and

purposes of the established ministry." (Id. at 5).  In the event OSF is dissolved, its assets revert to STOSF.  (Id. at 3).  OSF is recognized as a Catholic institution in the Official Catholic Directory. (Doc. 149-7 at 6).  Its bylaws provide that any Medical Staff Bylaw or Rule is invalid if it conflicts with the Ethical and Religious Directives for Catholic Health Care Services ("ERDs") promulgated by the United States Conference of Catholic Bishops.  (Doc. 150-3 at 20-21).

Both Plans at issue in this case are sponsored by OSF.  (Docs. 138 and 140, ¶¶ 56-57, 72-74).  The St. Francis Plan has approximately 18,000 participants, and the St. Anthony's Plan has approximately 1,300 participants.  (Declaration of April M. Rowe, OSF Manager of Employee Benefits, Doc. 153 at ¶¶ 8, 9).  Sixty participants in the St. Francis Plan are employed by for-profit entities; none of the St. Anthony's Plan participants are employed by for-profit entities. (Declaration of Amanda Lowry, Vice President Controller of OSF, Doc. 159 at ¶¶ 3, 5).

The St. Francis Plan is "administered and maintained" by the St. Francis Committee, whose members are appointed by the OSF Board of Directors (the majority of which is made up of St. Francis Order Sisters), and the majority of committee members must be Sisters.  (Doc. 153-1 at 63)   Currently, the Committee consists of seven voting members, four of whom are Sisters. (Doc. 150 at ¶ 27).  The Committee is designated as the Plan Administrator and has "the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan."   (Doc. 153-1at 63-64).   The Committee's determinations are considered "conclusive and binding[.]"   (Id. at 64).  The Committee also holds "all powers necessary or appropriate to accomplish its duties under [the] Plan [and] [e]xcept as otherwise provided in [the] Plan, the Committee shall have full and complete authority, responsibility, and control in its sole and absolute discretion over the management, administration and operation of the Plan[.]"  (Id.).  Those powers include the determination of

eligibility to receive Plan benefits, computation and certification to OSF and the trustee of the amounts "necessary or desirable to be contributed to the Plan," and the administration of the Plan's claims procedures and claims review procedures.  (Id. at 64-65).  Under the St. Francis Plan, benefits "shall not be paid unless the [St. Francis Committee], in its discretion, determines that the Claimant is entitled to them."  (Id. at 65).  The Committee is separately empowered to "adopt such rules and decisions as it deems necessary or desirable."  (Id. at 65).  OSF has authority to amend the Plan, although any amendment that affects the rights, duties or responsibilities of the St. Francis Committee (other than its removal) must have the Committee's written consent.  (Id. at 70).

The St. Anthony's Committee is similarly charged with administering the St. Anthony's Plan, and "shall have all discretionary powers and authority necessary to carry out the provisions of the Plan."  (Doc. 153-2 at 50, 53).  Its members are the same as those of the St. Francis Committee – seven voting members, four of whom are St. Francis Order Sisters.  (Doc. 150 at ¶ 27).  "Any action or determination or decision whatsoever taken or made by the [St. Anthony's Committee] in good faith shall be final, binding and conclusive upon all persons concerned, including but not limited to the Employer, Employees and former Employees, Participants and former Participants and their spouses and Beneficiaries."  (Doc. 153-2 at 52).  The St. Anthony's Committee is responsible for Plan interpretation, benefit determinations, the claims process, and revision of the Plan to correct errors to effectuate the intent of the Plan.  (Id. at 50-53).  However, the St. Anthony's Committee cannot otherwise modify the Plan without the express consent of the employer's Board.  (Id. at 52).

## DISCUSSION

Defendants move for summary judgment on two bases: that the Plans properly qualify for the church plan exemption and are therefore not subject to the ERISA requirements which underpin the claims in Counts I-VIII; and that the church plan exemption is not unconstitutional as alleged in Count IX.   Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  When deciding a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

As an initial matter, Plaintiffs argue that Defendants' motion for summary judgment was filed prematurely.  *F.R.C.P.* 56(d) permits, but does not require, the Court to defer consideration of a summary judgment motion or to allow additional time for discovery, among other options. While there are numerous areas of inquiry that Plaintiffs state they would have explored prior to the filing of summary judgment motions, those pertinent to the instant motion have been at issue

from the outset of this case.  Although Defendants' filed for summary judgment well before the extended discovery deadline, Plaintiffs had ample time and opportunity to conduct discovery relevant to the issues raised in Defendants' motion.  As such, the Motion is not premature.

### Do the Plans Qualify for the ERISA Church Plan Exemption?

ERISA exempts "church plans" from its requirements.  29 U.S.C. § 1003(b)(2).  Originally, the statute defined a church plan as "a plan established and maintained ... for its employees ... by a church or by a convention or association of churches."  29 U.S.C. § 1002(33)(A).  In 1980, Congress passed the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub. L. No. 96-364, § 407, 94 Stat. 1208 (1980), which amended the statute by expanding the scope of the church plan exemption.  Under the amended statute, "an 'employee of a church' includes an employee of a church-affiliated organization[.]"  *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1656, (2017) (citing 29 U.S.C. § 1002(33)(C)(ii)(II)).  The amendment also expanded the scope of the church plan exemption to include:

> A plan established and maintained for its employees ... by a church or by a convention or association of churches includes a plan maintained by an organization ... the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.  29 U.S.C. § 1002(33)(C)(i).

For purposes of defining church plans, "employees of a church" include "an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches."  29 U.S.C. § 1002(33)(C)(ii)(II).  Thus, the term "employee of a church" includes employees of nonprofit organizations controlled by or associated with a church.

In its recent decision in *Advocate*, the Supreme Court concluded that the church plan exemption applies to certain Plans not established by a church.  Specifically, the Court found that "[u]nder the best reading of the statute, a plan maintained by a principal-purpose organization ... qualifies as a 'church plan,' regardless of who established it." *Advocate*, 137 S.Ct. at 1663.

Following *Advocate,* courts have engaged in a three-step inquiry in order to determine whether the church plan exemption applies to Plans maintained by principal-purpose organizations:

1. Is the entity whose employees the plan benefits a tax-exempt nonprofit organization associated with a church?

2. If so, is the entity's retirement plan maintained by a principal-purpose organization? That is, is the plan maintained by an organization whose principal purpose is administering or funding a retirement plan for entity employees?

3. If so, is that principal-purpose organization itself associated with a church?

*Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1222 (10th Cir. 2017).[2]  This Court will employ this approach.

### 1. Is OSF a Nonprofit Organization Associated With a Church?

The entity whose plan is being maintained must be both a tax-exempt nonprofit and associated with a church, because "[t]he term employee of a church or a convention or association of churches includes [ ] an employee of an organization..., which is exempt from tax under [26 U.S.C. § 501] and which is controlled by or associated with a church or a convention or association of churches[.]"  29 U.S.C. § 1002(33)(C)(ii)(II).  Plaintiffs concede that OSF is a nonprofit organization, and that St. Anthony's Health Center was a nonprofit entity prior to its acquisition by OSF.  (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Doc.

---

[2] While not binding precedent, the Tenth Circuit's Opinion is well-reasoned and essentially "on all fours" with this case.  As such, the Court considers it very persuasive.

191 at 11).  What remains in dispute is whether OSF is "associated with" the church under the statute.

The term "associated with a church or convention or association of churches" refers to an organization that "shares common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv).  Here, the undisputed facts demonstrate that OSF "shares common religious bonds and convictions" with the Catholic Church.  As previously noted, STOSF (whose membership is limited to Sisters) is the sole member of OSF.  In addition to numerous references to Catholicism throughout its statements of values, OSF has incorporated Roman Catholic doctrine into its basic structure, including the qualification for directorship and the automatic invalidation of any medical bylaw or rule that conflicts with the ERDs formulated by the United States Conference of Catholic Bishops.  OSF is listed in the Official Catholic Directory, which "[c]ourts view…as a public declaration by the Roman Catholic Church that an organization is associated with the Church."  *Overall v. Ascension*, 23 F. Supp. 3d 816, 831 (E.D. Mich. 2014) (collecting cases).  OSF's "convictions" are evidenced by references to the doctrine, norms and dictates of the Roman Catholic Church, and the Catholic Church acknowledges OSF as an associated organization.  These facts reflect shared bonds and convictions and satisfy the statutory requirement that OSF be "associated with" a church or a convention or association of churches.  *See also Hall v. USAble Life*, 774 F. Supp. 2d 953, 960 (E.D. Ark. 2011).

The Court acknowledges Plaintiffs' urging for it to adopt the Fourth Circuit's "objective test" for determining whether an organization is "associated with a church or convention or association of churches."  In *Lown v. Cont'l Cas. Co*., 238 F.3d 543, 548 (4th Cir. 2001), the Fourth Circuit held that "[i]n deciding whether an organization shares such common bonds and

convictions with a church, three factors bear primary consideration: 1) whether the religious institution plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization." The Eighth Circuit subsequently found the test "useful." *Chronister v. Baptist Health*, 442 F.3d 648, 653 (8th Cir. 2006). This Court finds it less so. The existence of any of the three *Lown* considerations would certainly indicate institutional control. But "common bonds and convictions" entail something more. The Court agrees with the Tenth Circuit's assessment that the *Lown* factors "are much narrower than the broad language of the definition in § 1002(33)(C)(iv)" and therefore do not suffice as an exclusive test for association. *Medina*, 877 F.3d at 1224.

Plaintiffs also raise one of the affirmative exclusions from the definition of a church plan; disqualifying a plan "if less than substantially all of the individuals included in the plan" are employees of a church or are deemed employees of a church. 29 U.S.C. §1002(33)(B)(ii). Employees of a nonprofit organization controlled by or associated with a church are deemed employees of the church. Defendants assert (and Plaintiffs do not dispute) that all of the employees covered by the St. Anthony's Plan and all but 60 employees out of the approximately 18,000 covered by the St. Francis Plan are employees of OSF's nonprofit ventures. 99.6% certainly constitutes "substantially all." Therefore, the Plans are not excluded from the church plan definition on that basis.

### 2.   *Are the Plan Committees principal-purpose organizations?*

A principal-purpose organization is one whose "principal purpose or function ... is the administration or funding of a plan or program for the provision of retirement benefits or welfare

benefits, or both, for the employees of a church." 29 U.S.C. § 1002(33)(C)(i).  "Organization" is

not a defined term under the statute.  However, in defining "associated with," the statute provides

that organizations may qualify "whether a civil law corporation or otherwise[.]"  29 U.S.C. §

1002(33)(C)(iv).  This suggests that principal purpose organizations need not be a separate,

legally independent entity, and is consistent with the ordinary meaning of the term.

Black's Law Dictionary defines "organization" as "a body of persons (such as a union or

corporation) formed for a common purpose."  Organization, *Black's Law Dictionary* (10th ed.

2014).  Similarly, the Oxford English Dictionary defines it as "[a]n organized body of people

with a particular purpose, as a business, government department, charity, etc." Organization,

*Oxford English Dictionary* (Third ed. 2004).  Neither of these definitions lead one to conclude

that an organization must be legally separate from any other entity.  Several courts have

interpreted the term in this manner and concluded that internal, non-independent subcommittees

may qualify as "organizations" for purposes of the ERISA church plan exemption.  *See Medina*,

877 F.3d at 1226; *Sanzone v. Health*, No. 4:16 CV 923 CDP, 2018 WL 4071897, at *7 (E.D. Mo.

Aug. 27, 2018); and *Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*, 764 F.

Supp. 2d 1119, 1127 (D. Minn. 2011).  This Court joins them and finds that the Plan Committees

are organizations for purposes of the Court's analysis.

Next, Plaintiffs challenge whether the Plan Committees actually "maintain" the Plans.  It

is undisputed that the Plan Committees are the administrators of the Plans.  (Docs. 138 and 140

at ¶¶ 101-104, 106-108).  Nevertheless, Plaintiffs contend that OSF and SAHC (presumably

before the acquisition) – not the Plan Committees – actually maintain the Plans.  More

particularly, they argue that maintaining a Plan necessarily includes the power to modify or

terminate it (powers that are at least partially reserved to OSF) as well as funding it.

These arguments were considered and rejected in *Medina*, 877 F.3d at 1224–25, and by District Judge Catherine Perry of the Eastern District of Missouri in *Sanzone,* 2018 WL 4071897, at *5.  Both found that the "ordinary meaning" approach to interpreting the term "maintain" is appropriate, and found that the ordinary meaning did not require the power to modify or terminate the plan in order for an entity to be said to maintain it.  "Maintain" has several definitions in Black's Law Dictionary, the most applicable one being "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." Maintain, *Black's Law Dictionary* (10th ed. 2014).  Merriam-Webster's similarly defines "maintain" as "to keep in an existing state (as of repair, efficiency, or validity)"; "to continue or persevere in"; "sustain"; and "to support or provide for." Maintain, *Merriam-Webster's II Collegiate Dictionary* (10th ed. 2002).  In holding that a subcommittee did "maintain" the Plan in question, the *Medina* court concluded, "when ERISA says that a church plan includes a plan 'maintained' by a principal-purpose organization, 29 U.S.C. § 1002(33)(C), it simply means the principal-purpose organization, as Black's says, 'cares for the plan for purposes of operational productivity.' And this is precisely the point of the Subcommittee."  *Medina*, 877 F.3d at 1225. The Court agrees.[3]

The Plan Committees have authority over the Plans sufficient to meet the ordinary meaning of "maintaining" the Plans.  The Committees are each given significant power and control over the interpretation of the Plans, the eligibility of claimants, entitlement to benefits, as

---

[3] Plaintiffs point to a recent ruling from the Northern District of California in *Rollins v. Dignity Health*, 2018 WL 4262334 (N.D. Cal. Sept. 6, 2018), disagreeing with *Medina* on the issue of whether "maintain" requires something more than its ordinary meaning.  2018 WL 4262334, at *6.  The court there (and the Plaintiffs here) considered use of the ordinary meaning of "maintain" as synonymous with "administer" to render the term surplussage.  Neither Plaintiffs nor the court in *Rollins*, however, discuss what the term "administer" means, rendering their discussion about whether "maintain" means something more than "administer" a sterile exercise.

well as rule-making authority.  This degree of authority is consistent with "caring for the Plans for purposes of operational productivity."

Plaintiffs also suggest that the Plan Committees do not have "primary ongoing responsibility (and potential liability) to plan participants [,]" and therefore they do not "maintain" the Plans.  (Doc. 191 at 18) (citing *Advocate*, 137 S. Ct. at 1661).  The record in this case, however, belies this suggestion.  Both Plans entrust decisions about participant claims, eligibility and benefits to their respective Plan Committee, including the eligibility of an employee, beneficiary or other person to receive Plan benefits, as well as the interpretation of Plan provisions and the administration of claims procedures.  The St. Francis Plan specifically states that "Benefits under the Plan shall not be paid unless the [St. Francis Committee], in its discretion, determines that the Claimant is entitled to them."  (Doc. 153-1 at 65).  These are central responsibilities that may give rise to claims for the wrongful denial of benefits.  The interpretation advocated by Plaintiffs, which necessitates the inclusion of plan funding and the power to modify or terminate the Plan, is simply too narrow.  One may be appointed caretaker to maintain a property without the authority to burn it to the ground, build an addition or sell it.[4]

### 3.   Are the Plan Committees Associated with a Church?

Whether the Plan Committees themselves are sufficiently associated with a church rests on ERISA's definition of the term "associated with"; "shar[ing] common religious bonds and convictions with that church or convention or association of churches."  29 U.S.C. § 1002(33)(C)(iv).  In that vein, the Plan Committees are tightly connected with the Roman Catholic Church.  They are both dominated by members of a recognized Roman Catholic

---

[4] Plaintiffs infer that the Plan Committees do not actually maintain the Plans, because the minutes appear to show that they meet infrequently and briefly.  But the question is not whether the Plan Committees are doing their jobs well or excessively delegating their authority, but rather whether the structure satisfies the requirements of the church plan definition.

religious order.  Moreover, to the extent the Plan Committees are internal organizations of OSF, they share OSF's Catholic affiliation.  See *Medina,* 877 F.3d at 1277.  See also *Advocate*, 137 S. Ct. 1659 ("[I]f A is exempt, and A includes C, then C is exempt.") (*quoting Overall*, 23 F.Supp.3d at 828).

Based on an examination of the record and the arguments of the parties in the context of the *Medina* factors, the Court is persuaded that the church plan exemption applies to the Plans at issue.

### Does the Church Plan Exemption Violate the Establishment Clause?

Alternatively, Plaintiffs argue that the application of the church plan exemption to the Plans at issue violates the Establishment Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. Amend. 1.  Challenges under the Establishment Clause are analyzed based on a three part test enunciated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  Under the *Lemon* test, governmental action does not violate the Establishment Clause if (1) it has a secular purpose; (2) its principal or primary effect is one that neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion.  Conversely, governmental action violates of the Establishment Clause if it fails on any one of these three prongs.  *Books v. City of Elkhart, Indiana,* 235 F.3d 292, 301–02 (7th Cir. 2000) (citing *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987)).

The question relevant to the "purpose" prong is whether the challenged governmental conduct was done "for a religious purpose, or, put differently, whether its inclusion lacks a secular objective."  *Mayle v. United States*, 891 F.3d 680, 685–86 (7th Cir. 2018) (quotation and citation omitted).  "[H]aving just one secular purpose is sufficient to pass the *Lemon* test. *Id.*,

citing *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 800 (7th Cir. 1999). The alleviation of significant governmental interference with the ability of religious organizations to define and carry out their religious missions constitutes a secular objective (See, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987), and has been found to apply to the ERISA church plan exemption. *Medina,* 877 F.3d at 1231 (detailing factors showing this 'secular purpose', including the legislative histories of both the original church plan exemption and the 1980 expansion of its scope).

The second question under the *Lemon* test is whether the church plan exemption's principal or primary effect is one that neither advances nor inhibits religion. Statutes that give special consideration to religious groups are not per se invalid. Rather, "[f]or a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the government itself has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337.

The church plan exemption is one of a number of statutes that relieve religious organizations from otherwise generally-applicable requirements, including the Internal Revenue Code, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii) (exempting "churches, their integrated auxiliaries, ... conventions or associations of churches," and "the exclusively religious activities of any religious order" from a tax-filing requirement) and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12113(d) (exempting religious organizations from anti-discrimination requirements), and 42 U.S.C. § 12187 (exempting religious organizations from public accommodation requirements). There is no principled distinction between these exemptions and the church plan exemption.

The final prong of the *Lemon* test involves an assessment of whether the government action fosters an excessive government entanglement with religion. The church exemption does

not.  Rather than entangling the government in the affairs of religious organizations, the church plan exemption avoids the entanglement.   In other words, by exempting eligible plans from ERISA requirements, religious organizations and their associated entities are relieved from government mandates about how they conduct their affairs, structure their finances and pursue their missions.  As such, the third prong of *Lemon* is satisfied, and application of the church plan exemption does not run afoul of the Establishment Clause.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 147) is **GRANTED** and the case is **DISMISSED with prejudice**. All pending motions are **DENIED as MOOT**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiffs and to close the case

**IT IS SO ORDERED.**

**DATED:  September 28, 2018**

<u>**s/ Staci M. Yandle**</u>
**STACI M. YANDLE**
**United States District Judge**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SHEILAR SMITH, KASANDRA ANTON,** | ) | |
| **JUNE SCHWIERJOHN, BONNIE** | ) | |
| **BAILEY and PEGGY WISE, on Behalf of** | ) | |
| **Themselves and All Others Similarly** | ) | |
| **Situated, and on Behalf of the OSF Plans** | ) | **Case No. 16-CV-467-SMY-RJD** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **OSF HEALTHCARE SYSTEM, SISTERS** | ) | |
| **OF THE THIRD ORDER OF ST.** | ) | |
| **FRANCIS EMPLOYEES PENSION PLAN** | ) | |
| **ADMINISTRATIVE COMMITTEE,** | ) | |
| **RETIREMENT COMMITTEE FOR THE** | ) | |
| **RETIREMENT PLAN FOR EMPLOYEES** | ) | |
| **OF SAINT ANTHONY'S HEALTH** | ) | |
| **CENTER, PLAN ADMINISTRATOR FOR** | ) | |
| **THE OSF PLANS, OSF HEALTHCARE** | ) | |
| **SYSTEM HUMAN RESOURCES** | ) | |
| **COMMITTEE, and JOHN and JANE** | ) | |
| **DOES 1-40,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>JUDGMENT</u>

**IT IS ORDERED** that pursuant to the Order dated December 5, 2017 (Doc. 142) Counts

X-XIV of Plaintiffs' Fourth Amended Complaint are **DISMISSED without prejudice.**

**IT IS FURTHER ORDERED** that pursuant to the Order dated September 28, 2018

(Doc. [196]), Counts I-IX of the Fourth Amended Complaint are **DISMISSED with prejudice**.

Judgment is entered against Plaintiffs Sheilar Smith, Kasandra Anton, June Schwierjohn, Bonnie

Bailey and Peggy Wise and in favor of Defendants OSF Healthcare System, Sisters of the Third

Order of St. Francis Employees Pension Plan Administrative Committee, Retirement Committee

for the Retirement Plan for Employees of Saint Anthony's Health Center, Plan Administrator for

SA17

the OSF Plans, OSF HealthCare System Human Resources Committee, and John and Jane Does

1-40.   Plaintiffs shall recover nothing and this action is **DISMISSED in its entirety.**

Accordingly, the Clerk of Court is **DIRECTED** to close this case.


**DATED: September 28, 2018**

                                      **THOMAS L. GALBRAITH, Acting Clerk of Court**

                                      **By: s/ Stacie Hurst, Deputy Clerk**

**Approved:**
**s/ Staci M. Yandle**
**STACI M. YANDLE**
**DISTRICT JUDGE**