No. 18-3325

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

SHEILAR SMITH, et al.,

*Plaintiffs-Appellants*,

v.

OSF HEALTHCARE SYSTEM, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois,
No. 3:16-cv-00467-SMY-RJD
The Honorable Staci M. Yandle, Presiding

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

**KELLER ROHRBACK L.L.P.**
Matthew Gerend (*Lead Attorney*)
Lynn L. Sarko
Laura R. Gerber
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

Ron Kilgard
3101 N. Central Ave., Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088

**COHEN MILSTEIN SELLERS &**
**TOLL PLLC**
Karen L. Handorf
Michelle C. Yau
Mary Bortscheller
Scott M. Lempert
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel.: (202) 408-4600

*Counsel for Plaintiffs-Appellants*

(Additional counsel listed on inside cover)

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA  19087
Tel.: (610) 667-7706

**IZARD, KINDALL & RAABE, LLP**
Mark P. Kindall
29 South Main Street, Suite 305
West Hartford, CT  06107
Tel.: (860) 493-6292

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

ARGUMENT ............................................................................ 3

    I.    The Plans Are Not Church Plans............................................ 3

        A.    OSF Maintains the Plans............................................... 3

        B.    The Committees Do Not Maintain the Plans. .................................................................. 8

                1.    "Maintain" and "Administer" Have Distinct Meanings Under ERISA....................... 8

                2.    "Primary" Responsibility Is Key........................ 12

                3.    There Exist Genuine Factual Disputes Regarding Who Administers the Plans. .................................................................. 15

        C.    Even If the Committees "Maintained" the Plans, They Are Not Principal-Purpose "Organization[s]." ........................................ 16

        D.    Informal Governmental Opinions Are Neither Controlling nor Persuasive. ........................... 19

        E.    Defendants Misconstrue the Legislative History. ......................................................... 20

    II.    The District Court Abused Its Discretion by Denying Plaintiffs' Rule 56(d) Request. .............................. 22

    III.    Application of the Exemption Is Unconstitutional. ............. 23

        A.    Application of the Exemption Does Not Comport with the Stated Congressional Purpose. ...................................................... 23

B.  Application of the Exemption has the
    Primary Effect of Endorsing Religion. ....................... 26

    1.  *Walz* and *Gaylor* Are Inapposite. ...................... 28

    2.  Application of the Exemption Does
        Not Alleviate Any Burden or
        Entanglement. .................................................... 31

    3.  Application of the Exemption
        Unnecessarily Burdens
        Nonbeneficiaries. ............................................... 34

C.  The Historical Test Does Not Save the
    Exemption. .................................................................. 36

CONCLUSION ........................................................................ 38

# TABLE OF AUTHORITIES

**CASES**

*Advocate Health Care Network v. Stapleton,*
 137 S. Ct. 1652 (2017) ................................................................. *passim*

*Anderson v. UNUM Provident Corp.,*
 369 F.3d 1257 (11th Cir. 2004) .................................................. 4, 5, 6, 7

*Chilton v. UnumProvident Corp.,*
 2005 WL 8158055 (N.D. Ala. June 1, 2005) ........................................ 11

*Cohen v. City of Des Plaines,*
 8 F.3d 484 (7th Cir. 1993) .............................................................. 32, 34

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist,*
 413 U.S. 756 (1973) .............................................................................. 29

*Corp. of Presiding Bishop of Church of Jesus Christ of
 Latter-Day Saints v. Amos,*
 483 U.S. 327 (1987) ...................................................................... *passim*

*Estate of Cowart v. Nicklos Drilling Co.,*
 505 U.S. 469 (1992) ................................................................................ 9

*Crosby v. Cal. Physicians' Serv.,*
 279 F. Supp. 3d 1074 (C.D. Cal. 2018) ................................................ 11

*Cutter v. Wilkinson,*
 544 U.S. 709 (2005) ................................................................ 28, 34, 36

*Digrugilliers v. Consol. City of Indianapolis,*
 506 F.3d 612 (7th Cir. 2007) ................................................................ 28

*Doe ex rel. Doe v. Elmbrook Sch. Dist.,*
 687 F.3d 840 (7th Cir. 2012) ................................................................ 30

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
 529 U.S. 120 (2000) ................................................................................ 8

*Fort Halifax Packing Co. v. Coyne,*
  482 U.S. 1 (1987) ........................................................ 4, 5, 6

*Gaylor v. Mnuchin,*
  919 F.3d 420 (7th Cir. 2019) ..................................... *passim*

*Golden Gate Rest. Ass'n v. City & County of San Francisco,*
  546 F.3d 639 (9th Cir. 2008) ............................................ 5, 6

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ........................................................ 20

*Hariri v. Reliance Standard Life Insurance Co.,*
  2017 WL 3422029 (N.D. Cal. Aug. 9, 2017) ...................... 12

*Hightower v. Tex. Hosp. Ass'n,*
  65 F.3d 443 (5th Cir. 1995) .................................. 5, 7, 8, 11

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
  565 U.S. 171 (2012) .................................................... 32, 37

*Jimmy Swaggart Ministries v. Bd. of Equalization,*
  493 U.S. 378 (1990) .................................................... 31, 32

*Loughrin v. United States,*
  573 U.S. 351 (2014) ........................................................ 17

*Medina v. Catholic Health Initiatives,*
  877 F.3d 1213 (10th Cir. 2017) ............................... 2, 18, 26

*NLRB v. Catholic Bishop of Chicago,*
  440 U.S. 490 (1979) ........................................................ 32

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ........................................................ 19

*Texas Monthly, Inc. v. Bullock,*
  489 U.S. 1 (1989) ...................................................... 28, 30

*Estate of Thornton v. Caldor, Inc.*,
    472 U.S. 703 (1985) ...................................................... 35, 36

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985) .......................................................... 31

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) .......................................................... 36

*United States v. Lee*,
    455 U.S. 252 (1982) .......................................................... 36

*Walz v. Tax Comm'n*,
    397 U.S. 664 (1970) ................................................... *passim*

*Zenith Radio Corp. v. United States*,
    437 U.S. 443 (1978) .......................................................... 19

**STATUTES**

29 U.S.C. § 1002(1) .............................................................. 6

29 U.S.C. § 1002(9) ............................................................ 17

29 U.S.C. § 1002(16) ..................................................... 9, 17, 18

29 U.S.C. § 1002(21) .......................................................... 9, 14

29 U.S.C. § 1002(33) .......................................................... 17

29 U.S.C. § 1002(33)(A) ..................................................... 3, 21

29 U.S.C. § 1002(33)(C)(i) .............................................. 3, 10, 16

29 U.S.C. § 1002(33)(C)(ii)(II) ........................................ 17, 26

29 U.S.C. § 1002(33)(C)(iii) ............................................ 17, 26

29 U.S.C. § 1021 ............................................................... 25

29 U.S.C. § 1022 ............................................................... 25

29 U.S.C. § 1023 ................................................................ 25

29 U.S.C. § 1054(g) ........................................................... 15

29 U.S.C. § 1082 ................................................................ 15

29 U.S.C. § 1362 ................................................................ 15

Revenue Act of 1942, Pub. L. No. 77-753, § 162(a), 56 Stat. 798 (1942) ...................................................................... 37

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. I .................................................... *passim*

## RULES

Fed. R. Civ. P. 56(d) ...................................................... 2, 22

## LEGISLATIVE HISTORY

125 Cong. Rec. 10,052-53 (1979) ................................ 22, 25, 26

126 Cong. Rec. 20,245 (1980) ...................................... 22

126 Cong. Rec. 23,049 (1980) ...................................... 20

S. Rep. No. 93-383, *reprinted in* 1974 U.S.C.C.A.N. 4889 (1973) ............................................................................... 24

## OTHER AUTHORITIES

80 Fed. Reg. 65,135 (Oct. 26, 2015) ........................... 33

# INTRODUCTION

Congress did not intend for multi-billion-dollar hospital systems to invoke an ERISA-exemption for "church plans" as an excuse to underfund their employees' pensions by hundreds of millions of dollars, as OSF has done. The language Congress chose in defining a "church plan" provides a narrow accommodation for benefit plans "maintained" by churches or denominational pension boards, whose "principal purpose" is funding or administering benefits for church employees. Congress undisputedly did not allow church-associated hospitals to maintain their own ERISA-exempt church plans.

The Supreme Court's opinion in *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017), did not hold otherwise. *Advocate* held that a plan "maintained" by a principal-purpose organization need not have been "established" by a church. It did not address whether, as Defendants contend, plans sponsored by hospital systems like OSF can be treated as being "maintained" by principal-purpose organizations merely because they are "administered" by the hospitals' internal benefits committees.

Defendants repeatedly cite the Tenth Circuit's subsequent opinion in *Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017). But Defendants cannot overcome its multiple flaws, including its disregard of the Supreme Court's interpretation of the term "maintained." *Medina*, like the district court below, conflated distinct ERISA concepts ("maintain" and "administer") and disregarded key statutory context, which precludes the conclusion that an otherwise unqualified organization like OSF can use an internal committee to maintain its own church plan.

Even if "maintain" means "administer," the district court ignored genuine disputes of material fact, as record evidence suggests that OSF's internal benefit committees ("Committees") did not even administer the pension plans at issue ("Plans"). Plaintiffs were prevented from further developing these disputes in response to Defendants' premature Rule 56 motion because the district court abused its discretion by denying Plaintiffs' Rule 56(d) request.

Finally, although Defendants and the Government, as intervenor, spill considerable ink defending the *facial* constitutionality of the church plan exemption and the *concept* of religious accommodations,

they largely ignore the question presented: whether *application* of the church plan exemption to religious hospital systems like OSF is permissible under the Establishment Clause. As the Government concedes, exempting religious, but not secular, entities from a neutral law has an improper purpose and effect of endorsing or advancing religion if such exemption is "unnecessary" to avoid government entanglement in religion or "to eliminate a significant governmental burden" on religious exercise. Gov. Br. 16.

## ARGUMENT

### I. The Plans Are Not Church Plans.

#### A. OSF Maintains the Plans.

Defendants do not dispute the relevant legal framework. A plan qualifies as a "church plan" only if it is "maintained" by one of two types of entities: (1) a church,[1] pursuant to subparagraph 33(A) of the church plan definition, 29 U.S.C. § 1002(33)(A); or (2) a principal-purpose organization described in subparagraph 33(C)(i), *id.* § 1002(33)(C)(i). If the Plans are not "maintained" by a church or principal-purpose organization, they are not "church plans." Pl. Br. 26-28.

_____

[1] As used herein, "church" includes "a convention or association of churches."

Defendants also do not dispute that OSF is neither a church nor a principal-purpose organization. Indeed, Defendants concede they "have never contended that OSF, a nonprofit Catholic healthcare system, has the funding or administration of the Plans as its principal purpose." Def. Br. 30 n.4. Thus, if the Plans are "maintained" by OSF, they cannot qualify as ERISA-exempt church plans. *See* Pl. Br. 33-34.

The overwhelming weight of authority interpreting the term "maintained" in the ERISA context supports only one conclusion: OSF maintains the Plans. OSF has the "primary ongoing responsibility (and potential liability) to plan participants," *Advocate*, 137 S. Ct. at 1661, and "assumed … responsibility to pay benefits on a regular basis," *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987). OSF executed the operative OSF Plan restatement, as well as the SAHC Plan amendment by which it assumed the responsibilities as plan sponsor of the SAHC Plan. *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1267 (11th Cir. 2004). OSF has the power to amend both Plans, *Anderson*, 369 F.3d at 1265-67, and to determine the "kind and level" of Plan benefits, *Golden Gate Rest. Ass'n v. City & County of San Francisco* (GGRA), 546 F.3d 639, 653-54 (9th Cir. 2008). OSF is responsible for funding the

Plans. *Anderson*, 369 F.3d at 1267; *Fort Halifax*, 482 U.S. at 9. And OSF has sole authority to terminate the Plans. *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 449 (5th Cir. 1995). *See* Pl. Br. 29-32 (applying these standards).

Defendants' do not dispute these facts. Instead, they deny that the above referenced cases addressed the meaning of the term "maintained." Defendants are mistaken.

First, although Defendants cite (Def. Br. 25) *Advocate*'s disclaimer that "nothing we say … expresses a view" on the distinct question of whether "internal benefits committees … count as principal-purpose organizations," 137 S. Ct. at 1657 n.2, Defendants fail to acknowledge that the Supreme Court did not disclaim its view of the meaning of the term "maintained." The Supreme Court's holding was based, in part, on the relative importance of the entity that "maintains" a plan as opposed to the entity that "established" it: the "church-establishment condition … has limited functional significance" because "[e]stablishment of a plan … is a one-time, historical event" whereas "it is the entity maintaining the plan that has the primary ongoing responsibility (and potential liability) to plan participants." *Id.* at 1661.

Second, Defendants claim *Fort Halifax* addressed only "whether there was a plan at all." Def. Br. 23 n.2. But whether a plan exists depends on whether an employer "established or *maintained*" a plan, *see* 29 U.S.C. § 1002(1) (emphasis added), and the Supreme Court held that a state severance pay statute "neither establishes, *nor requires an employer to maintain*, an employee benefit *plan*" because, *inter alia*, "[t]he employer assumes no responsibility to pay benefits on a regular basis," 482 U.S. at 12 (first emphasis added).

Third, although *GGRA* noted that "the City administers" the Health Access Program ("HAP"), its conclusion that "the City, rather than the employer, establishes and maintains the HAP" was based on the facts that the City (i) controlled whether the HAP "will continue to exist"; (ii) was "free to change the conditions of eligibility"; (iii) "has [ ] control over the kind and level of benefits," and (iv) made the benefit "promises" to employees. 546 F.3d at 653-54.

Fourth, Defendants misconstrue *Anderson*, arguing the employer "maintained" a plan because it "performed all of the administrative functions associated with the maintenance of the plan." Def. Br. 20 (quoting *Anderson*, 369 F.3d at 1265). But in concluding that the

employer, Shaw, "maintained" the plan, *Anderson* relied, *inter alia,* on the facts that Shaw "maint[ained] a fund to pay benefits," "renewed its obligations" to provide benefits, "exercised its power to modify the terms of the plan," and "use[d] documents that bore the Shaw emblem." 369 F.3d at 1265-67. Although Shaw also performed "administrative functions," nothing in *Anderson* supports the conclusion—necessary to Defendants' position—that a plan administrator "maintains" a plan for which *another entity* made the benefits commitment, executed the plan documents, serves as plan sponsor, funds the plan, and possesses the authority to amend and terminate the plan.

Finally, Defendants contend that *Hightower* "centered on the fact that the governmental entity 'gave up its role in the [p]lan.'" Def. Br. 23 (quoting 65 F.3d at 449). But *Hightower* also considered whether a non-governmental hospital foundation "maintained" a plan *after* the county leased a hospital to the foundation and "gave up its role" in the hospital plan. 65 F.3d at 449. The Fifth Circuit concluded that because the foundation had a choice of whether to continue or terminate the plan, its decision to terminate meant that it "maintained" the plan. *Id.*

Application of these cases to the undisputed facts demonstrates that OSF maintains the Plans as a matter of law.

**B.    The Committees Do Not Maintain the Plans.**

### 1.    "Maintain" and "Administer" Have Distinct Meanings Under ERISA.

Defendants' contention that the Committees "maintain" the Plans is based solely on the Committees' powers to *administer* the Plans. *Compare* Def. Br. 20-21, *with* Pl. Br. 42-43 (Committees' powers are those of *plan administrators*). Defendants' are wrong as a matter of law.

Defendants invoke the "ordinary meaning" of "maintained" to argue that it might be construed to include acts of plan administration. Def. Br. 15, 18-21. But "words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted); Pl. Br. 36-43, and "maintain" and "administer" refer to two distinct types of authority under ERISA.

"Administration" refers to acts of *applying and interpreting* a plan's written terms, Pl. Br. 37-38, 42-43, and ERISA expressly describes plan administration as a fiduciary act, 29 U.S.C. §

1002(21)(A)(iii).  In contrast, ERISA uses the term "maintained" to refer to the role of a "plan sponsor," *id.* § 1002(16)(B), and the Supreme Court has held that a plan sponsor's acts of *designing, adopting, and amending* a plan's terms, which are akin to the acts of the "settlor" of a trust, are not fiduciary acts.  Pl. Br. 39 (citing cases).

Defendants do not respond beyond asserting that these "contextual clues … pale in comparison to the later-enacted 1980 amendments," which Defendants claim "characterize plan administration as part of maintenance."  Def. Br. 24.  But subparagraph 33(C)(i), which was adopted in 1980, does not redefine "maintained" to mean something different in the context of the church plan exemption than it does elsewhere under ERISA.  *See* Pl. Br. 40-42 (citing, e.g., *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) ("[I]dentical terms within an Act bear the same meaning.")).

Defendants note that subparagraph 33(C)(i) uses the disjunctive, such that an organization may have a principal purpose of *either* the administration *or* funding of benefit plans for church employees.  Def. Br. 21-22 (citing 29 U.S.C. § 1002(33)(C)(i)).  But Defendants conflate two distinct aspects of subparagraph 33(C)(i): (1) the condition for a

*plan* to qualify as a church plan, which requires that it be "maintained" by a principal-purpose organization; and (2) the definition of a principal-purpose organization, which is an organization with a "principal purpose or function" of "the administration or funding of a plan." *See* Pl. Br. 40-42 (quoting 29 U.S.C. § 1002(33)(C)(i)).

Defendants respond that there would be "no reason to classify" an organization that administers a plan as a principal-purpose organization "if it is impossible for that entity to qualify as maintaining" that plan. Def. Br. 22. This simply does not follow. If an organization's primary ongoing activity is the administration of benefits, that organization would have the "*principal* purpose or function" of plan administration even if it *also* maintains the plan by making the ongoing benefit commitment and possessing the authority to, *inter alia*, amend or terminate that commitment. Administration would remain its "main job." *Advocate*, 137 S. Ct. at 1657.

Defendants next contend that courts rely on acts of administration in evaluating who maintains a plan. Def. Br. 20. But courts consistently interpret "maintained" to refer to the role of the plan sponsor in designing, offering, and funding benefits, *see supra* pp 4-7,

10

and they treat administration and maintenance as distinct concepts, *see* Pl. Br. 39-40 (citing, *e.g.*, *Hightower*, 65 F.3d at 446, 449 (foundation "maintained" plan even though distinct entity was plan administrator)).

Further, as explained *supra* pp 6-7, *Anderson*'s consideration of administration *among multiple* relevant factors does not support Defendants' position that a plan administrator "maintains" a plan for which a *distinct entity* makes the benefit promise, determines the nature of and eligibility for benefits, funds the benefits, and has full authority to amend and terminate the plan. The same is true with respect to the few district courts that considered administration among several factors. *See, e.g.*, *Crosby v. Cal. Physicians' Serv.*, 279 F. Supp. 3d 1074, 1078-81 (C.D. Cal. 2018) (plan sponsor, which was "responsible for payment of monthly" plan dues and had sole termination authority, also administered plan); *Chilton v. UnumProvident Corp.*, 2005 WL 8158055, at *2 (N.D. Ala. June 1, 2005) (employer that administered plan also offered the benefits, selected the insurer, executed the master policy agreement, "was involved in the design of the plan," and "had regular interaction with Unum Life concerning brochure approval and

changes, policy changes and other aspects related to the maintenance of this plan").[2]

## 2. "Primary" Responsibility Is Key.

Even if administration were one factor courts weighed, it is not sufficient that a principal-purpose organization hold *some* of the responsibilities associated with plan maintenance; it must have the "*primary* ongoing responsibility." *Advocate*, 137 S. Ct. at 1661 (emphasis added). *See also* Pl. Br. 44-46. Where, as here, an employer promised benefits to its employees, sponsors the plan, funds the benefits, and has ultimate authority to amend or terminate the plan, it is that employer, and not the administrator, that has primary responsibility. This is particularly true here, where the Committees were appointed by, and act "on behalf" or "at the pleasure" of, OSF. *See* Pl. Br. 44-45.

Indeed, although Defendants list certain "ongoing" authority delegated to the Committees, Def. Br. 20-21, 27-29, the Committees'

---

[2] In *Hariri v. Reliance Standard Life Insurance Co.*, 2017 WL 3422029 (N.D. Cal. Aug. 9, 2017), the insurance policyholder responsible for the payment of premiums was a union, but the county that employed the plan participants and administered the plan exerted unusual influence over the union's selection and negotiation of the policy. *Id.* at *5.

authority is *secondary* to that of OSF.  The OSF Plan terms that the OSF Plan Committee has authority to construe were adopted by OSF, *see* Pl. Br. 29-33, 45, the Committee's benefit eligibility determinations are made pursuant to eligibility and accrual rules enacted by OSF, *see* A250-51 (§ 2.01), A266-74 (Articles III and IV), and the Committee may direct the trustee to pay only those "benefits to which any Participant shall be entitled *hereunder*" (i.e., under the Plan terms adopted by OSF), A305 (§ 9.04(b)) (emphasis added).  The Committee's authority is "subject to the specific terms of the Plan" adopted by OSF and it must interpret the Plan "in light of … evidence of the *intent of the Employer* [i.e., OSF]." A304-06 (§§ 9.04, 9.06) (emphasis added).

Likewise, the SAHC Plan Committee administers the SAHC Plan "in accordance with its terms," which were adopted by OSF (or its predecessor), and "shall have no power" to modify the plan terms, "to change or add to any benefits," or "to waive or fail to apply any requirements of eligibility for benefits" adopted by OSF (or its predecessor) "without the express consent of" the OSF Board.  A380-82 (§§ 11.2, 11.5).

Although the OSF Committee "compute[s] and certif[ies]" the amounts OSF contributes to the OSF Plan, Def. Br. 21, 29 (citing A305 (§ 9.04(h)), OSF both makes the contributions and determines the Plan's "funding policy and method." Pl. Br. 31-32 (citing A303-04 (§ 9.01(b)). *See also* A379-80 (§ 11.1) (OSF "shall have the sole responsibility for making contributions necessary to provide benefits under the [SAHC] Plan.").

Finally, that Plaintiffs *also* sued the Committees, in addition to OSF, Def. Br. 26, is of no consequence. A named plan administrator is a fiduciary, 29 U.S.C. § 1002(21)(A)(iii), who is liable for breaching fiduciary duties, *id.* § 1132(a)(2), and for failing to provide certain required notices, *id.* §§ 1021-25. *See also* A131-34 (¶¶ 164-78), A136-44 (¶¶ 192-234). That multiple entities may be liable for distinct duties does not mean the plan administrator has "primary ongoing responsibility (and potential liability) to plan participants." *Advocate*, 137 S. Ct. at 1661. Even in terms of relative liability, it is OSF, as the employer, who is liable for making contributions necessary to fund participants' benefits. 29 U.S.C. § 1082. *See also* A134-35 (¶¶ 179-83). And regardless of whether liability is *fiduciary* in nature, *see* Def. Br.

26-27, a plan sponsor is liable for making impermissible plan amendments, such as those that reduce accrued benefits, 29 U.S.C. § 1054(g), or for terminating a plan without first putting sufficient assets into the plan trust, 29 U.S.C. § 1362.

### 3. There Exist Genuine Factual Disputes Regarding Who Administers the Plans.

Even if maintenance referred exclusively to administration, the district court ignored evidence strongly suggesting that the Committees do not administer the Plans. *See* Pl. Br. 46-48. Defendants offer only two brief responses. Def. Br. 30 n.3.

First, they claim the Plans' frozen status explains the Committees' infrequent meetings. Pl. Br. 46-48. But as Defendants elsewhere concede, Def. Br. 11, "frozen" status means only that employees are not *accruing additional* benefits; current and former employees who already accrued benefits are entitled to benefits upon retirement, which must be administered on an ongoing basis.

Second, Defendants repeat the district court's view that the relevant question is "whether the structure satisfies" the church plan definition. Def. Br. 30 n.3. But the church plan definition does not

merely require a particular structure; it requires that a church plan be "maintained" by a principal-purpose organization.  *See* Pl. Br. 47-48.

## C.  Even If the Committees "Maintained" the Plans, They Are Not Principal-Purpose "Organization[s]."

Subparagraph 33(C)(i) is satisfied only if the principal-purpose entity maintaining a plan is an "organization."  Pl. Br. 48-52. Defendants concede that the Committees are "[i]nternal" to OSF and were "selected by OSF's Board."  Def. Br. 31; *see also* Pl. Br. 48-49.  But Defendants insist that the ordinary meaning of the term "organization" does not require an independent legal existence.  Def. Br. 31-32. Defendants again ignore statutory context.

Construing the term "organization" to include an internal committee of a church-associated hospital eviscerates a clear distinction Congress made in the statute between two types of church-associated organizations.  Church-associated, principal-purpose organizations may maintain church plans, 29 U.S.C. § 1002(33)(C)(i); other church-associated organizations may *not* maintain church plans, though their employees may participate in a church plan, *id.* § 1002(33)(C)(ii)(II), (iii); *see also* Pl. Br. 26-28, 50-51.  Defendants offer no response.

Defendants note the inclusion of the words "or otherwise" after the words "civil law corporation," 29 U.S.C. § 1002(33)(C)(i), but that means a principal-purpose entity need not be a corporation. It does not eliminate the requirement that a principal-purpose entity be an "organization," Pl. Br. 49-50, a term that must be construed consistent with statutory context.

Defendants argue it is "normal to treat" employers and internal benefit committees as "distinct entities under ERISA" where such committees serve as administrators or other fiduciaries. Def. Br. 33. But ERISA provides that administrators and fiduciaries may be "person[s]," 29 U.S.C. § 1002(16)(A)(i), 21(A), which is broadly defined, *id.* § 1002(9). The statute must be construed to give meaning to Congress's decision to use "organization" in subparagraph 33(C)(i) rather than "person." *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014).

Plaintiffs do not argue that ERISA "require[s] strict separation between plan fiduciaries … and plan settlors." Def. Br. 16. For example, if OSF, as plan sponsor, fails to designate a plan administrator, OSF would be the administrator by default. 29 U.S.C. §

1002(16)(A)(iii).  The problem for Defendants is that OSF indisputably

cannot *maintain* its own church plan, and subparagraph 33(C)(i) cannot

be construed to permit OSF to create an internal committee to do what

OSF itself cannot do.  *See* Pl. Br. 26-28.

Finally, in response to the fact that *Medina* assumed its

conclusion, *see* Pl. Br. 51-52, Defendants argue that the "Tenth Circuit

simply recognized that Plaintiffs' argument would lead to the

improbable result that a settlor could offer a church plan only by

creating 'a separate, self-funded, wholly independent Pension Corp. to

administer [the] plan.'" Def. Br. 35 (quoting *Medina*, 877 F.3d at 1226-

27).  But because the "settlor" *is* the entity that maintains a plan, *see*

*supra* pp 8-9, a principal-purpose organization "maintaining" a plan

would be the settlor and could unquestionably administer the plan.

Defendants' "improbable result" requires first mistakenly conflating

administration and maintenance, and then assuming Congress

intended to permit an entity other than a church or principal-purpose

organization to be the "settlor" of a church plan.  Nothing in the

statutory text or legislative history suggests any such intent.  *See, e.g.*,

Pl. Br. 6-10, 26-28.

### D. Informal Governmental Opinions Are Neither Controlling nor Persuasive.

Defendants invoke *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). But, critically, they do not deny that the informal opinion letters on which they rely are devoid of reasoning and lack any "power to persuade." *Compare* Pl. Br. 52-55 (quoting *Skidmore*, 323 U.S. at 140), *with* Def. Br. 36.

Defendants instead cite *Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978), for the premise that where there exist "substantial reliance interests," a "longstanding administrative construction of [a] statute should 'not be disturbed except for cogent reasons.'" Def. Br. 36-37 (quoting 437 U.S. at 457-58). But cogent reasons are present here— the retirement security of tens-of-thousands of Plan participants is threatened by Defendants' substantial underfunding of the Plans. Moreover, *Zenith* addressed reliance interests grounded in an agency position incorporated into an international trade agreement followed by "every major trading nation in the world." *Zenith*, 437 U.S. at 457-58. Here, the agency position has not been codified in any treaty or statute and was announced through informal letters that are expressly not

precedential, Pl. Br. 52-53, and were never intended to be relied upon as a defense to claims by plan participants to enforce ERISA, Pl. Br. 54.

### E. Defendants Misconstrue the Legislative History.

Congress added subparagraph 33(C)(i) to "clarif[y]" the church plan definition "to include plans maintained by a pension board maintained by a church." Pl. Br. 6-10 (quoting 126 Cong. Rec. 23,049 (1980) (ADD20)), 26-28. Defendants argue their position may prevail "even if" denominational pension boards were "front-and-center in legislators' minds," Def. Br. 38, because Congress may "'pass[] statutes that sweep more broadly than the main problem they were designed to address.'" *Gonzales v. Oregon*, 546 U.S. 243, 288 (2006)). But "it is ultimately the provisions of our laws … by which we are governed." *Id.* at 288 (citation omitted). The provisions Congress enacted unambiguously treat hospitals differently than principal-purpose organizations. Pl. Br. 26-28. And the legislative history underscores how Congress never envisioned stand-alone church plans sponsored by hospitals and instead discussed the importance of allowing employees of church agencies to be included *within the same* plans as church employees. *See* Pl. Br. 28 n.12.

Recent "pension board" documents—from outside the record—do not shed light on the intent of Congress in 1980. *Contra* Def. Br. 38-39. Moreover, whether some pension boards administer plans without funding them, Def. Br. 38, is irrelevant, as an organization qualifies as a principal-purpose organization if it *either* administers *or* funds plans, while a plan qualifies as a church plan only if it is "maintained" by the principal-purpose organization. *See supra* pp 9-10. Funding or arranging to fund benefits is only *one* factor considered by courts in evaluating which entity has "primary" responsibility and liability. Pl. Br. 31-32.

Whether the ELCA Church Council or the General Conference of the United Methodist Church possess the right to amend or terminate certain plans, Def. Br. 38-39, is also irrelevant. If churches, including "convention[s] or association[s] of churches," 29 U.S.C. § 1002(33)(A), retain the settlor authority inherent in the maintenance of their plans, the churches would "maintain" the church plans, consistent with subparagraph 33(A), and the pension boards would merely be plan administrators.

Finally, Defendants misplace reliance on an early floor statement from Senator Talmadge that a plan "funded or administered through a pension board … will be considered a church plan," Def. Br. 39 (citing 125 Cong. Rec. 10,053 (1979) (ADD14)). Talmadge subsequently clarified that subparagraph 33(C)(i) addressed plans "maintained" by pension boards. *See, e.g.*, 126 Cong. Rec. 20,245 (1980) (Sen. Talmadge) ("[M]any church plans are maintained by separately incorporated organizations called pension boards"); *see also* ADD20; ADD29.

## II. The District Court Abused Its Discretion by Denying Plaintiffs' Rule 56(d) Request.

Defendants filed their Rule 56 motion more than eight months before the close of fact discovery. At that time, plaintiffs had sought, but were still awaiting, additional discovery on material factual issues, including whether the Committees actually administer—much less maintain—the Plans. Pl. Br. 55-56. The district court abused its discretion in denying Plaintiffs' Rule 56(d) request. Pl. Br. 56-57.

Defendants repeat the district court's assertion that "Plaintiffs had ample time and opportunity to conduct discovery," Def. Br. 42 (quoting SA6-7), without addressing the delays caused by disputes regarding venue, consolidation, and the Supreme Court's grant of

certiorari in *Advocate*. *Compare* Pl. Br. 56-57, *with* Def. Br. 42 n.8.

Their contention that the district court had "all the evidence it needed,"

Def. Br. 42 n.8, is inconsistent with the district court's acknowledgment

that at least some outstanding discovery was "pertinent" to Defendants'

motion. SA6-7. Notably, the Government's brief underscores the

importance of the district court's error, as it faults Plaintiffs for not

submitting evidence that Plaintiffs had sought but not yet received.

*Compare* Gov. Br. 28, 31, *with* A438, A484-85.

## III. Application of the Exemption Is Unconstitutional.

Exempting religious, but not secular, hospital systems from

ERISA absent any need to alleviate a significant religious burden or

avoid entanglement in religion would have the improper purpose and

effect of advancing or endorsing religion. Pl. Br. 59-73.

### A. Application of the Exemption Does Not Comport with the Stated Congressional Purpose.

Defendants and the Government attempt to demonstrate a secular

purpose by relying on Congressional floor statements. But Plaintiffs

assert an *as-applied* claim. Congress was silent with respect to any

purpose served by Defendants' construction of the statute because

Congress never intended to apply the exemption to stand-alone plans sponsored by hospital systems. *See, e.g.*, Pl. Br. 7-10, 28 n.12.

Nevertheless, application of the exemption to large hospital systems does not serve Congress's stated purposes. *See* Pl. Br. 66-69 (citing cases). The co-sponsors of the 1980 amendments addressed "entanglement with religion," Def. Br. 45-46; Gov. Br. 18-19, but these statements expressed an intent for the amendments to further Congress' original purpose, *see* Pl. Br. 67 n.22, which was to avoid governmental evaluations of "books and records" regarding "churches and their religious activities." S. Rep. No. 93-383, *reprinted in* 1974 U.S.C.C.A.N. 4889, 4965 (1973). OSF is not a church and no church established, maintained, administers, or participates in the Plans. Pl. Br. 66-67.

Moreover, it is undisputed that OSF and other religious hospital systems already disclose their financial records and relationships in detail. *See* Pl. Br. 67-69. The Government speculates that Congress may have wanted to ensure that "ERISA *itself*" does not cause "entanglement," Gov. Br. 31, but as the Government elsewhere concedes, ERISA requires only "financial disclosures *concerning …*

*pension plan[s]*," Gov. Br. 3 (citing 29 U.S.C. §§ 1021-23) (emphasis added).  ERISA does not require disclosures of the "internal affairs" or "religious activities" of a plan sponsor.  *Contra* Gov. Br. 21.

Senator Talmadge also addressed "possible foreclosure of church property to satisfy plan liabilities."  Def. Br. 46 (citing 125 Cong. Rec. 10,052); Gov. Br. 26.  But neither Defendants nor the Government argue that applying ERISA to plans sponsored by multi-billion-dollar *hospital systems* would result in the foreclosure of *church* property.

Congressional concerns regarding denominational discrimination, Gov. Br. 20-21, 32, merely addressed the accommodation of congregational denominations that, unlike hierarchical denominations, used *separate* pension boards to maintain denominational plans.  *See* Pl. Br. 6-10.  Defendants invert this concern by suggesting that "*not requiring*" plans to be maintained by pension boards would avoid *favoring* congregational denominations.  Def. Br. 46 (emphasis added).  But subparagraph 33(C)(i) is an alternative; hierarchical denominations were already covered by subparagraph 33(A), which allowed churches to maintain plans.  Although Congress additionally accommodated all denominations by permitting *employees* of church agencies to be

included in *either* type of plan, 29 U.S.C. § 1002(33)(C)(ii)(II), (iii),

Congress was not concerned about stand-alone plans sponsored by

hospital systems of any denomination.[3]

Finally, this Court's evaluation of Congressional purposes

underlying a distinct statute—the tax exemption for parsonage housing

allowances, *Gaylor v. Mnuchin*, 919 F.3d 420 (7th Cir. 2019)—does not

save the church plan exemption.  Although *Gaylor* cited *Medina* for the

unremarkable premise that "[s]eeking to avoid government

entanglement is a secular legislative purpose," 919 F.3d at 432 (citing

*Medina*, 877 F.3d at 1231), *Gaylor* did not evaluate, much less approve

of, the Tenth Circuit's analysis of the church plan exemption.

## B. Application of the Exemption has the Primary Effect of Endorsing Religion.

The "government itself has advanced religion through its own

activities and influence," *Corp. of Presiding Bishop of Church of Jesus

Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 337 (1987), if it

---

[3] Congressional statements regarding "lines of authority" within congregational denominations concerned plans that already included agency *employees* in the same plan with church employees; if such plans were subjected to ERISA, denominations might have difficulty ensuring that all participating agencies complied with ERISA.  125 Cong. Rec. 10,052 (ADD13).

endorses or favors religious adherents over non-adherents.  Pl. Br. 58-59, 69-79 (citing cases).  The Government offers hyperbolic assertions that Plaintiffs' arguments "call into question" religious accommodations in Title VII, the ADA, and the Social Security Act.  But Plaintiffs do not dispute that the government may provide religious accommodations. *See* Pl. Br. 59-61.  Plaintiffs' actual position is that exempting religious, but not secular, entities from generally applicable statutes *absent* a need to eliminate government entanglement or alleviate significant religious burden inevitably conveys a message of governmental endorsement of religion.  Pl. Br. 62-63.

That there is "'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels," *Walz v. Tax Comm'n*, 397 U.S. 664, 668-69 (1970)), simply means the government may alleviate substantial or significant religious burdens even if an accommodation is not required by the Free Exercise Clause.  *Accord* Gov. Br. 13.[4]  But the Supreme Court has repeatedly cautioned that,

---

[4] *Amos* does not, as the Government suggests (Gov. Br. 23), associate mandatory exemptions with the word "substantial" and permissive accommodations with the word "significant."  Indeed, Congress itself used the term "substantial" in defining the limits of the *permissive* accommodations provided by RFRA and RLUIPA. Pl. Br. 61 n.19.

"[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005) (quoting *Amos*, 483 U.S. at 334-35). That is precisely what happens where, as here, the government *unnecessarily* exempts religious, but not secular, organizations from a generally applicable statute. Pl. Br. 62-63 (citing, e.g., *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989); *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 616-17 (7th Cir. 2007)). The Government concedes this principle. Gov. Br. 16 (citing *Texas Monthly*).

### 1. *Walz* and *Gaylor* Are Inapposite.

The Government and Defendants confuse matters by citing inapposite cases addressing the *inclusion* of religious entities within *generally applicable* exemptions. For example, *Walz* upheld the constitutionality of a property tax exemption that was available to *religious and secular* entities alike. 397 U.S. at 672-73 (churches included within "broad class of property owned by nonprofit, quasi-public corporations"). *Walz* held that application of this generally available exemption to religious groups cannot be viewed as sponsorship of religion. *Id.* at 675-76 ("No one has ever suggested that

tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.'"). Likewise, *Gaylor* held that the tax exemption for parsonage housing allowances was part of a broad, generally applicable policy of providing tax exemptions to employees with work-related housing requirements, 919 F.3d at 427-30, and applied *Walz* in concluding that it did not constitute government sponsorship of religion. *Id.* at 434.

A generally available tax exemption merely "*allows* churches to advance religion," *Amos*, 483 U.S. at 337 (discussing *Walz*), just as it allows secular institutions to advance their preferred causes. But the same cannot be said of an exemption offered exclusively to religious, but not secular, organizations. *See, e.g., Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 794 (1973) (distinguishing *Walz* in addressing a tax exemption available only to parents of children in sectarian schools).[5] Where, as here, an exemption does *not* alleviate a significant religious burden or eliminate government entanglement in religion, the government's offering of the exemption to religious, but not

---

[5] The church plan exemption is the *sole* general exemption for plans sponsored by private employers. Pl. Br. 5 & n.3.

secular, entities "cannot but 'conve[y] a message of endorsement'" of religion. *Texas Monthly*, 489 U.S. at 15 (citation omitted); *see also* Pl. Br. 62-63, 69-70.[6]

Whether this endorsement of religion also constitutes "financial support" for religion, Gov. Br. 34, Def. Br. 47-48, is irrelevant. In applying *Lemon's* effect test, this Court considers, in addition to financial support, whether the government practice has the "effect of communicating a message of government endorsement of religion." Pl. Br. 59 (quoting *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012)); *accord Gaylor*, 919 F.3d at 427 n.6 (noting continued applicability of endorsement test). Although no analogous endorsement concern arises from treating a religious entity the *same* as secular entities—thus putting the emphasis on financial support—an unnecessary exemption exclusively for religious entities violates the endorsement test regardless of whether it *also* constitutes financial support.

---

[6] That *Texas Monthly* did not overrule *Amos* and *Walz*, *see Gaylor*, 919 F.3d at 433, is of no consequence, as these cases addressed inapposite situations: *Walz* addressed the inclusion of religious entities within a generally applicable exemption, while *Amos* addressed an accommodation that eliminated government entanglement in religion.

## 2. Application of the Exemption Does Not Alleviate Any Burden or Entanglement.

ERISA is indistinguishable from a variety of neutral laws that courts have held do not burden religious exercise when applied to commercial activities. Pl. Br. 64-65 (citing cases). These cases did not merely address whether accommodations were "required" by the Free Exercise Clause. *Contra* Gov. Br. 23. They also explained, in evaluating the Establishment Clause, that recordkeeping and inspection provisions "apply[ing] only to commercial activities undertaken with a 'business purpose,' ... have *no impact on ... evangelical activities.*" *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305 (1985) (citation omitted) (emphasis added). *See also Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 394-96 (1990).

Defendants argue the exemption "relieves" a "burden on their exercise of religion" because it "allows" them to "further their own religious healing mission by giving them greater control over ... their assets." Def. Br. 47. But the Supreme Court has rejected such arguments: although "a generally applicable tax ... decreases the amount of money appellant has to spend on its religious activities, any

such burden is not constitutionally significant." *Jimmy Swaggart*, 493 U.S. at 390-91.

Unlike the exemption in *Amos*—which allowed religious institutions to hire or fire employees who shared or disagreed with the institutions' religious beliefs, Pl. Br. 61—Defendants and the Government do not explain how regulation of employee pensions has anything to do with the ability of OSF or similar organizations to "define and carry out their religious missions." *Amos*, 483 U.S. at 335. Nor does ERISA interfere with "matters of church government" or church rules for "internal discipline." Gov. Br. 42 (citations omitted).[7]

*Amos* did not hold that religious accommodation is justified whenever *any* law imposes "substantial liability" for non-compliance. *Contra* Gov. Br. 24, 42. Instead, *Amos* recognized that where an

---

[7] *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), is inapposite, as it addressed governmental interference in a *church's decisions to hire and fire ministers*, *id.* at 190-91. Similarly, *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979), is inapposite because the pertinent constitutional concerns were unique to religious schools (because of their instrumental role in religious instruction) and the nature of NLRB inquiries into the terms and "condition[s] of employment" (which cover "'nearly everything that goes on in the schools'"), *id.* at 502-04 (citation omitted). *See also Cohen v. City of Des Plaines*, 8 F.3d 484, 491 (7th Cir. 1993) (addressing unique role of religious education).

underlying law imposes a *significant religious burden*, restricting an

exemption therefrom to an organization's "religious" activities could

create an *additional* burden on the organization of having to predict

which of its activities a court may deem religious. 483 U.S. at 336.

This concern has no applicability here because ERISA does not impose

*any* significant religious burden on hospital systems.

Finally, ERISA does not prohibit using social factors in

investment decisions. *See* Pl. Br. 65-66. Although the *duty of loyalty*

(i.e., to act "solely in the interest of" plan participants) precludes

making social investment decisions "at the expense of the financial

interests" of participants, 80 Fed. Reg. 65,135 (Oct. 26, 2015),

Defendants concede the Plans already impose the duty of loyalty, Def.

Br. 34-35. *See also* Pl. Br. 65-66 (state law imposes same obligation).

OSF has offered no evidence that it cannot easily find ERISA-compliant

investment options consistent with its guidelines. *See* Pl. Br. 65. And

contrary to the Government's contention, Gov. Br. 29-30, *Amos*, *Walz*,

and *Gaylor* do not permit the government to "prophylactically exempt

religious entities," but not secular entities, from laws that do *not*

themselves impose religious burdens.

### 3. Application of the Exemption Unnecessarily Burdens Nonbeneficiaries.

Application of the church plan exemption also runs afoul of the Supreme Court's instruction that an accommodation "must be measured" to "not override other significant interests," including by not unnecessarily imposing burdens on third-parties. Pl. Br. 71-73 (quoting *Cutter*, 544 U.S. at 722). Neither the Government nor Defendants deny the exemption burdens OSF employees by depriving them of critical retirement protections, including minimum funding and PBGC insurance. *See* Pl. Br. 71-72.[8]

Whether the *Amos* exemption from Title VII burdens employees, Gov. Br. 36-37; Def. Br. 49, is of no consequence because, unlike here, that exemption actually served a valid purpose (eliminating entanglement), and the potential harm to employees (termination based on religion) was the necessary result of the accommodation. *See* Pl. Br.

---

[8] The exemption *also* burdens secular hospital systems that compete with religious hospitals. Pl. Br. 71-72. *Cohen* did not hold that an *unnecessary* competitive advantage for religious entities was permissible if limited to non-profit organizations. *Contra* Gov. Br. 35. Instead, *Cohen* restricted a *valid* accommodation to non-profit organizations to ensure the accommodation was tailored to the valid purpose. 8 F.3d at 493.

61.  Application of the church plan exemption does not serve a valid purpose; but even if, *arguendo*, ERISA burdened certain religious practices, such as social investment practices, the "accommodation" is not "measured" at all—it imposes burdens on employees, including the deprivation of PBGC insurance, that have nothing to do with any purported religious burden.

Finally, the Government's attempt to distinguish *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985), falls flat.  Application of the exemption does not merely "refrain from imposing government burdens" on OSF.  Gov. Br. 39.  It deprives employees of ERISA's myriad substantive protections for *employees*.  *See* Pl. Br. 3-5.  Thus, application of the exemption "arms" religious hospitals like OSF with an "absolute and unqualified right" not to fund or insure their employees' pensions and "unyielding[ly] weigh[s]" that right "over all other interests."  *Caldor*, 472 U.S. at 709.  Employees, in turn, "must adjust their affairs to the command of the State"—i.e., that they have

*no right* to a funded and insured pension—"whenever the statute is invoked" by a religious employer. *Id. Accord Cutter*, 544 U.S. at 722.[9]

## C. The Historical Test Does Not Save the Exemption.

The Government and Defendants argue that application of the exemption survives the Establishment Clause under the Supreme Court's historical approach. As a preliminary matter, to interpret this approach as permitting *all* practices *unless* they were historically viewed as the establishment of religion, Gov. Br. 44, would flip this approach on its head. By that standard, countless new legislative enactments in contexts unimaginable to the framers could avoid constitutional *scrutiny*, even if they unnecessarily favored religious adherents over non-adherents or discriminated between denominations. That is not what the Supreme Court has held. Instead, courts "must acknowledge a practice that was *accepted* by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014) (emphasis added).

---

[9] The Government appears to misunderstand the distinction drawn in *United States v. Lee* between a permissible exemption from the social security system for *self-employed individuals* and an impermissible exemption for *employers*, which "impose[s] the employer's religious faith on the employees." 455 U.S. 252, 260-61 (1982).

The church plan exemption was not enacted until 1974. Pl. Br. 6. Subparagraph 33(c)(i) was not added until 1980, Pl. Br. 9, and was not misinterpreted to apply to entities like OSF until two years later. Pl. Br. 10-11. Application of the church plan exemption in any context, much less to multi-billion-dollar hospital systems, has not "withstood the critical scrutiny of time and political change" in any way analogous to the practices to which the Supreme Court has applied the historical approach.

The parsonage tax exemption considered in *Gaylor*, was consistent with a long history of tax exemptions for churches, 919 F.3d at 436. The ministerial exemption addressed in *Hosanna-Tabor* was consistent with our founding principles of ensuring that the government "have no role in filling ecclesiastical offices," 565 U.S. at 184. There is no analogous principle recognizing that religious hospital systems operating like large businesses should be exempted from pension regulations.[10]

---

[10] Prior to ERISA, federal regulation of pensions consisted of tax qualification requirements that applied to plans of *all* entities. *See, e.g.*, Revenue Act of 1942, Pub. L. No. 77-753, § 162(a), 56 Stat. 798, 862 (1942).

# CONCLUSION

The Court should reverse the district court's grant of summary judgment regarding the church-plan status of the Plans and vacate the district court's ruling on the Establishment Clause. *See* Pl. Br. 57-59. Otherwise, the Court should reverse as to the Establishment Clause claim.

RESPECTFULLY SUBMITTED this 26th day of April 2019.

KELLER ROHRBACK L.L.P.

By: *s/ Matthew M. Gerend*
Matthew Gerend (*Lead Attorney*)
Lynn L. Sarko
Laura R. Gerber
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

KELLER ROHRBACK L.L.P.
Ron Kilgard
3101 N. Central Ave., Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088

KESSLER TOPAZ MELTZER & CHECK, LLP
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706

COHEN MILSTEIN SELLERS & TOLL PLLC
Karen L. Handorf
Michelle C. Yau
Mary Bortscheller
Scott M. Lempert
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel.: (202) 408-4600

IZARD, KINDALL & RAABE, LLP
Mark P. Kindall
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel.: (860) 493-6292

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I, Matthew M. Gerend, certify that:

1.    This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 6,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook font.

Dated this 26th day of April 2019.

By /s/ Matthew M. Gerend

Keller Rohrback L.L.P.
1201 Third Ave., Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that counsel for all the parties to this appeal are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ Matthew M. Gerend